UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | |
|---|---|
| In re | |
| OLDAPCO, INC., *et al.,* | Chapter 11 |
| Debtors. | Case No. 17-12082 (MFW) |
| | **(Jointly Administered)** |
| ALAN D. HALPERIN AND EUGENE I. DAVIS, AS CO-TRUSTEES OF THE APPVION LIQUIDATING TRUST, | Adv. Proc. No. 18-50955 (MFW) |
| Plaintiff, | |
| v. | |
| MARK R. RICHARDS, THOMAS J. FERREE, TAMI L. VAN STRATEN, JEFFREY J. FLETCHER, KERRY S. ARENT, STEPHEN P. CARTER, TERRY M. MURPHY, ANDREW F. REARDON, KATHI P. SEIFERT, MARK A. SUWYN, CARL J. LAURINO, DAVID A. ROBERTS, ARGENT TRUST COMPANY, STOUT RISIUS ROSS, INC., STOUT RISIUS ROSS, LLC, JOHN/JANE DOES 1-40, | |
| Defendants. | |

## REVISED SECOND AMENDED COMPLAINT

Alan D. Halperin and Eugene I. Davis, the Co-Liquidating Trustees (the "Co-Trustees") of the Appvion Liquidating Trust (the "Appvion Liquidating Trust") established in connection with the above-captioned chapter 11 cases, by and through their undersigned counsel, hereby alleged against the above-named, on personal knowledge as to all matters regarding themselves and on information and belief as to all other matters, as follows:

## INTRODUCTION

1.      This litigation involves the harmful and destructive manipulation of the Debtors' corporate enterprise by certain of the Debtors' directors and officers, and the advisers they engaged to oversee and administer the core functions of the Appvion, Inc. Savings and Employee Stock Ownership Plan (the "ESOP"), the former ultimate owner of the Debtors.

2.      The Officer/Employee Defendants and the Director Defendants were at the helm of a sinking ship. The Debtors' capital structure, with ESOP ownership, required substantial and unconditional financial support from Debtor Appvion, Inc. ("Appvion") to fund withdrawals by retiring and other ESOP participants. This systematic unconditional financial support required Appvion and the other Debtors to grow themselves out of their hole, which they proved unable to do. In fact, the Debtors' Carbonless business was in perpetual decline, the Thermal business faced challenging headwinds, and in 2015, the Debtors sold their Encapsys business in an attempt to extract value mainly to reduce the Debtors' indebtedness. The Encapsys sale only accelerated the decline of the Debtors, as the focus shifted to the Debtors' remaining businesses which did not offer a true path to long-term sustainability.

3.      Faced with a sustained headwind, and in some cases, in order to maximize the value of their own incentive compensation and the distributions they were owed under the ESOP, Officer/Employee Defendants, under the supervision of the Director Defendants, artificially and

materially inflated the value of the stock held by the ESOP. With an unjustifiably high valuation in place, some of the Officer/Employee Defendants and/or the Director Defendants were then able to retire from (or otherwise terminate their employment with) the Debtors, thus maximizing the value of the distributions that they were owed and lining their own pockets with the Debtors' money, to the detriment of the Debtors' estates and their creditors.

4.      This manipulation began after a years-long decline in the Debtors' core carbonless paper business. Like any other, the Debtors' business experienced highs and lows since their formation in 2001. Adverse trends in the Debtors' industry and broader economic factors caused the Debtors to shed approximately 50% of their workforce between 2001 and the Petition Date. These trends—combined with the liabilities imposed by the ESOP structure itself—also caused the Debtors, to assume an unsustainable degree of balance sheet leverage.

5.      These persistent industry headwinds ultimately created a significant shortfall between revenue that the Debtors generated, and the money needed by their capital structure and the ongoing financial demands imposed by ESOP ownership. During this decline, the Debtors repeatedly missed their financial projections. When it appeared that the Debtors would miss their financial projections, nearly every year Management identified certain "gap" projects to try to artificially make up the shortfall. In more recent years, although the Debtors virtually never even came close to achieving their financial projections, management willfully ignored the Debtors' financial reality, and continued to project fantastical financial performance that was divorced from reality.

6.      The manner in which management produced wildly optimistic financial projections was due not to an unwavering faith in the strength of Debtors' business, but rather to a masked desire to serve their own interests. This is because the financial projections that

management prepared played a fundamental and direct role in the determining the fair market value of Debtor Paperweight Development Corporation ("PDC") common equity, which in turn drove their compensation.

7.    The financial projections prepared by Debtors' management ("Management"), which included some of the Officer/Employee Defendants, were critical to the ESOP trustee's determination, with the assistance of an outside appraisal firm, of the fair market value of PDC common equity. Each determination of the fair market value of PDC's common equity had a direct effect on management's incentive equity compensation, because the value of such compensation was directly dependent on the value of the PDC common equity, as calculated by the ESOP trustee. This relationship between the purportedly independent valuations and Management's compensation caused a material conflict of interest with regard to Management's role in preparing the financial projections that formed the basis of each such valuation.

8.    In light of the fact that the Debtors repeatedly failed to meet financial projections, and in light of the obvious deterioration of Debtors' business, members of the boards of directors of Appvion and PDC were either aware of and complicit in the malfeasance of senior management, or did not satisfy their fiduciary obligation to reasonably inform themselves of the financial condition and prospects of the Debtors. Even the most cursory comparison of the Debtors' financial results with the Debtors' lofty financial projections should have caused great concern amongst the directors. However, like senior management, these directors were materially incentivized to ignore the obvious warning signs, because the value of their incentive compensation was also directly tied to the equity value of PDC's common stock.

9.    The directors' failure to discharge their fiduciary obligations is also explained by a board selection process that rewarded cronyism. The Debtors' corporate governance structure

granted PDC's Chief Executive Officer (who also happened to serve simultaneously as Appvion's Chief Executive Officer) virtually unilateral control over the appointment and removal of directors. This structure led to divided loyalty and conflicts of interest, where allegiance to the Chief Executive Officer came before allegiance to the shareholders, or to the corporate enterprise in the context of insolvency.

10.     During the years relevant to this complaint, the trustee of the ESOP was Argent Trust Company, which engaged Stout Risius Ross, Inc. (for valuations until December 31, 2016) and Stout Risius Ross, LLC (for the valuation as of June 30, 2017, collectively, "Stout") to serve as the independent appraiser to value PDC's common stock. Stout, and Argent by extension, sat side by side with Management to discuss and review the financial projections and results of operations on which Stout's FMV Determinations analyses depended. Figure 1 below reflects how Management, under the guidance of their boards of directors, utterly failed to project future earnings before interest, tax, depreciation and amortization ("EBITDA"), dramatically underestimating the Debtors' operating performance.

**Figure 1: Appvion Repeatedly Failed to Meet Its Projections**



*Source*: Dec. 2012 FMV, at 29, 31, 36-37; Dec. 2013 FMV, at 34, 36, 41-42; Dec. 2014 FMV, at 40, 42, 47-48; Dec. 2015 FMV, at 39, 41, 46-47; Dec. 2016 FMV, at 23-24, 30, 32.

11.     Whether they were purposefully inflated to obfuscate the Debtors' true business prospects, or the D&O Defendants breached their fiduciary duties by failing to detect and correct the manifest implausibility they exhibited, the EBITDA projections played a crucial role in Stout's FMV Determinations.

12.     Given that Management missed its own EBITDA forecasts with regular

frequency, it is astonishing that Argent and Stout continued to use and rely on Management's internal EBITDA projections as the basis for certain elements of Stout's FMV Determinations. Yet, despite the Debtors' long history failing to meet projections, in certain cases, Argent and Stout relied on Management's implausibly optimistic and demonstrably unreliable projections to increase the fair market value of PDC common stock. For example, in its December 2015 FMV, Stout refused to apply disappointing actual EBITDA results for the Thermal Business in the Guideline Company Method (resulting in an increase of the equity value), while at the same time, using the Debtors' delusional EBITDA projections for the Thermal Business in Stout's Discounted Cash Flow Method. In doing so, Argent and Stout consciously adopted Management's reasoning that certain Actual EBITDA results were "below historical and long term projected levels and do not represent the Company's performance on an ongoing basis."

13.     In addition to knowingly accepting management's unrealistic projections, Argent and Stout also routinely met with and sought guidance from senior management in conducting specific valuation techniques to determine the fair market value of the PDC common stock. For example, Management gave significant input concerning the selection of comparable companies for the Guideline Companies Method, used for FMV Determinations. Also, Management, Argent and Stout routinely reviewed and discussed the Debtors' financial performance, EBITDA results and forecasts, cash follow and volume projections, both by individual business line and as a whole, five-year strategic business plans, target gap strategic initiatives, earnings, results of operations.

14.     When the Debtors long history of failing to achieve EBITDA projections is combined with the fact that the Debtors' incentive-laden compensation program is tied to Stout's FMV Determinations, it is no coincidence that Management and the Debtors' directors had

financial incentive and means to take advantage of that opportunity, all to the detriment of the Debtors and their creditors. The Debtors' directors and officers failed to observe basic tenets of good corporate governance where Appvion was wholly-owned by PDC and where each was insolvent during the time period at question here.

15.     Most offensive is that Stout opined that the Debtors were solvent by a significant margin at a time when the Debtors were balance sheet insolvent and cash flow insolvent, both of which were reflected in real time by the trading prices of the Debtors' Term Loans and Second Lien Notes. Stout disregarded these important data points, instead relying on its own valuation and the fact that holders of Term Loans had refused to compromise the principal amount of their loans below par. It is as if Stout did not know, or comprehend, that the Second Lien Notes had traded at a significant discount to par for some time. This is striking when one considers that Stout claims to have reviewed PDC's Form 10-K which specifically state that the Second Lien Notes had traded at a significant discount to par.

16.     As a result of the inflated FMV Determinations, since June 30, 2013 the Debtors paid out a net amount of $35.5 million to the ESOP. This outflow had a ripple effect on the Debtors' business, playing a role in the Debtors' decision to sell its Encapsys business, causing increasing demands on cash flow, constraining liquidity, and constraining money for capital expenditures. In essence, it was a Ponzi scheme saddling the Debtors with an unsustainable capital structure. As a result of the Debtors' doomed capital structure and inflated FMV Determinations (and the financial obligations satisfied by the Debtors as a result), the holders of the Second Lien Notes and General Unsecured Claims (as defined in the Plan of Liquidation) each suffered massive losses. For example, the market value of Second Lien Notes as of the Effective Date was $1.075 per $100 of principal amount, reflecting the market's belief that the

Second Lien Notes would experience an aggregate loss of $247.3 million or 99% of their principal value, plus a loss of $7.5 million of unpaid interest that accrued on the Second Lien Notes before the Petition Date. Under the Plan of Liquidation, the Second Lien Notes received warrants and interests in the Appvion Liquidating Trust. The losses of General Unsecured Creditors were similarly massive, receiving little more than the interests in the Appvion Liquidating Trust, and resulting in losses in the hundreds of millions of dollars.

17.     This action also seeks redress for breaches of the duties of care and loyalty by the Officer/Employee Defendants and the Director Defendants in connection with the parent / subsidiary relationship of PDC and Appvion. The Officer/Employee Defendants and the Director Defendants failed to recognize that their duties shifted in respect to intercompany transactions when Appvion became insolvent. Many of the Officer/Employee Defendants and the Director Defendants wore dual hats during the time of such insolvency.

18.     A blatant example is the failure of Appvion's directors in connection with Appvion's forgiveness of a $30 million intercompany note to PDC in November 2013 for no consideration. Appvion's forgiveness of the note was a breach of fiduciary duty and occurred when there was no differentiation between decisions made by the parent, PDC with respect to its wholly owned subsidiary, Appvion. Moreover, in substance and effect, this loan forgiveness was an unlawful corporate dividend in violation of Delaware state law. This decision was made at a time when the boards of PDC and Appvion were identical.

19.     Even after the November 2013 loan forgiveness occurred, the Officer/Employee Defendants and the Director Defendants made the decision to extend unsecured intercompany loans totaling $30 million from Appvion to PDC while PDC never had a reasonable prospect for repayment. The Debtors were careening into the financial abyss, and the Appvion, Inc. Board of

Directors (the "Appvion Board") again ignored its duties to Appvion in order to continue to support PDC's unsustainable payments to the ESOP. Again, this amounted, in substance, to an unlawful corporate dividend in violation of Delaware state law.

20.    Ultimately, the self-dealing and free-wheeling approach to management and oversight of the Debtors resulted in an unsustainable capital structure, laden with debt and leverage in a failing business. This action seeks to hold those former directors and officers of the Debtors accountable, as well as those who aided in the commission of unlawful and improper acts.

## **PARTIES**

21.    Plaintiff Alan D. Halperin is a Co-Trustee of the Appvion Liquidating Trust and is a resident of New York, New York.

22.    Plaintiff Eugene I. Davis is a Co-Trustee of the Appvion Liquidating Trust and is a resident of New Jersey.

23.    The Co-Trustees were appointed to serve pursuant to the Plan of Liquidation[1] in the above-captioned cases and are authorized under the Liquidating Trust Agreement, to prosecute and resolve claims against Defendants on behalf of the Appvion Liquidating Trust. Pursuant to the Plan, Litigation Claims (as defined in the Plan of Liquidation), include causes of action against, among others, certain former Directors and Officers of the Debtors (collectively, the "D&Os," but excluding Released D&Os, as defined in the Plan of Liquidation), and any persons related to claims and Causes of Action related to or arising out of ESOP that are not Direct ESOP Claims (as defined in the Plan). Plan Art. VIII.G.1, *see also* Plan Art. IX.C.

---

[1]    *See* Findings of Fact, Conclusions of Law, and Order Confirming Second Amended Joint Combined Disclosure Statement and Chapter 11 Plans of Liquidation, dated August 14, 2018, at Exhibit 1 (D.I. 970) (the "Plan of Liquidation").

24.     Mark R. Richards was the (i) chairman of the PDC Board of Directors ("PDC Board"), (ii) chairman of the Appvion Board, (iii) President of PDC and Appvion, (iv) Chief Executive Officer of PDC and Appvion, serving as President and Chief Executive Officer of each of Appvion and PDC from at least June 2005 until his retirement on August 4, 2015. Mr. Richards served as chairman of the PDC Board and chairman of the Appvion Board from June 2005 until December 31, 2015. Richards was a member of the ESOP Committee from approximately April 2005 through December 2015. Mr. Richards currently resides in Fort Lauderdale, Florida.

25.     Thomas J. Ferree was the Senior Vice President Finance and Chief Financial Officer of Appvion since February 2010 and Senior Vice President Finance of PDC since January 2011. Mr. Ferree was the Vice President Finance and Chief Financial Officer of Appvion from October 2006 through January 2010 and Treasurer of Appvion and Chief Financial Officer and Treasurer of PDC since November 2006. Mr. Ferree retired from such employment in June 2017. Until his departure in June 2017, Mr. Ferree also served as the ESOP Plan Administrator, which had responsibilities for establishing the schedule for making distributions to retired ESOP participants in connection with PDC common stock. As highlighted herein, Mr. Ferree was a member of the ESOP Committee. Mr. Ferree resides in Solon, Iowa.

26.     Tami L. Van Straten is a former Vice President, General Counsel, Secretary of PDC and Appvion since January 2012. Ms. Van Straten previously served as General Counsel and Secretary for Appvion and PDC from March 2010 to 2012 and as Assistant General Counsel and Assistant Secretary for Appleton and PDC from August 2006 through March 2010. Ms. Van Straten joined Appvion in 2001 and served in a number of legal counsel roles from 2001 to August 2006. As highlighted herein, Ms. Van Straten was a member of the ESOP Committee.

Ms. Van Straten resides in Appleton, Wisconsin.

27.     Jeffrey J. Fletcher was Vice President and Controller of Appvion since December 2010, and Assistant Treasurer of Appvion since January 2010; prior to December, 2010 Mr. Fletcher was Vice President Financial Operations from March 2010, and prior to March 2010, Mr. Fletcher was Principal Accounting Officer and Controller of Appvion since March 2007. Mr. Fletcher has been Vice President of PDC since January 2011, and Assistant Treasurer and Controller of PDC since March 2007. He retired from such employment in July 2017. Mr. Fletcher resides in Cumming, Iowa.

28.     Kerry S. Arent is a former Vice President - Human Resources of Appvion. Ms. Arent was Senior Vice President Human Resources of Appvion (or its predecessor) since January 2013 and joined Appvion in 1982. Ms. Arent retired from such employment on December 31, 2015. As highlighted herein, Mr. Arent was a member of the ESOP Committee. Ms. Arent resides in Appleton, Wisconsin.

29.     Stephen P. Carter is a former member of the PDC Board and the Appvion Board, serving in this positions from July 2004 until his retirement effective December 31, 2016. Mr. Carter was jointly appointed to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Carter was a member of the PDC Board's Audit Committee (the "Audit Committee") from 2014 through 2016 and served as the Chairman of that committee in 2016. Mr. Carter was responsible for providing assistance to the PDC Board in relation to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. Mr. Carter resides in Rockford, Illinois.

30.     Terry M. Murphy is a former member of the PDC Board and the Appvion Board, serving in this positions from June 2007. Effective January 1, 2016, Mr. Murphy became

chairman and director of the PDC Board and the Appvion Board. Mr. Murphy was nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC. Mr. Murphy is presently a consultant for the Appvion Holding Corp. Mr. Murphy a member of the Audit Committee from 2012 through 2017 and served as the Chairman of that committee in 2012 through 2015. Mr. Murphy was responsible for providing assistance to the PDC Board in relation to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. Mr. Murphy resides in Naples, Florida.

31.     Andrew F. Reardon is a former member of the PDC Board and the Appvion Board, serving in this positions from June 2007 until December 31, 2015. Mr. Reardon was nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC. From 2012 through 2013, Mr. Reardon served as a member of the PDC Board's Compensation Committee (the "Compensation Committee"). Mr. Reardon resides in Marco Island, Florida.

32.     Kathi P. Seifert was a member of the PDC Board and the Appvion Board, serving in this positions from July 2004. Ms. Seifert was nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC. Ms. Seifert no longer serves as a member of the PDC Board and the Appvion Board. From 2012 through 2013, Ms. Siefert served as a member of the Compensation Committee. Ms. Seifert resides in Appleton, Wisconsin.

33.     Mark A. Suwyn is a former member of the PDC Board and the Appvion Board, serving in this positions from July 2011. Mr. Suwyn was jointly nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Suwyn was a member of the Audit Committee from 2016 through 2017 and

served as the Chairman of that committee in 2017. Mr. Suwyn was responsible for providing assistance to the PDC Board in relation to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. From 2012 through 2013, Mr. Suwyn served as a member of the Compensation Committee. Mr. Suwyn resides in Bonita Springs, Florida.

34.     Carl J. Laurino was a member of the PDC Board and the Appvion Board, serving in this positions from January 1, 2017 until the Effective Date. Mr. Laurino was jointly nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Laurino was a member of the Audit Committee in 2017. Mr. Laurino was responsible for providing assistance to the PDC Board in relation to financial accounting and reporting practices and the quality and integrity of the PDC financial reports. Mr. Laurino resides in Union, Kentucky.

35.     David A. Roberts was a member of the PDC Board and the Appvion Board, serving in this positions from May 11, 2016 until the Effective Date. Mr. Roberts was jointly nominated to the PDC Board and the Appvion Board by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Roberts resides in Carmel, Indiana.

36.     Kevin Gilligan was the President and Chief Executive Officer of Appvion and PDC from August 2015 to the Effective Date. Mr. Gilligan was a member of the PDC Board and the Appvion Board, serving in this positions from January 2016 until the Effective Date. Mr. Gilligan previously served as President of the Paper Division since June 2014. Mr. Gilligan is presently a consultant for Appvion Holding Corp. As highlighted herein, Mr. Gilligan was a member of the ESOP Committee. Mr. Gilligan resides in Appleton, Wisconsin.

37.     John/Jane Doe 1-20 (the "Does") are former employees of the Debtors who were involved in the preparation of financial projections and/or interacted with Stout and/or Argent in

connection with any FMV Determination connected with any claim asserted herein.

38.    Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, Mr. Suwyn, Mr. Roberts, and Mr. Gilligan are collectively referred to herein as the "Director Defendants."[2]

39.    Mr. Richards, Mr. Ferree, Ms. Van Straten, Mr. Fletcher, Ms. Arent, Mr. Gilligan, and certain John/Jane Does are collectively referred to herein as the "Officer/Employee Defendants."[3]

40.    Argent Trust Company ("Argent"), is a corporation organized and existing under the laws of the State of Tennessee, with its principal place of business in Atlanta, Georgia. From January 1, 2014 through the Petition Date, Argent served as ESOP Trustee.

41.    Stout Risius Ross, Inc., is a corporation organized and existing under the laws of the State of Michigan, with its principal place of business in Farmington Hills, Michigan. From at least July 16, 2012, Stout Risius Ross, Inc. acted as a service provider to Reliance and Argent, as appropriate, as trustee of the ESOP.

42.    Stout Risius Ross, LLC, is a limited liability company organized and existing under the laws of the State of Michigan, with its principal place of business in Farmington Hills, Michigan. Stout Risius Ross, LLC acted as a service provider to Argent, as trustee of the ESOP.

## NON-PARTIES

43.    George William Wurtz III is a former member of the PDC Board and the Appvion Board from July 2011. Mr. Wurtz was jointly appointed to the PDC Board and the Appvion Board  by the then Chief Executive Officer of Appvion and PDC, and the ESOP Trustee, Argent. Mr. Wurtz is presently the Chief Executive Officer of Appvion Holding Corp.

---

[2]  Even though Mr. Gilligan is no longer a defendant in this Revised Second Amended Complaint, he remains defined as a "Director Defendant" as referenced herein.

44.     The Principal Financial Group ("The Principal"), acted as a record-keeper to handle the accounting related to the ESOP.

45.     Reliance Trust Company ("Reliance") served as trustee from the ESOP until December 31, 2013.

46.     Maureen Cosgrove is or was formerly an employee of Argent.

47.     Marc Hansberger is or was formerly an employee of Argent.

48.     Stephen Martin is or was formerly an employee of Argent and was formerly an employee of Reliance Trust Company

49.     Howard Kaplan is or was formerly an employee of Argent and was formerly an employee of Reliance Trust Company.

50.     Mark Shorthouse is or was formerly an employee of Argent.

51.     David Williams is or was formerly an employee of Argent.

52.     Phil Buchanan is or was formerly an employee of Argent.

53.     From July 15, 2013 through July 14, 2017, Scott Levine was an employee of Stout and was involved in the preparation of the December 2013 FMV, June 2014 FMV, December 2014 FMV, June 2015 FMV, December 2015 FMV, June 2016 FMV, December 2016 FMV, and June 2017 FMV.

54.     Cara Davis is or was formerly an employee of Stout.

55.     Robert S. Socol is or was formerly an employee of Stout.

56.     Aziz El Tahch is or was formerly an employee of Stout.

57.     From July 10, 2014 through July 14, 2017, Isiah Aguilar was an employee of Stout and was involved in the preparation of the June 2014 FMV, December 2014 FMV, June

---

[3] Even though Mr. Gilligan is no longer a defendant in this Revised Second Amended

2015 FMV, December 2015 FMV, June 2016 FMV, December 2016 FMV, and June 2017 FMV.

## JURISDICTION AND VENUE

58.    The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334(b) and Article XV of the Plan of Liquidation. This adversary proceeding is a core proceeding under 28 U.S.C. § 157(b).

59.    Plaintiff consents to the entry of final orders or judgments by this Court if it is determined that this Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

60.    Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## ALLEGATIONS OF FACT APPLICABLE TO ALL CLAIMS

### I.    OVERVIEW OF THE DEBTORS' BUSINESS

#### A.    DESCRIPTION OF THE DEBTORS' OPERATIONS AND HISTORY

61.    Prior to their bankruptcy filing on October 1, 2017 (the "Petition Date"), Appvion and its subsidiaries and affiliates, namely Debtor PDC Capital Corporation, Debtor Appvion Receivables Funding I LLC and Debtor APVN Holdings LLC (collectively with PDC, the "Debtors"), formerly headquartered in Appleton, Wisconsin, were a leading manufacturer of specialty, high value added coated paper products with a long corporate history in the United States dating back to the early 1900s. Through a series of mergers and acquisitions over the course of the last century, the Appleton Coated Paper Company began to develop and produce carbonless paper, acquired pulp and paper mills, and eventually became Appvion on May 9, 2013.

62.    In addition to its headquarters in Appleton, Wisconsin, Appvion had

---

Complaint, he remains defined as a "Officer/Employee Defendants" as referenced herein.

manufacturing facilities in West Carrollton, Ohio, and Roaring Springs, Pennsylvania.

63.     Appvion's business was organized into two operating divisions: carbonless ("Carbonless" or the "Carbonless Business") and thermal ("Thermal" or the "Thermal Business"), referring to the type of paper produced by each division.

64.     The thermal paper segment developed and produced substrates for the transaction and item identification markets and accounted for approximately 60% of the Debtors' net sales in 2016. Between 2011 and 2016, the thermal market expanded at a 2% compound average growth rate, with annual rates ranging from increases of 1% to 3%.

65.     The carbonless paper segment included carbonless, security and other specialty paper products and accounted for approximately 40% of the Debtors' net sales in 2016. The market for carbonless paper products had been in decline since 1994 as a result of greater use of competing technologies, including digital laser, inkjet and thermal printers, and electronic communications. Between 2011 and 2016, the North American carbonless paper market declined by approximately 7-11% annually and, as of the Petition Date, the decline was expected to continue at this rate over the next several years. Worldwide, the market for carbonless paper had also declined approximately 3-6% per year.

66.     On November 9, 2001, the Debtors' employees purchased the predecessor to Appvion ( i.e., Appleton Papers Inc.) from its parent company, Arjo Wiggins, through the use of an employee stock ownership plan.

67.     In late 2001, over 90% of the Debtors' employees invested nearly $107 million in an employee stock ownership plan. On November 9, 2001, the ESOP's participants ("ESOP Participants") contributed $107 million that was used by the ESOP to purchase 10,684,372 shares of the common stock of PDC, representing 100% of the outstanding shares of PDC. PDC

simultaneously used all the proceeds from the sale of common stock, together with the proceeds of a senior credit facility, senior subordinated notes, a deferred payment obligation and available cash, to finance the purchase of the Debtors from Arjo Wiggins.

68.    Prior to the Petition Date, PDC owned 100% of the common stock of Appvion. Prior to the Petition Date, Appvion only had one class of common stock.

69.    As of November 9, 2001, the Debtors had approximately 2,500 employees. As of May 28, 2017, the Debtors had approximately 1,388 employees, representing a decrease of 45%.

70.    As of the Petition Date, the Debtors employed approximately 1,350 employees. As of the Petition Date, approximately 450 of the Debtors' employees were part-time or full-time, salaried employees and approximately 915 were full-time, hourly employees.

71.    In August 2015, Appvion completed the sale of assets primarily used in the development, manufacture and sale of microencapsulation materials by the former Encapsys segment of the Debtors (the "Encapsys Business") to Rise Acquisition LLC. In a written statement dated August 4, 2015, Richards is attributed as saying that "the success and growth potential of the Encapsys business earned an attractive purchase price. Appvion chose to extract the value of Encapsys now as a way to significantly reduce company debt and gain financial flexibility to invest in its technical papers and coatings business." http://www.appvion.com/en-us/Documents/Historical%20News/News_Release_Sale_Encapsys_Aug_4_2015.pdf    Richards additionally said "[w]ith an improved balance sheet, we will gain financial strength and flexibility to focus on our paper and coatings business and to pursue opportunities to expand our business and product portfolio." *Id.*

72.    Upon information and belief, the Encapsys sale was approved by Appvion Board without a vote by ESOP participants.

### B.   THE DEBTORS' ORGANIZATIONAL STRUCTURE

73.     PDC, a Wisconsin corporation, is the ultimate parent company of the Debtors and, prior to the Petition Date, was owned in its entirety by the ESOP. Prior to the Petition Date, PDC did not conduct any business apart from undertaking matters incidental to its ownership of the stock of its subsidiaries, matters relating to the ESOP, and actions required to be taken under ancillary acquisition agreements.

74.     PDC Capital, a Wisconsin corporation, is a wholly-owned subsidiary of PDC and a parent company to Arjo Wiggins. Prior to the Petition Date, PDC Capital did not conduct any business apart from undertaking matters incidental to its ownership of the stock of its subsidiary.

75.     Arjo Wiggins, a corporation incorporated in Bermuda, is a 20% owned subsidiary of PDC Capital. Arjo Wiggins is not a Debtor and prior to the Petition date, it had no assets and no operations.

76.     Appvion, a Delaware corporation, is a wholly-owned subsidiary of PDC, and the parent company of Appvion Canada, Appvion Receivables, APVN, and Appvion Netherlands. Prior to the Petition Date, Appvion was the major operating company and manufacturer of the Debtors' products. Appvion also employed the majority of the Debtors' employees. In May 2013, Appleton Papers Inc. changed its name to Appvion, Inc.

77.     Appvion Canada, a limited Canadian corporation, is a wholly owned subsidiary of Appvion and prior to the Petition Date, was an operating entity based in Toronto, Ontario. Appvion Canada was not a Debtor.

78.     Appvion Receivables, a Delaware limited liability company, is a wholly owned subsidiary of Appvion and prior to the Petition Date, had no assets and no operations. Appvion Receivables was the seller of certain of the accounts receivable of the Debtors under its Account Receivable Securitization (as defined below).

79.     APVN, a Delaware limited liability company, is a wholly owned subsidiary of Appvion and was a 1% owner of the stock of Appvion Netherlands, which, prior to the Petition Date, had no operations.

80.     On the Petition Date, Appvion Netherlands, a subsidiary of Appvion and APVN founded in May 2014, also filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Prior to the Petition Date, Appvion Netherlands never conducted any operations.

## II.     EMPLOYEE OWNERSHIP AT APPVION

### A.     THE ESOP STRUCTURE

81.     Through the ESOP, Appvion allowed its employees to own its equity shares of Appvion as part of the Debtors' retirement plan. The Debtors' retirement savings plan had two components: (i) a 401(k) fund that permitted participants with the ability to make pre-tax contributions for investment purposes through the deferral of a percentage of their compensation; and (ii) a separate tax-qualified employee stock ownership plan designed to invest primarily in the common stock of PDC. Subject to certain IRS limitations, employees could defer, on a pre-tax basis, a percentage of their pay to the 401(k) fund, to the ESOP, or to a combination of both.

82.     Deferrals directed to the ESOP accumulated in a short-term interest-bearing account within the ESOP trust until the next FMV Determination Date. These deferrals and the interest earned on these amounts were used to purchase shares of PDC common stock based upon the FMV Determination of the price of a share of PDC common stock as determined on the FMV Determination Date preceding or following the date on which the participant made the deferrals, whichever was lower.

83.     The Debtors matched ESOP participants' deferrals up to a maximum of 6% of their total compensation.

84.     Because PDC's common stock was one of the investment options of the 401(k) plan, the structure here is sometimes referred to as a "KSOP."

85.     When an ESOP participant retired, or otherwise terminated his or her employment with Appvion, the ESOP participant became eligible to be paid the value of the stock held in their individual account, pursuant to the terms of the ESOP. In making these distributions, the ESOP would thereby re-purchase the PDC common stock held for the benefit of the departing ESOP participant, using contributions made by current ESOP participants, as well as funds borrowed by the Debtors which in turn were funded from cash on hand as well as from money borrowed from third-party lenders.

86.     The manner in which the ESOP made distributions to an ESOP participant varied depending on whether the distribution was due to retirement, disability, resignation, dismissal, or permanent layoff.

87.     For retired employees, the ESOP would begin to make distributions no later than the end of the plan year following the year of retirement. Depending in part on the wishes of the ESOP participant, the ESOP Committee (as defined herein) could make distributions in a series of annual installments over a period of no longer than five years, could accelerate these distribution payments, or could make a single lump-sum payment.

88.     Each distribution made to an ESOP participant was made in cash at the then-current fair market value of all of the PDC common stock ("FMV").

89.     Because PDC was wholly-owned by the ESOP, and because no PDC common shares were publicly traded, the ESOP required the ESOP Trustee to secure a determination of the FMV (a "FMV Determination") from an independent appraiser twice per year, on June 30 and December 31 each year (each respectively, a "FMV Determination Date").

90.     According to the Appvion ESOP Guide,

The term fair market value means the price that a willing buyer would pay a willing seller for a company's stock. It assumes that both the buyer and seller are knowledgeable about the company and that neither one has an obligation to buy or sell the stock.

In determining a company's fair market value, the appraiser must consider all facts considered relevant…. factors that often affect value include a company's size, growth, profitability, financing arrangements, market position, and risks relating to its business. The company's customers, suppliers, management, workforce, and facilities, relative to their competitors, may also be considered.

Furthermore, a company's value may be influenced by the current and future state of the company's industry and prospects for the economy as a whole.

To determine a company's fair market value, an appraiser may consider several approaches. Two of the most commonly used valuation approaches considered by the appraiser are the market approach and the income approach …

Appvion ESOP Guide, at Part I – P. 9.

91.     The FMV Determination was essentially an opinion of the enterprise value of PDC and its subsidiaries, including Appvion.

**B.     ADMINISTRATION OF THE ESOP AND THE ESOP TRUST**

92.     Effective May 28, 2014, Argent was the trustee of the ESOP Trust. The ESOP Committee approved the hiring of Argent and that decision was later ratified by the Appvion Board.

93.     On May 26, 2015, Argent entered into engagement letters with Appvion amending and restating the March 22, 2014 agreement by and between Reliance and Appleton Papers, Inc. *See* Argent Engagement Letter dated May 26, 2015 (MLB_01044).

94.     Between April 1, 2013 and May 28, 2014, the trustee of the ESOP Trust was Reliance. Prior to April 1, 2013, the trustee of the ESOP Trust was State Street Global Advisors (together with Argent and Reliance, each an "ESOP Trustee").

95.     Pursuant to the Appvion, Inc. Employee Stock Ownership Trust agreement for the

Appvion, Inc. Employee Stock Ownership Trust (the "ESOP Trust"), effective as of August 3, 2015, Argent, as the ESOP Trustee, held the ESOP's assets, including, without limitation, 100% of the common shares of PDC.

96.     The ESOP Trust's assets also included cash from contributions by ESOP participants. Participating employees contributed cash from rollovers from other tax-qualified benefit plans, such as 401(k) or profit sharing plans, and deferrals from employees' eligible pay. The ESOP Trustee would then use the cash contributions to either purchase shares of PDC common stock, and/or to pay out ESOP participants who leave the ESOP or elect to move money from investments in PDC common stock to other investment options in the 401(k) fund pursuant to a so-called "diversification election." The value of the PDC common stock is allocated to individual accounts of the ESOP participants. When participants retire, leave employment for other reasons, or make a diversification election, they were eligible to be paid the value of the vested PDC common stock in their individual account.

97.     Pursuant to Section 8.1 of the ESOP, an ESOP administrative committee ("ESOP Committee") was established to assist and oversee the ESOP Trustee. The ESOP Committee provided direction and input to the ESOP Trustee and was responsible for making discretionary decisions concerning the operation of the ESOP. Until July 31, 2017, the ESOP Committee was comprised of five members of the Debtors' executive team. From time to time, the members of the ESOP Committee included Messrs. Richards, Ferree, Gilligan, Ms. Van Stratten, and Ms. Arent as well as certain John Does. Effective August 9, 2017, Grant Lyon became the sole member of the ESOP Committee.

98.     Argent received payments totaling $35,996 in the ninety (90) days prior to the Petition Date from Appvion, Inc. as follows: (i) $17,979 on August 10, 2017, and (ii) $18,017 on

September 5, 2017. *See* D.I. 266, Question 3, at 17. Additionally, Argent received $200,000 annually from Appvion from May 26, 2015.

99.      Argent, as ESOP Trustee, hired a number of advisors to assist it in performing its duties to the ESOP.

100.     Amongst Argent's duties to the ESOP was determining the FMV of the common stock of PDC owned by the ESOP Trust. To assist it in determining the FMV, Argent retained Stout to provide valuation services. Stout had provided valuation services to Reliance, as ESOP Trustee, since before 2013.

101.     The terms and scope of Stout's services were confirmed in writing at various times over the course of Stout's engagement by each ESOP Trustee.

102.     Stout entered into a June 20, 2013 letter (the "June 2013 Stout Engagement Letter") by and between Reliance, as ESOP Trustee. (MLB_01959) The June 2013 Stout Engagement Letter provided that Stout would provide certain financial advisory services to Reliance, solely in Reliance's capacity as ESOP Trustee.

103.     The June 2013 Stout Engagement Letter stated that the

engagement objectives and scope to consist of the determination of the Fair Market Value of the common stock of Appvion, Inc. ("Appvion" or the "Company") as of June 30, 2013 and December 31, 2013 collectively, the "Valuation Dates."). We understand that our valuation analysis will be used for annual reporting and plan administration purposes by the [ESOP Trustee]. We will report solely to [Reliance], notwithstanding that [Appvion] will pay all fees for our work.

In accordance with [ERISA]…, for purposes of this engagement, we define the term "Fair Market Value" as the price at which an asset would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, and both parties are able, as well as willing, to trade and are well-informed about the asset and the market for the asset…

104.     The June 2013 Stout Engagement Letter defines the "company" as Appvion, Inc.

(MLB_01959) The June 2013 Stout Engagement Letter states as follows:

> In order for us to maximize the value of our work and to keep the project on schedule, It Is important for us to be provided with information we request from the Company promptly. Additionally, if the Company is or becomes aware of other relevant information necessary to the proper completion of this engagement, the Company agrees to provide us with this information.

> Specifically, the Company acknowledges that the successful delivery of our services, and the fees charged, are dependent on (i) the Company's timely and effective completion of its responsibilities, (II) the accuracy and completeness of the assumptions and information provided to us, and (iii) timely decisions and required approvals.

(MLB_01959).

105.    The June 2013 Stout Engagement Letter also states:

> Our fees for the services described in this letter will be a fixed fee of $100,000 for the Valuation Dates, plus reasonable out-of-pocket expenses, and will be paid by the Company. This fee estimate Includes the time required to issue the written report and analysis, as well as giving a presentation to the Trustee. Any subsequent work, including but not limited to, consultations with your advisors, testimony or preparation for testimony, etc., will be billed at our standard hourly rates.

> ...

> We understand that the Company will pay our fees and expenses for work on this matter and, therefore, we request that the enclosed copy of this letter be signed by an officer of the Company and returned to us.

(MLB_01959).

106.    The June 2013 Stout Engagement Letter also provided that by executing that engagement letter, Appvion was indicating its agreement to all of certain Professional Terms attached to the June 2013 Stout Engagement Letter.

107.    Mr. Ferree executed the June 2013 Stout Engagement Letter on behalf of Appvion. (MLB_01959).

108.    Stout entered into subsequent engagement letters with Argent with respect to

FMV Determinations that contained substantially similar text as the June 2013 Stout Engagement Letter cited in the preceding paragraphs. *See* Stout Engagement Letter dated May 18, 2015 (concerning FMV Determinations as of June 30, 2015 and December 31, 2015) (MLB_01945); Stout Engagement Letter dated January 28, 2016 (concerning FMV Determinations as of June 30, 2016 and December 31, 2016) (MLB_01938); Stout Engagement Letter dated May 3, 2017 (concerning FMV Determinations as of June 30, 2017 and December 31, 2017) (MLB_01978).

109.    Stout periodically sent Appvion invoices for its preparation of FMV reports from 2013 through 2017. Appvion remitted payments to Stout as set forth in Figure 2 below

**Figure 2: Schedule of Payments by Appvion to Stout**

| Payment Date | Payment Amount | Check # |
|---|---|---|
| Between 1/9/14 and 7/8/14 | $52,660.00 | Unknown |
| Between 7/8/14 and 1/8/15 | $51,660.29 | Unknown |
| 1/8/15 | $25,000.00 | Application of Retainer |
| 1/26/15 | $33,639.37 | 1972234 |
| 6/30/15 | $87,500.00 | Application of Retainer |
| 7/13/15 | $88,350.00 | 1977474 |
| Between 8/7/15 and 1/11/16 | $30,233.12 | Unknown |
| 7/6/16 | $25,000.00 | Application of Retainer |
| Between 7/6/16 and 1/10/17 | $25,735.33 | Unknown |
| Between 1/10/17 and 6/12/17 | $50,978.13 | Unknown |
| 7/7/17 | $25,937.60 | 1999525 |
| 8/10/17 | $25,535.87 | Unknown |
| **TOTAL** | **$522,229.71** | |

*Source:* App015959; App015964; App015966; App015971; App015977-78; App015984; D.I. 266, Question 3, at 190.

110.    In sum, Stout sought and received payments of $522,229.71 from Appvion, a Delaware corporation, between 2014 – 2017.

111.    In addition to engaging Stout to assist with the FMV Determination, Argent hired The Principal to serve as record-keeper to handle the accounting related to the ESOP, and to

ensure that the ESOP was run in accordance with the laws and regulations that govern employee stock ownership plans under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461.

### C.    THE SIGNIFICANCE OF THE TWICE ANNUAL FMV DETERMINATION

112.    The biannual FMV Determination served several crucial functions, related both to the administration of the ESOP, and to the operation of the Debtors' businesses.  For this reason, the FMV Determinations had a fundamental impact on determining the overall financial well-being of the Debtors, and Appvion in particular.

113.    Since prior to June 2013, Stout's valuations were utilized by the ESOP Trustee for a number of purposes in addition to its annual reporting and ESOP administration obligations. For instance, Stout's FMV Determination was used by the Debtors, their boards of directors, and the Debtors' management to:

      a.    determine the per-share price at which ESOP participants made contributions to the ESOP;

      b.    determine the per-share price at which the ESOP made distributions to ESOP participants in connection with participant hardship withdrawals, participant diversification elections, employee terminations, retirement benefits, and employee loan requests;

      c.    estimate the FMV of redeemable PDC common stock for the purposes of estimating the ultimate redemption liability, financial projections, cash flow projections, liability management, financial reporting and others;

      d.    estimate the upcoming repurchase obligations under the ESOP; and

      e.    determine the fair market value of phantom units for the purposes of long term incentive compensation under the Appvion, Inc. Long-Term Incentive Plan, the long-term restricted stock unit plan and other nonqualified deferred compensation with the Debtors' non-employee directors.

114.    Prior to the Petition Date, PDC honored its repurchase obligations. Prior to the Petition Date, the Debtors' corporate finance personnel prepared forecasts of PDC's repurchase

obligations, taking into account projections of ESOP participants' retirement, death, permanent disability, or termination of employment. Provided that the employee was at least 55 years of age with 10 years of participation in the ESOP, the Debtors' KSOP also permitted employees to diversify his or her account balance. This option permitted eligible participants to divest a portion of the PDC common stock held in their ESOP accounts, and to instead avail of other investment options in the Debtors' 401(k) plan. Such an exercise of diversification rights would trigger a repurchase obligation on the part of PDC.

115.    Because the ESOP itself frequently did not have sufficient cash from employee contributions to cover the cost of distributions, the ESOP borrowed the money necessary to fund the repurchase of PDC common shares within specific timeframes and at the applicable FMV, from PDC.

116.    Since the satisfaction of PDC's repurchase obligations required PDC to provide the cash to the ESOP, and since PDC was merely a holding company without cash-generating operations, PDC borrowed funds from Appvion in order to satisfy its repurchase obligations. PDC borrowed these funds from Appvion under one or more intercompany lending transactions. In turn, Appvion, from time to time, in the three years prior to the Petition Date borrowed money from its lenders to fund its loans to PDC for the repurchase obligations. In this way, the repurchase obligations imposed by the ESOP on the Debtors are inextricable from the Debtors' own finances.

117.    Further, because the per-share cost of each distribution incurred by the ESOP was established exclusively by the FMV Determinations by Stout (and adopted by Argent), those FMV Determinations played a dispositive role in the Debtors' insolvency, including the insolvency of Appvion.

118.    For these reasons, these twice annual FMV Determinations had a fundamental and direct impact on the financial well-being of the ESOP and, by extension, of the Debtors themselves.

119.    An artificially high valuation of PDC common stock benefited former ESOP participants that were still receiving ESOP distributions at the time of the inflated valuation, because such participants received an unjust premium over the true FMV.

120.    Because the value of the distributions made by the ESOP was determined by the prevailing FMV at the time of the distribution, Officer/Employee Defendants and Director Defendants were incentivized to ensure that the FMV was maximized. This was because the Debtors compensated the Officer/Employee Defendants and Director Defendants primarily in three ways.

121.    First, effective January 3, 2010, Appvion adopted a long-term restricted stock unit ("RSU") plan to award key management employees with future cash payments based on FMV Determinations. All stock units awarded under this plan vested three years after the date they were awarded, and the cash value of the PDC common stock awarded was paid on the date of vesting. Because the compensation ultimately received by executives under this plan depended directly on the FMV Determination as of the vesting date, and because Stout (in conjunction with the ESOP Trustee) was responsible for the FMV Determination, Stout's FMV Determination directly impacted the compensation received by the recipients of stock awards under this plan. *See, e.g.*, Dec. 2015 FMV, at 6.

122.    Second, the Debtors had a non-qualified deferred compensation plan that awarded non-employee members of their boards of directors with phantom stock units. This deferred compensation was paid in five equal annual cash installments following the conclusion of a

director's service on the applicable board of directors. The value of these cash installments depended on the FMV Determination. Because the compensation ultimately received by directors under this plan depended directly on the FMV Determination as of the installment date, and because Stout (in conjunction with the ESOP Trustee) was responsible for the FMV Determination, Stout's FMV Determinations directly impacted the compensation received by the recipients of stock awards under this plan. *See, e.g.*, Dec. 2015 FMV, at 6. In addition, the Debtors also had a nonqualified excess plan, under which certain highly-compensated officers could elect to defer their compensation on a pre-tax basis, and accumulate earnings in an amount up to 50% of their base salary and/or 75% of their annual performance-based incentive pay.

123.    Third, the Debtors adopted a long-term incentive plan ("LTIP") that awarded synthetic equity units to employees, which were awarded at prices based on the most recent FMV Determination by Stout (and adopted by Argent). Because the compensation ultimately received by employees under this plan depended directly on the FMV Determination as of the award date, and because Stout (in conjunction with the ESOP Trustee) was responsible for the FMV Determination, Stout's FMV Determinations directly impacted the compensation received by the recipients of stock awards under this plan. *See, e.g.*, Dec. 2015 FMV, at 6.

124.    Thus, the Officer/Employee Defendants and Director Defendants had a vested interest in ensuring that the FMV of PDC's common stock was maximized for each period when the director or officer received a payment as a result of an equity award granted pursuant to the plans described in paragraphs immediately preceding.

## III.    THE DEBTORS' PREPETITION CAPITAL STRUCTURE

125.    Prior to the Petition Date, the Debtors reported their financial information on a consolidated basis. As of August 31, 2017, the last reporting period prior to the Petition Date, the Debtors' books and records reflected total assets of approximately $381 million. As of that same

date, the Debtors' current liabilities totaled approximately $75 million and the Debtors' long-term liabilities totaled $640.9 million, the latter consisting of approximately $112 million in accrued pension obligations, $65 million of trade and other accrued obligations, and $482 million of long-term debt obligations.

126.    Prior to the Petition Date, the Debtors' primary sources of liquidity and capital resources included cash provided by operations and credit available under its $75 million revolving credit facility and $24 million accounts receivable securitization facility.

127.    As of the Petition Date, a total of approximately $490 million was owed to the Debtors' pre-petition lenders under the Senior Secured Credit Facility and Second Lien Notes.

### A.    SENIOR SECURED CREDIT FACILITY

128.    On June 28, 2013, Appvion entered into a $435 million senior secured credit facility (the "Senior Secured Credit Facility"), which included a $335 million first lien term loan facility (the "Term Loan") and a $100 million revolving credit facility (the "Revolving Credit Facility"), pursuant to that certain Credit Agreement dated as of June 28, 2013 by and among Appvion and PDC, as borrowers, and other parties thereto. As of the Petition Date, the Debtors owed $240.8 million, including accrued and unpaid interest of $0.6 million, under the Senior Secured Credit Facility.

### B.    SECOND LIEN NOTES

129.    On November 19, 2013, Appvion issued $250 million aggregate principal amount of Second Lien Notes. The Second Lien Notes were scheduled to mature on June 1, 2020. As of the Petition Date, the Debtors owed approximately $257.5 million, which includes accrued and unpaid interest of approximately $7.5 million, on the Second Lien Notes.

### C.    ACCOUNTS RECEIVABLE SECURITIZATION

130.    On June 4, 2014, the Debtors entered into the Accounts Receivable Securitization

Facility, with a commitment size of $30.0 million. As of the Petition Date, approximately $24 million was owed under this securitization.

### D.    OTHER INDEBTEDNESS AND OBLIGATIONS

131.    On August 8, 1997, the Debtors issued $6 million aggregate principal amount of its Village of Combined Locks, Wisconsin Variable Rate Demand Industrial Development Revenue Bonds, Series 1997 pursuant to that certain Secured Variable Rate Industrial Development Bonds Due 2027 (the "Industrial Development Bonds"). As of the Petition Date, approximately $6 million was owed under the Industrial Development Bonds. Prior to the Petition Date, the Debtors were the borrower under a term loan with the State of Ohio due May 2019 (the "Ohio Loan"). As of the Petition Date, $544,047 was owed under the Ohio Loan. The Debtors had approximately $2.2 million in pending workers' compensation claims as of the Petition Date.

### E.    PENSION PLAN OBLIGATIONS

132.    Each of the Debtors was a contributing sponsor of the Appvion, Inc. Retirement Plan (the "Pension Plan"), 29 U.S.C. § 1301(a)(13), or a member of the contributing sponsor's controlled group, 29 U.S.C. § 1301(a)(14). The Pension Plan was covered by Title IV of ERISA. Figure 3 below reflects the total projected benefit obligation of the Debtors' defined benefit pension plans that exceeded the fair value of the plan assets at various points in time.

#### Figure 3: Total Projected Underfunded Pension Obligation ($ in thousands)

| | 12/29/12 | 6/30/13 | 12/28/13 | 6/29/14 | 1/3/15 | 7/5/15 | 1/2/16 | 7/3/16 | 12/31/16 | 7/2/17 |
|---|---|---|---|---|---|---|---|---|---|---|
| Defined Benefit Obligations that Exceeded the Fair Value of Pension Plan Assets | 137,081 | 127,824 | 66,143 | 54,598 | 93,052 | 93,141 | 106,400 | 107,128 | 112,600 | 112,067 |

*See* PDC Form 10-K for the year ended December 29, 2012, at 45; PDC Form 10-Q for the quarter ended June 30, 2013, at 4; PDC Form 10-K for the year ended December 28, 2013, at 46; PDC Form 10-Q for the quarter ended June 29, 2014, at 3; PDC Form 10-K for the year ended January 3, 2015, at 42; PDC Form 10-Q for the quarter ended July 5, 2015, at 3; PDC Form 10-K for the year ended January 2, 2016, at 13; PDC Form 10-Q for the quarter ended July 3, 2016, at 3; PDC Form 10-K for the year ended December 31, 2016, at 12; PDC Form 10-Q for the quarter ended July 2, 2017, at 2.

F.    **INTERCOMPANY INDEBTEDNESS**

133.    As described more fully herein, all ESOP/PDC common share activities, including issuance, deferrals, redemptions, and accretion, were recorded by PDC. Cash to fund ESOP redemption activities was loaned to the ESOP by PDC. Since inception of the ESOP in 2001, employee withdrawals were significantly larger than employee contributions.

134.    On June 11, 2004, Appleton Papers Inc. (now Appvion, Inc.) was given a promissory note by PDC, in the original principal amount of $167,006,667 (the "Intercompany Note"). *See* App000002.

135.    On November 20, 2013, an Intercompany Promissory Note Distribution and Payoff Letter was executed by Mr. Fletcher for Appvion, Inc. and PDC. *See* App000002-03. In connection therewith, Appvion purported to make a non-cash distribution to PDC in the aggregate amount of the Note and PDC acknowledged receipt of the distribution and further acknowledged that it is simultaneously using the distribution to satisfy all amounts owing to Appvion. *Id*. Both Appvion and PDC therein acknowledged and agreed that, as of the date thereof, the Note was satisfied and cancelled. *Id*.; s*ee also* PDC Form 10-K for the year ended January 2, 2016, at 43.

136.    Neither of the Minutes of the November 7, 2013 meeting of the Appvion Board

(App004845) nor Minutes of the December 4-5, 2013 meeting of the Appvion Board (App006599) specifically reflect any discussion of the Intercompany Note or the payoff thereof. Additionally, the PDC Board's November 11, 2013 resolutions approving the 2013 refinancing of certain indebtedness (App05664) specifically approve of the terms of the payoff of the Intercompany Note in November 2013.

137.    The Debtors reported a net income of $17.7 million for fiscal year 2013, and reported a net loss of $148.5 million for fiscal year 2012.

138.    After the intercompany Note was forgiven, PDC and Appvion established an interest-bearing intercompany lending arrangement (the "Intercompany Loans"), recorded via ledger entries, by which loans were made by Appvion to PDC. *See* PDC Form 10-K for the year ended January 2, 2016, at 43. The proceed of such Intercompany Loans was established in order to fund required distributions from PDC to the ESOP.

139.    In connection with its bankruptcy filing, PDC filed its schedules of assets and liabilities. *See* D.I. 267. As part of those schedules of assets and liabilities, PDC listed Appvion as a holder of a general unsecured claim against PDC in the amount of $30,603,411. *See* D.I. 267, Claim #678770.

## IV.    THE DEBTORS' PRE-PETITION CORPORATE GOVERNANCE

### A.    ELECTION OF DIRECTORS

140.    The Debtors' corporate governance structure granted PDC's Chief Executive Officer outsized, if not virtually unilateral, control over the nomination to and removal of directors from the PDC board. This control derived from the voting agreements entered into between PDC and the ESOP Trust.

141.    On November 9, 2001, PDC and the ESOP Trust (then known as Appleton Papers Inc. Employee Stock Ownership Trust) entered into a security holders agreement (the "PDC

Security Holders Agreement") which sets forth the manner in which the members of the PDC Board are nominated and appointed.

142.    The PDC Security Holders Agreement ensured that not a single director could be elected to the PDC Board without the approval of PDC's Chief Executive Officer. Under the PDC Security Holders Agreement, the ESOP Trust agreed to vote all of its shares of PDC common stock on and after January 1, 2005, to elect to PDC's board, four individuals nominated by PDC's Chief Executive Officer and three individuals jointly nominated by the ESOP Trust and PDC's Chief Executive Officer.

143.    In their successive capacities as ESOP Trustees, State Street Global Advisors, Reliance, and Argent voted the PDC common shares held in the ESOP Trust for the election of certain directors of the PDC Board consistent with the PDC Security Holders Agreement.

144.    The PDC Security Holders Agreement also ensured that no director serving on the PDC Board could be removed without the approval of PDC's Chief Executive Officer. The PDC Security Holders Agreement provides that directors nominated by joint nomination may only be removed by mutual agreement of the ESOP Trust and PDC's Chief Executive Officer.

145.    From time to time, Mr. Murphy, Mr. Gilligan, Mr. Roberts, Mr. Richards, and/or Ms. Seifert were nominated by Mr. Richards and/or Mr. Gilligan, each as PDC's then Chief Executive Officer, and elected to the PDC Board. Mr. Carter, Mr. Laurino, Mr. Suwyn and/or Mr. Wurtz were jointly nominated by Mr. Richards and/or Mr. Gilligan and the ESOP Trust, and elected to the PDC Board.

146.    On November 9, 2001, PDC, Appvion (then known as Appleton Papers Inc. and Appleton Investments LLC entered into a security holders agreement (the "Appvion Security Holders Agreement") which sets forth the manner in which the members of the Appvion Board

are nominated and appointed. Under the Appvion Security Holders Agreement, PDC agreed to vote all of its shares of Appvion common stock on and after January 1, 2005, to elect to Appvion's board, four individuals nominated by Appvion's Chief Executive Officer and three individuals jointly nominated by PDC (controlled by its Chief Executive Officer) and Appvion's Chief Executive Officer. Since Mr. Richards and Mr. Gilligan each served simultaneously as Chief Executive Officer of both PDC and Appvion, each had near unilateral control over the appointment of directors to the Appvion Board.

147.    Upon information and belief, PDC voted the Appvion common shares held by it for the election of certain directors of the Appvion Board consistent with the Appvion Security Holders Agreement.

148.    The Appvion Security Holders Agreement also provides that jointly nominated directors may only be removed by mutual agreement of PDC and Appvion's Chief Executive Officer.

149.    From time to time, Mr. Murphy, Mr. Gilligan, Mr. Roberts, Mr. Richards, and/or Ms. Seifert were nominated by Mr. Richards and/or Mr. Gilligan, each as Appvion's then Chief Executive Officer, and elected to the Appvion Board. Mr. Carter, Mr. Laurino, Mr. Suwyn and/or Mr. Wurtz were jointly nominated by Mr. Richards and/or Mr. Gilligan and by PDC, whose management was controlled by then then Chief Executive Officer.

### B.    OVERSIGHT AND COMPOSITION OF DIRECTOR AND EXECUTIVE COMPENSATION

150.    Prior to the Petition Date, the PDC Board and/or the Appvion Board had a compensation committee(s) responsible for authorizing the compensation of their respective Chief Executive Officer subject to ratification by the PDC Board and/or the Appvion Board, approving the compensation of the named executive officers based on the recommendations of the Chief Executive Officer and reviewing the compensation of the other executive officers. The

PDC Board and/or the Appvion Board's compensation committee(s) also had authority for administration of the Long-Term Incentive Plan and the Long-Term Restricted Stock Unit Plan. Effective January 1, 2017, members of the PDC Board and/or the Appvion Board's compensation committee(s) included: Mr. Wurtz, Mr. Roberts and Ms. Seifert. Mr. Wurtz served as the compensation committee chair.

151. Prior to the Petition Date, the PDC Board and/or the Appvion Board had corporate governance committee(s) for the purpose of developing, recommending and evaluating best corporate governance practices applicable to the Debtors, including those related to director compensation, nomination of directors, election of members to board committees and board education and practices. Effective January 1, 2017, members of the PDC Board and/or the Appvion Board's compensation committee(s) included: Ms. Seifert, Mr. Gilligan, Mr. Roberts and Mr. Wurtz. Ms. Seifert serves as the corporate governance committee(s) chair.

152. Executives' compensation each year consisted of several components. These included: a basic salary; RSU awards (referring to the grant value of RSUs granted in that fiscal year); Stock Appreciation Rights ("SARs") awards; earnings due to changes in the executive's pension value and nonqualified deferred earnings; bonuses; and other types of compensation, which included life insurance, company match and company retirement contributions to the KSOP, and the appreciation value of previously-granted RSUs that vested in that fiscal year. Several of these components depended directly on the value of PDC common stock as calculated by Stout (and adopted by Argent) twice each year. Collectively, therefore, a substantial proportion of Management's compensation each year was directly determined by the FMV Determinations over which Management had control.

153. Specifically, the per-share grant value of RSU awards granted in the preceding

fiscal year was equivalent to the most recent FMV Determination performed by Stout (and adopted by Argent). The appreciation value of RSUs that vested in the preceding fiscal year was the difference between the RSUs' grant value, and their value on the date of vesting. The RSUs' value on the date of vesting was equivalent to the most recent FMV Determination performed by Stout (and adopted by Argent).

154.    The value of the SAR awards was determined by the applying the Black-Scholes valuation methodology to the most recent stock price calculated by Stout (and adopted by Argent).

155.    The per-share grant value of awards under the LTIP was equivalent to the most recent FMV Determination performed by Stout (and adopted by Argent) at the time the awards were granted. The appreciation value of LTIP awards that vested in the preceding fiscal year was the difference between the awards' grant value, and their value on the date of vesting. The awards' per-share value on the date of vesting was equivalent to the most recent FMV Determination performed by Stout (and adopted by Argent).

156.    Because the value of each of these components was directly related to the FMV Determinations, this mechanic gave the D&Os an ongoing and constant interest in inflating the FMV Determinations for their personal gain. Management's ability to oversee the valuations which directly affected their personal compensation each year presents yet another blatant conflict of interest.

C.    EXECUTIVE COMPENSATION BETWEEN 2013 – 2016

1.    *Richards*

157.    Richards' executive compensation until his retirement in 2015 was heavily dependent on Stout's valuations. Figure 4 below reflects his compensation in his last three years of employment by the Debtors.

**Figure 4: Richards' Compensation Between 2013 - 2015**

|  | 2013 | 2014 | 2015 |
|---|---|---|---|
| Salary | $800,000 | $815,385 | $800,000 |
| SARs Value | $644,670 | $692,010 | $690,272 |
| RSU Value | $649,350 | $674,375 | $698,500 |
| Changes in pension value and nonqualified deferred compensation earnings | $126,139 | $420,646 | $124,408 |
| Non-equity incentive plan compensation | $102,400 | $492,800 | $ - |
| Other compensation | $497,210 | $86,709 | $2,995,387 |
|  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 46% | 42% | 39% |

*See* PDC Form 10-K for the year ended December 28, 2013, at 99; PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year ended January 2, 2016, at 89.

158.    The bulk of Richards's "other compensation" in 2015 was due to his retirement on December 31, 2015. This consisted of, *inter alia*, $600,560 in RSU payments and $64,069 in SARs.

> **2.    Gilligan**

159.    Gilligan's executive compensation until his retirement was heavily dependent on Stout's valuations. Figure 5 below reflects his compensation during 2014 to 2016 by the Debtors.

**Figure 5: Gilligan's Compensation Between 2014 - 2016**

|  | 2014 | 2015 | 2016 |
|---|---|---|---|
| Salary | $223,077 | $447,596 | $575,769 |
| SARs Value | $138,200 | $432,692 | $709,050 |
| RSU Value | $130,400 | $429,560 | $811,800 |
| Changes in pension value and nonqualified deferred compensation earnings | $ - | $ - | $465 |
| Non-equity incentive plan compensation | $82,707 | $ - | $ - |
| Other compensation | $43,070 | $74,699 | $38,485 |
|  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 43% | 62% | 71% |

*See* PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year

ended January 2, 2016, at 89; Form 10-K for the year ended December 31, 2016, at 83.

### 3. *Ferree*

160. Ferree's executive compensation until his retirement was heavily dependent on Stout's valuations. Figure 6 below reflects his compensation during 2013 to 2016 by the Debtors.

#### Figure 6: Ferree's Compensation Between 2013 - 2016

|  | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| Salary | $430,154 | $440,308 | $432,000 | $432,000 |
| SARs Value | $188,500 | $202,710 | $203,350 | $139,200 |
| RSU Value | $193,050 | $195,000 | $201,300 | $159,900 |
| Changes in pension value and nonqualified deferred compensation earnings | $48,415 | $85,771 | $(7,547) | $70,690 |
| Non-equity incentive plan compensation | $33,036 | $159,667 | $  - | $  - |
| Other compensation | $190,200 | $48,053 | $47,321 | $37,354 |
|  |  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 35% | 36% | 46% | 36% |

*See* PDC Form 10-K for the year ended December 28, 2013, at 99; PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year ended January 2, 2016, at 89; Form 10-K for the year ended December 31, 2016, at 83.

### 4. *Van Straten*

161. Van Straten's executive compensation was heavily dependent on Stout's valuations. Figure 7 below reflects her compensation from 2013 to 2016 by the Debtors.

**Figure 7: Van Straten Compensation Between 2013 - 2016**

|  | 2013 | 2014 | 2015 | 2016 |
|---|---|---|---|---|
| Salary | $243,846 | $276,442 | $286,423 | $330,385 |
| SARs Value | $60,320 | $69,000 | $65,296 | $139,200 |
| RSU Value | $70,200 | $65,000 | $66,000 | $159,900 |
| Changes in pension value and nonqualified deferred compensation earnings | $   - | $50,695 | $(1,436) | $23,498 |
| Non-equity incentive plan compensation | $15,606 | $83.515 | $   - | $   - |
| Other compensation | $52,149 | $26,872 | $25,131 | $21,570 |
|  |  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 29% | 23% | 30% | 44% |

*See* PDC Form 10-K for the year ended December 28, 2013, at 99; PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year ended January 2, 2016, at 89; Form 10-K for the year ended December 31, 2016, at 83.

     **5.**     ***Arent***

162.    Arent's executive compensation until her retirement was heavily dependent on Stout's valuations. Figure 8 below reflects her compensation from 2013 to 2015 by the Debtors.

**Figure 8: Arent's Compensation Between 2013 - 2015**

|  | 2013 | 2014 | 2015 |
|---|---|---|---|
| Salary | $283,462 | $290,481 | $282,000 |
| SARs Value | $82,940 | $90,870 | $90,948 |
| RSU Value | $87,750 | $89,375 | $92,400 |
| Changes in pension value and nonqualified deferred compensation earnings | $27,753 | $211,511 | $117,370 |
| Non-equity incentive plan compensation | $19,956 | $96,558 | $   - |
| Other compensation | $102,774 | $29,989 | $650,889 |
|  |  |  |  |
| Percentage of Compensation Directly Dependent on Stout's FMV Determinations | 28% | 22% | 22% |

*See* PDC Form 10-K for the year ended December 28, 2013, at 99; PDC Form 10-K for the year ended January 3, 2015, at 97; PDC Form 10-K for the year ended January 2, 2016, at 89.

163.    The bulk of Arent's "other compensation" in 2015 was due to her retirement on December 31, 2015. This consisted of, inter alia, $79,528 in RSU payments and $8,442 in SARs.

### D.    NON-EMPLOYEE DIRECTOR COMPENSATION

164.    Starting in 2013, cash compensation to members of the PDC Board and Appvion Board who are not employees of Appvion, PDC or any of their subsidiaries, consisted of $55,000 in annual retainer fees and $15,000 annually for serving as the chairman of the Audit Committee, $10,000 annually for serving as the chairman of the Compensation Committee or $7,500 for serving as the chairman of the Corporate Governance Committee. *See* PDC Form 10-K for the year ended December 28, 2013, at 110.

165.    Director fees are paid quarterly in arrears of the services provided. *See* PDC Form 10-K for the year ended December 28, 2013, at 110.

166.    Directors also received deferred compensation of $55,000 awarded in units which track PDC common stock. *See* PDC Form 10-K for the year ended December 28, 2013, at 110. Deferred compensation was calculated and accrued for six-month calendar periods of service beginning January 1 and July 1 using the PDC common stock price determined by the ESOP trustee as of the ESOP valuation date coincident with or most recently preceding such date of payment. *Id*. If a director joined or ceased to be a director during the six-month period, the deferred compensation is prorated for the time served as a director. *Id*. The deferred compensation was paid upon cessation of service as a director in five annual cash installments, with each installment equal to one-fifth of the director's units and the first installment paid following the next semi-annual share price determination. *Id*. The value of the installment payment was be determined by the PDC common stock price in effect at the time of payment. *Id*.

167.    On March 7, 2013, the Appvion Board adopted the Appvion, Inc. Non-Employee Director Deferred Compensation Plan to formalize the terms of the plan. *See* PDC Form 10-K for

the year ended December 28, 2013, at 110.

E.    ESOP PARTICIPANT INVOLVEMENT IN CORPORATE DECISION-MAKING

168.    Neither the PDC Security Holders Agreement nor the Appvion Security Holders Agreement permits the ESOP participants to directly elect members of the PDC Board and the Appvion Board, or permit ESOP participants to select the ESOP Trustee. Thus, ESOP Participants are unable to exert control over the management of the Debtors' business or even the affairs of the ESOP.

169.    The PDC Security Holders Agreement also prohibits Appvion from issuing capital stock to any person other than PDC or making, or permitting any of Appvion's subsidiaries to make, any acquisition in a single transaction or series of related transactions with a fair market value in excess of $100 million, in each case without the prior written consent of PDC.

170.    Section 4.3 of the ESOP Agreement permits ESOP participants to direct the ESOP Trustee as to the exercise of any shareholder voting rights attributable to shares of PDC common stock allocated to his or her accounts under the ESOP as it relates to approval or disapproval of any corporate merger or consolidation, recapitalization, reclassification, liquidating, dissolution, sale of substantially all of the assets of a trade or business or such other transactions that may be prescribed by regulation.

171.    Argent and Stout participated, from time to time, in an Appvion Committee also known as the Argent Trust ESOP Services Committee. During these meetings, Argent and Stout met to review each FMV Determination before it became final and was forwarded to the Debtors. Argent and Stout also reviewed and discussed matters related to the Debtors' businesses, the Debtors' projections, the Debtors' strategic initiatives, the Debtors' executive leadership, and other matters related to the Debtors.

172.   From time to time, employees of Argent and/or Stout participated in PDC Board and Appvion Board meetings, and meetings of subcommittees thereof. Figure 9 below reflects the occurrence of certain Appvion Board and PDC Board meetings since e2014, and outside participants.

### Figure 9: Appvion Board / PDC Board Meetings, and Outside Participants

| Board | Board Committee | Meeting Date | Meeting Location | Stout Participant(s) | Argent Participant(s) | Citation |
|---|---|---|---|---|---|---|
| Appvion | N/A | 5/7/14 | Appleton, WI | | Steve Martin (at Reliance) | App006119 |
| Appvion | N/A | 5/28/14 | Appleton, WI | | Steve Martin (at Reliance) | App006122 |
| Appvion | N/A | 6/23/14 | Appleton, WI | | Steve Martin (at Reliance) | App006123 |
| PDC | N/A | 8/17/14 | Telephonic | | Steve Martin | App007150 |
| PDC | N/A | 9/18/14 | Chicago, IL | | Steve Martin Marc Hansberger | App007150 |
| PDC | N/A | 9/22/14 | Telephonic | | Steve Martin | App007153 |
| Appvion | N/A | 8/6/14 | Appleton, WI | | Steve Martin Marc Hansberger | App007161 |
| Appvion | N/A | 8/17/14 | Telephonic | | Steve Martin | App007164 |
| Appvion | N/A | 8/6/14 | Chicago, IL | | Steve Martin Marc Hansberger | App007165 |
| Appvion | N/A | 9/22/14 | Telephonic | | Steve Martin | App007167 |
| PDC | N/A | 11/11/14 | Telephonic | | Steve Martin | App008233 |
| PDC | N/A | 11/14/14 | Telephonic | | Steve Martin | App008234 |
| PDC | N/A | 12/14/14 | Telephonic | | Steve Martin Marc Hansberger | App008236 |
| PDC | N/A | 3/10/15 | Naples, FL | | Steve Martin Marc Hansberger | App008238 |
| PDC | N/A | 4/15/15 | Telephonic | | Steve Martin Marc Hansberger | App008239 |
| Appvion PDC | N/A | 6/3/15 | Telephonic | Isaiah Aguilar | Steve Martin Marc Hansberger | App008240 |
| Appvion PDC | N/A | 6/22/15 | Telephonic | | Steve Martin Marc Hansberger | App008242 |
| Appvion PDC | N/A | 6/22/15 | Chicago, IL | Scott Levine | Steve Martin Marc Hansberger | App008244 |
| Appvion PDC | N/A | 7/27/15 | Telephonic | | Steve Martin Marc Hansberger | App008247 |
| Appvion PDC | Ad Hoc Committee | 7/28/15 | Telephonic | | Marc Hansberger | App008249 |
| Appvion PDC | Ad Hoc Committee | 7/29/15 | Telephonic | | Marc Hansberger | App008258 |
| Appvion | N/A | 8/12/15 | Appleton, WI | | Steve Martin | App010293 |

| | | | | | Marc Hansberger | |
|---|---|---|---|---|---|---|
| **Appvion** | N/A | 9/21/15 | Telephonic | | Marc Hansberger | App010296 |
| **Appvion** | N/A | 9/24/15 | Telephonic | | Steve Martin | App010297 |
| **Appvion** | N/A | 10/20/15 | Telephonic | | Steve Martin | App010298 |
| **Appvion** | N/A | 10/20/15 | Telephonic | | Steve Martin | App010529 |
| **Appvion** | N/A | 11/11/15 – 11/12/15 | Appleton, WI | | Steve Martin | App010530 |
| **Appvion** | N/A | 11/20/15 | Telephonic | | Steve Martin | App010533 |
| **Appvion** | N/A | 2/6/16 | Telephonic | | Marc Hansberger | App013562 |
| **Appvion** | N/A | 2/22/16 | Telephonic | | | App011534 |
| **Appvion** | N/A | 3/8/16 – 3/9/16 | Naples, FL | | Steve Martin | App011764 |
| **Appvion** | N/A | 4/21/16 | Telephonic | | Steve Martin Marc Hansberger | App011767 |
| **Appvion** | N/A | 5/10/16 – 5/11/16 | Roaring Spring, PA | | Steve Martin Marc Hansberger | App010783 |
| **Appvion** | N/A | 6/14/16 | Telephonic | | Steve Martin Marc Hansberger | App010786 |
| **Appvion PDC** | N/A | 6/21/16 | Telephonic | | | App010787 |
| **Appvion** | N/A | 8/9/16 | Telephonic | | | App012124 |
| **Appvion** | N/A | 9/12/16 | Telephonic | | | App012127 |
| **Appvion** | N/A | 8/9/16 | Chicago, IL | | Steve Martin Marc Hansberger | App012128 |
| **Appvion** | N/A | 11/8/16 – 11/9/16 | Appleton, WI | | Steve Martin | App013557 |
| **Appvion** | N/A | 12/12/16 | Telephonic | | Marc Hansberger | App013560 |
| **Appvion PDC** | N/A | 1/16/17 | Telephonic | | Marc Hansberger | App013561 |
| **Appvion** | N/A | 2/15/17 | Telephonic | | | App013563 |
| **Appvion** | N/A | 3/14/17 – 3/15/17 | Appleton, WI | | Steve Martin Marc Hansberger | App013737 |
| **Appvion** | N/A | 5/10/17 – 5/11/17 | Appleton, WI | | Steve Martin | App012926 |
| **Appvion** | N/A | 6/20/17 | Chicago, IL | | | App012929 |

## V.  THE MEMBERS OF THE APPVION BOARD AND PDC BOARD WERE AWARE OF THE ABJECT FAILURE OF THE MANAGEMENT TO CREATE RELIABLE, ACHIEVABLE FINANCIAL PROJECTIONS

173.    The financial demise of Appvion and the abject failure of the Debtors'
management to create reliable, non-inflated, financial projections was well known to the
members of the Appvion Board and PDC Board. The members of the Appvion Board and PDC
Board were updated by Management on a regular basis, and actively participated in the vetting

process of these projections through board activities as well as through the activities of the Audit Committee.

174.   Debtors' senior management persistently refused to bring their financial projections closer to the realm of achievability, and the Debtors' had a demonstrated track record of repeatedly missing projections.  The projections' disconnect from reality was such that the Appvion Board and the PDC Board either had to have been complicit in the projections', or grossly negligent in the discharge of their fiduciary duties in failing to address the fundamental deficiencies represented by them.

175.   When it appeared that the Debtors would miss their financial projections, nearly every year, Management identified certain "gap" projects to try to artificially make up the shortfall. The Appvion Board was kept appraised by Management concerning the need for these "gap" projects.

176.   From mid-2013 through the Petition Date, the Audit Committee, as applicable, with the assistance of certain members of management and Argent, regularly reviewed and discussed the Debtors' financial performance, including reviewed EBITDA results and forecasts, discussed earnings, results of operations, Audit enterprise-wide risk management, the content and disclosures contained in PDC's Forms 10-K, instances where performance for a given period did not meet expectations or was disappointing, and detailed results for the Thermal, Carbonless and Encapsys® business segments.

177.   In May 5, 2014 Audit Committee update, the Audit Committee cautioned that as an implication of the ESOP Capital Structure was "[t]he risk of maintaining the current ESOP capital structure is that participant redemption payments divert cash from growth opportunities and debt repayments…" App006037.   The Audit Committee also cautioned that the highly

leveraged capital structure presented covenant compliance risk. App006037.

178.   In an August 11, 2015 Audit Committee update, the Audit Committee identified as risks for 2015-2016 the highly leveraged capital structure and the implications of ESOP Capital Structure. (App008064, at App008068) The risk description noted that "[t]he risk of maintaining the current ESOP capital structure is that participant redemption payments divert cash from growth opportunities and debt repayments." The same update was given by the Audit Committee in an August 8, 2016 presentation. (App010681).

179.   In an August 8, 2017 Audit Committee update, the Audit Committee identified as risks for 2017-2018 (App012831-32) the highly leveraged capital structure and the implications of ESOP Capital Structure. The risk description noted that "[t]he risk of maintaining the current ESOP capital structure is that participant redemption payments divert cash from growth opportunities and debt repayments." *Id*.

180.   From mid-2013 through the Petition Date, the Appvion Board and PDC Board, as applicable, with the assistance of certain members of management and Argent, regularly reviewed and discussed the Debtors' financial performance, EBITDA results and forecasts, cash follow and volume projections, both by individual business line and as a whole, five-year strategic business plans, target gap strategic initiatives, earnings, results of operations, Audit enterprise-wide risk management, the content and disclosures contained in PDC's Forms 10-K, Audit Committee reports, compensation committee reports, governance committee reports, ESOP Committee reports, ESOP distributions, historical and then current updates on legal diversification elections and payments as well as distribution elections and payments to ESOP plan participants, annual business plan against targets, EBITDA adjustments, annual performance against the annual incentive plan targets, executive incentive plan, liquidity,

biannual share prices as calculated by Stout.

## VI. STOUT'S FMV DETERMINATIONS

### A. THE PROCESS BY WHICH STOUT PREPARED ITS FMV DETERMINATIONS

181. Because Stout was the only firm engaged by the ESOP Trustee to determine the FMV of PDC common stock, and because there was no public market for PDC common stock, Stout worked closely with and ultimately relied on financial projections and other input from Debtors' management in order to determine the FMV. Debtors' senior management played a crucial role in the process.

182. Management was also the almost exclusive source of the financial data (including projections) on which Stout relied to prepare its valuations. Officer/Employee Defendants' deep involvement in Stout's valuation process allowed those Officer/Employee Defendants to manipulate Stout's FMV Determinations for their personal gain. Further, because Officer/Employee Defendants and Director Defendants had a vested interest in maximizing the FMV of PDC common stock calculated by Stout (and adopted by Argent), Officer/Employee Defendants' paramount role in the development of the inputs to the valuation process also represented a blatant conflict of interest.

183. Stout was fully aware that the financial projections it received from Debtors' senior management were wildly inflated.  Because Stout periodically received detailed financial information about the Debtors' projections and financial performance for valuation purposes, it strains credulity that Stout was unaware of the Debtors' track record of missing projections, and that the Debtors' business had virtually no chance of actually meeting the projections prepared set by senior management.  As explained more fully below, instead of seeking more reliable projections from management, or employing other valuation methodologies that did not require it to rely on unreliable data, Stout elected to compensate for the risk intrinsic to the inflated

projections by knowingly manipulating key aspects of its valuations.

184.    Prior to the time at which each FMV Determination was due (*i.e.* at least on a semi-annual basis), Stout received financial projections, financial results, business performance data, and other due diligence items from Officer/Employee Defendants Stout relied on the information provided by Officer/Employee Defendants to carry out FMV Determination. In the course of preparing its FMV Determination, Stout met with certain members of management to request due diligence items, and to generally discuss the FMV Determination report being prepared. Stout's FMV Determination reports state that during these meetings, certain Officer/Employee Defendants would discuss the operations, financial condition, future prospects, and projected operations and performance of the Debtors.

185.    Notably, certain Officer/Employee Defendants also intimately involved themselves in the identification and selection of comparable companies, for use by Stout (and adopted by Argent) for one of its primary valuation methodologies. *See, e.g.*, June 2016 FMV, at 29 ("We searched several sources and held discussions with management to identify guidelines public companies that are sufficiently similar to Carbonless and Thermal to render the Guideline Company Method relevant for application to our analysis.").

186.    Stout relied on two primary valuation methodologies, which it used together, with equal weighting, to calculate the "Fair Market Value" of the PDC common stock. These methodologies were: (i) the Guideline Company Method (the "Guideline Company Method"), whereby the value of a company is estimated by comparing it to similar public companies; and (ii) the Discounted Cash Flow Method ("DCF Method"), which estimates the value of a company based on the subject company's earning capacity.

187.    According to the FMV Determinations, in addition to the two aforementioned approaches, Stout also considered using the Transaction Method, which values companies based upon the terms, prices and conditions of sales of companies in the industry. Stout determined not to use a transaction based method because there was an insufficient number of transactions in the industry with public disclosure of financial terms to allow for meaningful conclusions to be drawn.

188.    Stout applied the foregoing valuation methodologies to separately determine the value of Debtors' Carbonless and Thermal Businesses by themselves. Stout then determined the FMV of PDC common stock by combining these two individual valuations. In doing so, the FMV Determinations fail to account for the non-production costs of the business that is not allocable to either the Carbonless or Thermal Businesses, such as overhead and other corporate costs.

189.    According to its FMV Determination reports, Stout relied principally on the following sources of information to calculate the FMV of PDC's common stock:

1. The PDC's financial statements filed with the SEC;

2. The PDC's internally-prepared financial statements, including internally-prepared financial statements for the Carbonless Business, Thermal Business and Encapsys Business;

3. The PDC's internally-prepared balance sheets;

4. Financial projections prepared by PDC's management, including financial projections for the Carbonless Business, Thermal Business and Encapsys Business;

5. Discussions with certain members of PDC's senior management regarding the operations, financial condition, future prospects, and projected operations and performance of the Debtors;

6. Publicly available information and financial data on publicly traded companies considered similar to the Debtors from an investment risk/return perspective; and

7. Other information and conducted other studies, analyses, and investigations as Stout deemed appropriate.

*See, e.g.,* June 2015 FMV, at 3; Dec. 2015 FMV, at 3; June 2016 FMV, at 3; Dec. 2016 FMV, at 3; June 2017 FMV, at 3.

### B. STOUT'S DETERMINATION OF THE FAIR MARKET VALUE OF PDC COMMON STOCK

190.    As of June 2013, Stout opined that the FMV of PDC's common stock was $17.85 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2013, issued: July 15, 2013 (the "June 2013 FMV"), at 53.

191.    As of December 2013, Stout opined that the FMV of PDC's common stock was $16.25 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of December 31, 2013, issued January 10, 2014 (the "Dec. 2013 FMV"), at 57.

192.    As of June 2014, Stout opined that the FMV of PDC's common stock was $16.30 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2014, issued: July 10, 2014 (the "June 2014 FMV"), at 58.

193.    As of December 2014, Stout opined that the FMV of PDC's common stock was $11.00 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of December 31, 2014, issued January 14, 2015 (the "Dec. 2014 FMV"), at 63.

194.    As of June 2015, Stout opined that the FMV of PDC's common stock was $12.90 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2015, issued: July 28, 2015 (the "June 2015 FMV"), at 57.

195.    As of December 2015, Stout opined that the FMV of PDC's common stock was $12.30 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of December 31, 2015, issued January 15, 2016 (the "Dec. 2015 FMV"), at 57.

196.    As of June 2016, Stout opined that the FMV of PDC's common stock was $13.70

per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2016, issued July 11, 2016 (the "June 2016 FMV"), at 53.

197.    As of December 2016, Stout opined that the FMV of PDC's common stock was $10.35 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of December 31, 2016, issued January 13, 2017 (the "Dec. 2016 FMV"), at 39.

198.    As of June 2017, Stout opined that the FMV of PDC's common stock was $6.85 per share. *See* Paperweight Development Corp., Valuation of Common Stock as of June 30, 2017, issued July 14, 2017 (the "June 2017 FMV"), at 39.

199.    Figure 10 below reflects Stout's opinion of the PDC common stock share price over time.

**Figure 10: FMV Determinations of the PDC Common Stock Price**



June 2017 FMV, at 38.

C.    STOUT'S DETERMINATION OF THE FAIR MARKET VALUE OF THE PDC
COMMON STOCK SHARES WAS SUSCEPTIBLE TO MANIPULATION, AND WAS
WILDLY INFLATED AND FLAWED.

200.    For the period June 2013 through June 2017, the FMV of PDC's common stock, as determined by Stout (and adopted by Argent), ranged from $17.85 per share to $6.85 per share.

201.    For the period June 2013 through June 2017, the FMV of PDC's common stock, as determined by Stout (and adopted by Argent), is inconsistent with the Debtors' financial performance and market indicators during the same period.

202.    These deviations between Stout's FMV of PDC's common stock and other financial and market data are pronounced for the period June 2013 through June 2017. During that period the FMV of PDC's common stock as calculated by Stout is higher than other available data affecting the Debtors' valuation would suggest.

203.    The inflated projections prepared by Debtors' senior management are primarily responsible for the disconnect between Stout's FMV Determinations and the Debtors' financial reality.   Stout was fully aware that the projections it received from management were unjustifiably inflated and unreliable.   Instead of pressing management for more reliable projections on which to base its FMV Determinations in limited instances, Stout attempted to compensate for the unreliability (and implicitly, the risk) reflected in the projections by tweaking various aspects of its valuation methodologies. These adjustments were inconsistent between different FMV Determinations, and often lacked any business justification.  Many of the errors in the FMV Determinations detailed below are therefore not the result of mere academic disagreement over the most prudent way to value the Debtors' business, but rather adjustments that Stout knowingly made to compensate for the unreliable financial projections it was provided and chose to rely on.  In this way, Stout knowingly aided and abetted the D&O Defendants'

breaches of fiduciary duty.

204.    Similarly, because Argent was tasked with determining the fair value of PDC common stock on a biannual basis, Argent is equally responsible for the purposeful and knowing manipulation of the valuations of PDC's common stock.  Like Stout, it is untenable that Argent could have been unaware of the unjustifiably inflated optimistic projections the Debtors' senior management provided, and of Stout's inconsistent efforts to account for the unreliability of these projections.

205.    There are several decisions and methodologies employed by Stout (and adopted by Argent) to arrive at the inflated FMV of PDC's common stock.

### 1.    The Stout Valuations Failed to Include Material Indebtedness By Only Including Certain Interest-Bearing Debts, But Not Other Liabilities

206.    Stout's FMV Determinations exclude material indebtedness by only including certain interest bearing debts. Stout's FMV Determinations included the obligations with respect to the following debt instruments in the amount outstanding as of the date thereof: (i) Term Loan (listed as "First Lien Notes" in each FMV Determination report); (ii) Revolving Credit Facility; (iii) Ohio Loan; (iv) Second Lien Notes; (v) Industrial Revenue Bonds; (vi) Columbia County, Wisconsin Forgivable Note. *See* Dec. 2013 FMV, at 86; June 2014 FMV, at 87; Dec. 2014 FMV, at 92; June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64.

207.    Stout even undercounted the amount owed in respect of the Second Lien Notes as follows in Figure 11 by accepting Debtors' management's downward adjustment of the principal amount to account for "unamortized discounts."

**Figure 11: Variance Between Principal Amount of**
**Second Lien Notes and Debt Obligation Used by Stout**
**($ in thousands)**

|  | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| Principal Amount | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 | $250,000 |
| Amount Used by Stout | $246,253 | $246,518 | $246,701 | $246,982 | $247,230 | $247,490 | $247,763 | $248,047 |
| Difference | ($3,747) | ($3,482) | ($3,299) | ($ 3,018) | ($2,770) | ($ 2,510) | ($2,237) | ($1,953) |

*See* Dec. 2013 FMV, at 86; June 2014 FMV, at 87; Dec. 2014 FMV, at 92; June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64.

208.    Moreover, even though Stout listed the Revolving Credit Facility on the schedule of Interest-Bearing Debt, Stout excluded the amounts owed under the Revolving Credit Facility for the FMV Determinations for December 2015 through June 2017. *See* Dec. 2015 FMV, at 52; June 2016 FMV, at 48; Dec. 2016 FMV, at 36; and June 2017 FMV, at 36.

209.    Stout's FMV Determinations also did not include certain liabilities of the Debtors even though those obligations appeared on the Debtors' internal monthly balance sheets as "long-term liabilities." These "long-term liabilities" related to the following: (i) underfunded pension obligations; (ii) non-pension postretirement obligations; (iii) compensation obligations; (iv) workers compensation obligations; (v) accrued insurance obligations; (vi) accrued taxes obligations; (vii) due on accounts receivable securitization; and (viii) other obligations (the "Excluded Liabilities"). *Compare* Dec. 2013 FMV, at 86; June 2014 FMV, at 87; Dec. 2014 FMV, at 92; June 2015 FMV, at 83; June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64, *with* PDC Form 10-K for the year ended December 28, 2013 at 59; PDC Form 10-Q for the quarter ended June 29, 2014, 2014, at 9; PDC Form 10-K for the year ended January 3, 2015, at 56; PDC Form 10-Q for the

quarter ended July 3, 2016, at 10; PDC Form 10-Q for the quarter ended July 5, 2015, at 9; PDC Form 10-K for the year ended January 2, 2016, at 52; PDC Form 10-Q for the quarter ended July 3, 2016, at 10; PDC Form 10-K for the year ended December 31, 2016, at 47; PDC Form 10-Q for the quarter ended July 2, 2017, at 8.

210.    Stout's failure to include underfunded pension obligations resulted in the exclusion at between $93.1 million and $112.6 million in liabilities from July 2015 through July 2017. *Compare* June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64, *with* PDC Form 10-Q for the quarter ended July 5, 2015, at 3; PDC Form 10-K for the year ended January 2, 2016, at 13; PDC Form 10-Q for the quarter ended July 3, 2016, at 3; PDC Form 10-K for the year ended December 31, 2016, at 12; PDC Form 10-Q for the quarter ended July 2, 2017, at 2.

211.    Even in the earlier years, Stout failed to account for the underfunded pension obligations resulted in the exclusion at between $66.1 million and $93.1 million in liabilities from December 28, 2013 until January 3, 2015. *Compare* Dec. 2013 FMV, at 86; June 2014 FMV, at 87; Dec. 2014 FMV, at 92 *with* PDC Form 10-K for the year ended December 28, 2013, at 19; PDC Form 10-K for the year ended January 3, 2015.

212.    Upon information and belief, on May 26, 2016, the ESOP Committee discussed the Debtors' underfunded pension liability and whether Stout should include this liability in its FMV Determinations. Upon information and belief, Ferree was tasked with discussion the underfunded pension with Stout following the ESOP Committee's May 26, 2016 meeting.

213.    Stout's failure to include non-pension postretirement obligations, compensation obligations, workers compensation obligations, accrued insurance obligations, accrued taxes obligations, due on accounts receivable securitization, and other obligations resulted in the

exclusion at between $39.7 million and $44.9 million in liabilities from July 2015 through July 2017. *Compare* June 2015 FMV, at 83; Dec. 2015 FMV, at 83; June 2016 FMV, at 79; Dec. 2016 FMV, at 64; and June 2017 FMV, at 64, *with* PDC Form 10-Q for the quarter ended July 5, 2015, at 9; PDC Form 10-K for the year ended January 2, 2016, at 52; PDC Form 10-Q for the quarter ended July 3, 2016, at 10; PDC Form 10-K for the year ended December 31, 2016, at 47; PDC Form 10-Q for the quarter ended July 2, 2017, at 8.

214.    Figure 12 below reflects these other omitted liabilities.

## Figure 12: Certain Liabilities Excluded By Stout In It FMV Determinations ($ in thousands)

|  | 12/28/13 | 6/29/14 | 1/3/15 | 7/5/15 | 1/2/16 | 7/3/16 | 12/31/16 | 7/2/17 |
|---|---|---|---|---|---|---|---|---|
| Compensation | 5,700 | 6,587 | 10,738 | 8,848 | 6,457 | 8,240 | 6,090 | 6,360 |
| Trade discounts | 12,397 | 11,976 | 12,740 | 11,308 | 2,977 | 10,870 | 10,844 | 9,947 |
| Workers' compensation | 4,816 | 4,482 | 3,541 | 3,229 | 3,133 | 2,786 | 2,587 | 2,475 |
| Accrued insurance | 2,062 | 1,908 | 1,791 | 1,851 | 1,435 | 1,269 | 1,381 | 1,315 |
| Other accrued taxes | 1,462 | 1,340 | 1,543 | 1,324 | 1,694 | 1,218 | 1,268 | 1,187 |
| Postretirement benefits other than pension | 2,637 | 2,637 | 2,472 | 2,472 | 1,869 | 1,869 | 1,543 | 1,543 |
| Due on accounts receivable securitization | - | - | - | - | 5,500 | 7,400 | 10,500 | 11,600 |
| Other | 9,288 | 7,642 | 15,165 | 10,628 | 8,705 | 7,907 | 10,726 | 8,754 |
| TOTAL | 38,362 | 36,572 | 47,990 | 39,660 | 41,770 | 41,559 | 44,939 | 43,181 |

*See* PDC Form 10-K for the year ended December 28, 2013, at 59; PDC Form 10-Q for the quarter ended June 29, 2014, at 9; PDC Form 10-K for the year ended January 3, 2015, at 56; PDC Form 10-Q for the quarter ended July 5, 2015, at 9; PDC Form 10-K for the year ended January 2, 2016, at 52; PDC Form 10-Q for the quarter ended July 3, 2016, at 10; PDC Form 10-K for the year ended December 31, 2016, at 47; PDC Form 10-Q for the quarter ended July 2, 2017, at 8.

215.    It was egregious for Stout to ignore the Excluded Liabilities such liabilities under applicable accounting and valuation standards when performing a FMV Determination.

216.    The inclusion of Excluded Liabilities as debts of the Debtors would have led to a materially lower FMV of PDC's common stock for the period December 2013 through June 2017.

> **2.      The Stout FMV Determinations Utilized Aggressive Assumptions and Projections, Even in the Face of Demonstrable Evidence that Actual Results Failed to Meet These Projections**

217.    Stout's FMV Determinations, at the Officer/Employee Defendants' behest, incorporated fanciful assumptions concerning the growth of the Debtors' business, unsupported by historical performance and unwarranted. Moreover, in many cases, the Debtors' financial performance subsequent to the issuance of the subject FMV Determination failed to achieve the forecasted growth projections. Figure 1 above reflects Appvion's past projections versus actual results.

218.    Moreover, in Stout's June 2015 and June 2016 FMV Determinations, Stout accepted management's projection that EBITDA for the Debtors' Thermal Business would increase by more than 100% year over year. *See* June 2015 FMV, at 41; June 2016 FMV, at 37.

219.    Similarly, in Stout's December 2015 FMV Determination, when comparing the last twelve month ("LTM") EBITDA for the projected new twelve months, Stout accepted management's projection that the Thermal EBITDA ████████████████ year over year growth. *See* Dec. 2015 FMV, at 41.

220.    Many of the key metrics projections used by Stout in its DCF Method remained largely unchanged from prior FMV Determination periods, notwithstanding that the Debtors consistently failed to meet their projections from prior periods. Accordingly, the inclusion of such aggressive EBITDA assumptions, coupled with the failure to account for the Debtors' inability to achieve financial goals in prior periods, caused Stout to arrive at a FMV of PDC's common stock higher than available financial data and historical performance in the Thermal

Business segment would otherwise suggest.

221.    Another example is when Stout accepted management's projection that EBITDA for the Thermal Business would be ███████ for the fiscal year ended December 31, 2015. Management's projection of EBITDA for the Thermal Business, as of June 30, 2015, was as follows, as represented in Figure 13.

**Figure 13: FMV Determinations - Thermal EBITDA Projections**
**($ in thousands)**

| | Projection Period Ended | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 12/31/15 | 12/31/16 | 12/31/17 | 12/31/18 | 12/31/19 | 12/31/20 |
| June 2015 FMV Determination - Thermal EBITDA Projection | $20,759 | $31,499 | $41,527 | ███ | | ███ |

*See* June 2015 FMV, at 67.

222.    However, when Stout determined the FMV as of December 31, 2015, the Debtors' Thermal EBITDA was ███████████ for the twelve months ended December 31, 2015. So, in the twelve months ended December 31, 2015, the Debtors' Thermal EBITDA was approximately ███████████ management's projections. Yet, management hardly revised their Thermal EBITDA projections for the next FMV Determination, as represented in Figure 14 below.

**Figure 14: FMV Determinations - Thermal EBITDA Projections**
**($ in thousands)**

| | Projection Period Ended | | | | | |
| --- | --- | --- | --- | --- | --- | --- |
| | 12/31/15 | 12/31/16 | 12/31/17 | 12/31/18 | 12/31/19 | 12/31/20 |
| June 2015 FMV Determination - Thermal EBITDA Projection | $20,759 | $31,499 | $41,527 | ███ | ███ | ███ |
| December 2015 FMV Determination - Thermal EBITDA Projection | | $28,593 | $41,089 | ███ | ███ | ███ |

*See* June 2015 FMV, at 67; Dec. 2015 FMV, at 41.

223.    In spite of the actual Thermal EBITDA being approximately ██████ ██████ management's projections, management only reduced its Thermal EBITDA projections by ██████ for the next fiscal year, and by no more than ██████ ██████ for fiscal years 2018 through 2020. Dec. 2015 FMV, at 47.

224.    Management's projections for the June 2016 FMV Determination also failed to respond to adverse results. For example, the June 2016 FMV reflected Thermal EBITDA of ██ ██████ for the twelve months ended June 30, 2016, well below the projected amount. June 2016 FMV, at 37. In spite of this poor performance, management decided to *raise its fiscal year 2016 Thermal EBITDA projection* to the June 2015 projection level and did not change any fiscal year 2017-2020 projections from the December 2015 levels. June 2015 FMV, at 41, 47; Dec. 2015 FMV, at 41, 47; June 2016 FMV, at 37, 43.

225.    A composite of the Thermal EBITDA Projections at various FMV Dates is as follows in Figure 15:

**Figure 15: FMV Determinations - Thermal EBITDA Projections ($ in thousands)**



| Adjusted EBITDA | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|
| Actual | | | | | | | | | | |
| June 2012 FMV | ██ | ██ | ██ | ██ | ██ | | | | | |
| Dec. 2012 FMV | | ██ | ██ | ██ | | ██ | | | | |
| June 2013 FMV | | ██ | ██ | ██ | | ██ | | | | |
| Dec. 2013 FMV | | | ██ | ██ | | ██ | ██ | | | |
| June 2014 FMV | | | ██ | ██ | | ██ | ██ | | | |
| Dec. 2014 FMV | | | | ██ | ██ | ██ | ██ | ██ | | |
| June 2015 FMV | | | | ██ | ██ | ██ | ██ | ██ | ██ | |
| Dec. 2015 FMV | | | | | ██ | ██ | ██ | ██ | ██ | |
| June 2016 FMV | | | | | ██ | ██ | ██ | ██ | ██ | |
| Dec. 2016 FMV | | | | | | ██ | ██ | ██ | | ██ |
| June 2017 FMV | | | | | | ██ | ██ | ██ | ██ | ██ |

*See* June 2012 FMV, at 24; Dec. 2012 FMV, at 31, 37; June 2013 FMV, at 40; Dec. 2013 FMV,

at 36, 42; June 2014 FMV, at 43; Dec. 2014 FMV, at 42, 48; June 2015 FMV, at 47; Dec. 2015

FMV, at 41, 47; June 2016 FMV, at 43; Dec. 2016 FMV, at 24, 32; June 2017 FMV, at 23, 24.

226.    A composite of the Carbonless EBITDA Projections at various FMV Dates is as

follows in Figure 16:

## Figure 16: FMV Determinations – Carbonless EBITDA Projections



*See* June 2012 FMV, at 23; Dec. 2012 FMV, at 29, 36; June 2013 FMV, at 39; Dec. 2013 FMV,

at 34, 41; June 2014 FMV, at 42; Dec. 2014 FMV, at 40, 47; June 2015 FMV, at 46; Dec. 2015

FMV, at 39, 46; June 2016 FMV, at 42; Dec. 2016 FMV, at 23, 30; June 2017 FMV, at 23, 24.

227.    A composite of the Thermal EBITDA Projections and Carbonless EBITDA

Projections at various FMV Dates is as follows in Figure 17:

## Figure 17: FMV Determinations - Thermal and Carbonless EBITDA Projections (in $ thousands)

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **June 2013 FMV** | | ■ | ■ | ■ | ■ | | | | |
| **Dec. 2013** | | | ■ | ■ | ■ | ■ | | | |
| **June 2014 FMV** | | | ■ | ■ | ■ | | | | |
| **Dec. 2014 FMV** | | | | ■ | ■ | ■ | ■ | ■ | |
| **June 2015 FMV** | | | | ■ | ■ | ■ | ■ | ■ | ■ |
| **Dec. 2015 FMV** | | | | | ■ | ■ | ■ | ■ | ■ |
| **June 2016 FMV** | | | | | ■ | ■ | ■ | | |
| **Dec. 2016 FMV** | | | | | ■ | ■ | ■ | ■ | ■ |
| **June 2017 FMV** | | | | | ■ | ■ | ■ | ■ | ■ |

*See* June 2012 FMV, at 23, 24; Dec. 2012 FMV, at 29, 31, 36, 37; June 2013 FMV, at 39, 40; Dec. 2013 FMV, at 34, 36, 41, 42; June 2014 FMV, at 42, 43; Dec. 2014 FMV, at 40, 42, 47, 48; June 2015 FMV, at 46, 47; Dec. 2015 FMV, at 39, 41, 46, 47; June 2016 FMV, at 42, 43; Dec. 2016 FMV, at 23, 24, 30, 32; June 2017 FMV, at 23, 24.

### 3.    The Stout FMV Determinations Include Fundamental Flaws In the Guideline Company Method

228.    Stout's Guideline Company Method analysis repeatedly contained companies that were not suitable for comparison. The Guideline Company Method analysis, according to Stout,

is a valuation technique whereby the value of a company is estimated by comparing it to similar public companies. Criteria for comparability in the selection of publicly traded companies include operational characteristics, growth patterns, relative size, earnings trends, markets served, and risk characteristics. Each should be within a reasonable range of the subject company's characteristics to make comparability relevant.

Once a guideline company is selected, pricing multiples are developed by dividing the market value of equity or Enterprise Value (equity plus interest-bearing debt) by appropriate measures of operating results such as sales, operating income, or earnings. After analyzing the risk and return characteristics of the guideline companies relative to the subject company, appropriate pricing multiples are applied to the operating results of the subject company to estimate its value.

*See* June 2015 FMV, at 29; *see also* Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72.

229.    For each FMV Determination, after consulting with the Debtors' management,

Stout purported to have been "able to find public companies that are similar enough so as to make the results implied by the Guideline Company Method relevant for consideration in our conclusion of value." June 2015 FMV, at 33; *see also* Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72.

230.    In order to select companies for Stout's Guideline Company Method analysis, Stout "searched several sources and held discussions with [the Debtors'] management to identify guideline public companies that are sufficiently similar to the Carbonless and Thermal to render the Guideline Company Method relevant for application in [Stout's] analysis." June 2015 FMV, at 33; *see also* Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72.

231.    Stout admitted that "…there are few public companies directly comparable to Carbonless and Thermal [Businesses] in terms of underlying relevant investment characteristics, such as markets, products, growth, cyclical variability, or other pertinent factors." June 2015 FMV, at 33; *see also* Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72. Nonetheless Stout identified a group of public companies that it "deem[ed] similar from a risk and return perspective." June 2015 FMV, at 33; Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72. Stout made this assumption in spite of the fact that "these companies differ from Carbonless and Thermal in terms of specific product offerings and markets served…" June 2015 FMV, at 33; Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June 2017 FMV, at 72.

232.    Stout also believed that "the guideline public company group, as a whole, reflects economic conditions and business risks for Carbonless and Thermal's industry in general." June 2015 FMV, at 33; Dec. 2015 FMV, at 29; June 2016 FMV, at 25; Dec. 2016 FMV, at 71; June

2017 FMV, at 72.

233.    The Officer/Employee Defendants had a material role in the selection of the comparable companies for purposes of the Guideline Company Method. This represented a conflict of interest and lacked independence as it applies to the ultimate financial burden that it would place on Appvion.

234.    For the June 2015 FMV Determination, Stout selected the following companies Stout "identified as similar to Carbonless and Thermal for purposes of our analysis: (i) Neenah Paper, Inc.; (ii) International Paper Company; (iii) Wausau Paper Company; (iv) Domtar Corporation; (v) P.H. Glatfelter Company; and (vi) Verso Paper Corp." *See* June 2015 FMV, at 33.

235.    Starting with the December 2015 FMV Determination, Stout excluded Verso Paper Corp. from its Guideline Company Method set for undisclosed reasons. Stout never explained that Verso Paper Corp. filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code (11 U.S.C. §§ 101, et seq.), in January 2016. Starting with the June 2016 FMV Determination, Stout excluded Wausau Paper Company from its Guideline Company Method set. June 2016 FMV, at 29. Starting with the June 2016 FMV Determination, Stout included Resolute Forest Products Inc., a "paper, pulp, and lumber producer based in Montreal, Canada. *Id*.

236.    The initial selection of comparable companies for purposes of the Guideline Company Method is highly suspect, as those companies materially differ in size, market share, product lines and leverage than those of the Debtors.

237.    Once Stout identified a set of companies it intended to use for the Guideline Company Method, Stout applied the Guideline Company Method to the Thermal and Carbonless

Businesses separately.

238.    In considering what multiple to use in the Guideline Company Method for the Carbonless Business, Stout concluded, among other things, that "Carbonless is smaller than all of the guideline companies in terms of net sales and EBITDA; and Revenue is expected to decline through the projection period (or certain stated years) due to the declining market;…" June 2015 FMV, at 38; Dec. 2015 FMV, at 38; June 2016 FMV, at 34; Dec. 2016 FMV, at 29; June 2017 FMV, at 29.

239.    In considering what multiple to use in the Guideline Company Method for the Thermal Business, Stout concluded, among other things, that

> Thermal is smaller than all of the guideline companies in terms of EBITDA and revenue, which suggests lower pricing multiples; Thermal profitability as a percentage of revenue is below all of the guideline companies; Thermal's historical three-year revenue and EBITDA growth rates are below the medians of the guideline companies, while Thermal's LTM revenue and EBITDA growth rates are above the medians of the guideline companies;

June 2015 FMV, at 40; Dec. 2015 FMV, at 40; June 2016 FMV, at 36; Dec. 2016 FMV, at 31; June 2017 FMV, at 31; *see also* Dec. 2013 FMV, at 35; June 2014 FMV, at 36; Dec. 2014 FMV, at 41.

240.    A number of the companies used in the Guideline Company Method are truly not comparable to the Debtors. For example, if one compares size, as measured by the ratio of LTM net sales and/or LTM EBITDA, PDC is nothing like International Paper Company. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26. International Paper Company's LTM net sales ratio ranged from 30 times to 32.1 times that of PDC. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26. International Paper Company's LTM EBITDA ratio ranged from 48.2 times to 79.8 times that of PDC. *See* June 2015 FMV, at 36;

Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26.

241.    The comparison of the same ratios of PDC to Domtar Corporation reflect totally different companies not suitable for comparison. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26. Domtar Corporation's LTM net sales ratio ranged from 7.1 times to 7.6 times that of PDC. *Id.* Domtar Corporation's LTM EBITDA ratio ranged from 9.7 times to 14.7 times that of PDC. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26.

242.    The Guideline Company Method set used by Stout varies significantly as it related to leverage (i.e., LTM Total Debt to EBITDA). In almost every comparison set, PDC's leverage ratio far exceeded those of the purported peers that Stout selected. *See* June 2015 FMV, at 36; Dec. 2015 FMV, at 36, June 2016 FMV, at 32; Dec. 2016 FMV, at 26; June 2017 FMV, at 26. The single outlier was Verso Corporation, an entity that ultimately filed for chapter 11 bankruptcy protection in the year less than six months after Stout included it in the Guideline Company Method set used by Stout.

243.    The selection is the "comparable companies" stands in striking contrast to the selection of comparable companies for other purposes. For example, in Appvion's "Third Quarter 2015 Review & Full Year 2015 Forecast" dated 11/11/15 (App010333), Appvion's Board considered not only Wausau Paper, Glatfelter, Domtar, Neenah Paper, International Paper (each considered by Stout to be comparable to Appvion), but also Verso Paper (which was removed from the list of comparable companies in the December 2015 FMV) and also Schweitzer-Mauduit, Ahlstrom. *See* App010371.

244.    In a separate November 2015 SG&A Review for the Appvion Board, the Appvion Board again considered Wausau Paper, Glatfelter, Domtar, Neenah Paper, International Paper, Verso Paper, Schweitzer-Mauduit, and Ahlstrom to be comparable to Appvion. *See* App010320.

245.    In March 2016, the Appvion Board, reviewing "2016 Update and Full Year Forecast" again considered Wausau Paper, Glatfelter, Domtar, Neenah Paper, International Paper, Verso Paper, Schweitzer-Mauduit, and Ahlstrom to be comparable to Appvion. *See* App011563.

246.    For the June 2015 FMV Report, Stout's Guideline Company Method contains a series of errors. <u>First</u>, for the Carbonless business, Stout's guideline company method applies a multiple to forecasted "Next Fiscal Year" (2015) EBITDA and "Next Fiscal Year" (2015) Revenue estimates. This is problematic because the comparable company multiple is based on historical financial performance and the metric to which the multiple is applied is future projected earnings of the Carbonless and Thermal Businesses for the next fiscal year.

247.    <u>Second</u>, for the Thermal Business, Stout's guideline company method applies a multiple to forecasted "Next Fiscal Year+1" (2016) EBITDA and "Next Fiscal Year+1" (2016) Revenue estimates. This is problematic because the comparable company multiple is based on historical financial performance and the metric to which the multiple is applied is future projected earnings of the Carbonless and Thermal Businesses for the next fiscal year plus one. The June 2015 FMV states that Stout "selected an [Next Fiscal Year+1] EBITDA multiple for Thermal above the median of the range of the guideline companies to account for the Company's more conservative projections." By doing so, Stout reaffirmed the absurdity of its valuation. There is no sound basis to apply an 8.0x multiple in these circumstances and Stout's explanation that this accounts for conservative projections is laughable. In fact, just six months later, in the

December 2015 FMV determination, the 2016 year end EBITDA projections for the Thermal Business were reduced by an additional 10 %.

248.    Third, for the Thermal Business, Stout's guideline company method declines to apply a multiple to "Next Fiscal Year" EBITDA, "Next Fiscal Year" Revenue, and Latest Twelve Months EBITDA. Stout declines to do so because each of these "are below historical and projected levels and do not represent the Company's performance on an ongoing basis." June 2015 FMV, at 40. Stout's statement is flatly contradicted by the actual performance of the Thermal Business on an ongoing basis as of July 8, 2015 when the June 2015 FMV was issued.

249.    In valuing the Debtors' Thermal Business segment for the December 2015 FMV, June 2016 FMV, December 2016 FMV, and June 2017 FMV, Stout only considered revenue multiplies of the comparable companies and completely ignored the EBITDA multiplies of the comparable companies, resulting in a higher enterprise value of the Thermal Business than had the EBITDA multiples of the comparable companies been considered. The December 2015 FMV report states: "We did not apply multiples to the Company's NFY, LTM, or three-year average EBITDA results, which are below historical and long-term projected levels and do not represent the Company's performance on an ongoing basis." Dec. 2015 FMV, at 40.

250.    In the June 2015 FMV, the December 2015 FMV, and the June 2016 FMV, Stout applied a "control premium" of 10% to the companies selected for its guideline company analysis. In the June 2016 FMV, Stout stated the rationale behind applying a control premium:

> In the Guideline Company Method, the multiples generated from the guideline companies are representative of marketable, minority ownership interests. Therefore, by applying those multiples to the different financial fundamentals of Appvion, we arrive at an indication of the Fair Market Value of Appvion on a minority ownership interest basis. Because our analysis seeks to value Appvion on a controlling ownership basis interest, however, it is

> appropriate to apply a premium to the guideline company multiples
> to reflect the additional value of control.

June 2016 FMV, at 88.

251.    Stout determined the size of the control premium (10%) by examining the control premiums paid in acquisitions of publicly-traded companies, and in transactions within Appvion's industry. Stout's application of a 10% control premium to its guideline company analysis had the effect of increasing its FMV conclusion.

252.    Stout's application of a control premium in the June 2015 FMV, the December 2015 FMV, and the June 2016 FMV is faulty, for several reasons. First, the ESOP required the engagement of an independent appraiser to determine the FMV of PDC company stock in order to determine the value of distributions, contributions, diversification rights, and other conveyances of PDC stock. Such conveyances necessarily reflected minority interests in PDC, and the ESOP, with over one thousand participants as of the Petition Date, would never allow for the conveyance of a controlling interest of all of PDC's common stock.

253.    The ESOP does not require the determination of the FMV of a controlling interest in PDC. Rather, it requires an independent appraiser to determine "the fair market value of Company Stock," (i.e., the FMV of PDC common stock). The FMV of the PDC common stock would be expected to reflect the same discounts, premiums, or other factors that apply to the FMV of the stock of comparable companies.

254.    Stout abruptly and unceremoniously stopped applying a control premium to its Guideline Company Method in the December 2016 FMV nor the June 2017 FMV. Stout did not provide an explanation as to why it did not apply a control premium, or why the application of a control premium was no longer required.

255.   However, the June 2017 FMV did state the following:

> The equity position held by the ESOP as of the Valuation Date represents a majority interest of the common stock, which allows the holder of such stock to exercise control rights over certain aspects of the business that may not otherwise be available to shareholders of the guideline companies. All else held constant, these prerogatives of control held by the ESOP may suggest a higher multiple.

June 2017 FMV, at 29.

256.   Despite this statement, there is no indication that Stout's FMV Determination for June 2017 incorporated a control premium.

257.   Further, Stout's statement that "[t]he equity position held by the ESOP as of the FMV Determination Date represents a majority interest of the common stock" is disingenuous and misleading. It is certainly true that the ESOP was a 100% owner of the common stock of PDC. However, the ESOP only held this stock in trust for the more than one thousand ESOP participants, and the ESOP did not grant those participants any of the tools of control that otherwise justify the attribution of a premium in the first place. For example, ESOP participants were not permitted to elect directors to the PDC Board—an ability that is otherwise fundamental to the notion of a controlling interest.

258.   The abrupt and inexplicable disappearance of the control premium from Stout's two most recent FMV Determinations illustrates the extent to which Stout's valuation methodology was manipulated to achieve particular FMV goals, and to which such methodology was divorced from the independent and academically rigorous analysis Stout (and my extension, Argent) was expected to provide.

259.   In an egregious example, Stout applied a grossly inflated multiple to the Guideline Company Method for the December 2014 FMV report that was untethered to reality. In that report, Stout applies a 7.5x multiple for the Thermal Business to the Net Fiscal Year

EBITDA and LTM EBITDA calculations. Dec. 2014 FMV, at 42. The application of this multiple is juxtaposed to a contemporaneous, significantly lower multiple that employees of Appvion, Stout and Argent actually discussed. In a meeting held on December 2, 2014, and attended by Mr. Socol, Mr. Levine, and Mr. Aguilar of Stout, Mr. Fletcher, Mr. Ferree, and Mr. Richards of Appvion, Mr. Hansberger of Argent and an unknown employee of Argent, that unknown employee wrote that the Thermal Business "basically trades at 4x-5x + higher multiples are not very likely." Yet, inexplicably, Stout nonetheless used a 7.5x multiple to determine the value of the Thermal Business in the December 2014 FMV. This, by itself, inflated the FMV by approximately $20 million to $32 million for that valuation date.

> **4.** **The Stout FMV Determinations Make Improper Exclusions and Adjustments so as to Manipulate and Inflate the Results of the FMV Determinations**

260.    The Stout FMV Determination make improper exclusions and adjustments so as to manipulate and inflate the results of the FMV Determination. One improper exclusion and adjustment is Stout's decision to include different ratios or not to count certain ratios that had been used on the past.

261.    For example, the June 2015 FMV Determination uses the "Next Fiscal Year +1" EBITDA ratio in its Guideline Company Method – Thermal. *See* June 2015 FMV, at 41. Stout claimed that it included this projection for the Thermal Business "to account for the Company's more conservative projections." *See* June 2015 FMV, at 40. In subsequent valuations, Stout used the "Next Fiscal Year" EBITDA ratio for their Guideline Company Method – Thermal techniques. *See* Dec. 2015 FMV, 41; June 2016 FMV, 37; Dec. 2016 FMV, 32; and June 2017 FMV, at 32. But, in the Dec. 2016 FMV, after a particularly disappointing twelve month period ended December 31, 2016, Stout did not revert back to the "Next Fiscal Year +1" EBITDA ratio for their Guideline Company Method – Thermal techniques. *See* Dec. 2016 FMV, 32.

262.     Another example of Stout's manipulated and inflated the FMV Determination is Stout's decision exclude the "Latest Twelve Months" EBITDA ratio in its Guideline Company Method – Thermal. *See* June 2015 FMV, at 41; Dec. 2015 FMV, 41; June 2016 FMV, 37; Dec. 2016 FMV, 32; and June 2017 FMV, at 32. In support of its failure to do so, Stout stated that it "did not apply multiples to the Company's … [Latest Twelve Month EBITDA Ratio], … which are below historical and long-term projected levels and do not represent the Company's performance on an ongoing basis." June 2015 FMV, at 40; Dec. 2015 FMV, 40; June 2016 FMV, 36; Dec. 2016 FMV, 33; and June 2017 FMV, at 31.

263.     Similarly, Stout excluded the "Next Fiscal Year" EBITDA ratio in its Guideline Company Method – Thermal. *See* Dec. 2015 FMV, 41; June 2016 FMV, 37; Dec. 2016 FMV, 32; and June 2017 FMV, at 32. In all of these cases, Stout again stated that it "did not apply multiples to the Company's [Next Fiscal Year], … which are below historical and long-term projected levels and do not represent the Company's performance on an ongoing basis." Dec. 2015 FMV, 40; June 2016 FMV, 36; Dec. 2016 FMV, 33; and June 2017 FMV, at 31.

264.     Likewise, Stout excluded the "Three-Year Average" EBITDA ratio in its Guideline Company Method – Thermal. *See* Dec. 2015 FMV, 41; June 2016 FMV, 37; Dec. 2016 FMV, 32; and June 2017 FMV, at 32. In all of these cases, Stout again stated that it "did not apply multiples to the Company's … three-year average EBITDA results, which are below historical and long-term projected levels and do not represent the Company's performance on an ongoing basis." *See* Dec. 2015 FMV, 40; June 2016 FMV, 36; Dec. 2016 FMV, 33; and June 2017 FMV, at 31.

265.     Upon information and belief, one or more Officer/Employee Defendants assisted Stout to selectively exclude these ratios, for the stated reason that it was because the results were

below long-term projections. As Stout explained in its June 2017 FMV, "[w]e did not apply multiples to the Company's NFY, LM, or three-year average EBITDA results, which are below historical and long-term projected levels and are not expected to represent the Company's performance on an ongoing basis." June 2017 FMV, at 31. Either Stout made this adjustment on its own prerogative, or it did so at the behest of and in consultation with one or more Officer/Employee Defendants. If Stout had included the Last Twelve Month EBITDA Ratio, the Next Fiscal Year EBITDA Ratio, and the Three-Year Average EBITDA Ratio, the Guideline Company Method – Thermal valuation would have been reduced and thus the overall FMV would have correspondingly been reduced. Thus, by excluding the "Latest Twelve Months" EBITDA ratio, the "Next Fiscal Year" EBITDA ratio, and the "Three-Year Average" EBITDA ratio from the Guideline Company Method – Thermal, Stout inflated the valuation of the Thermal Business.

266.    In its December 2016 and June 2017 FMV Determination reports, Stout also attributed its Guideline Company Method – Thermal and Carbonless multiple selection to the fact that the ESOP hold a majority interest of the common stock of PDC, "which allows the holder of such stock to exercise control rights over certain aspects of the business that may not otherwise be available to shareholders of the guideline companies. All else held constant, these prerogatives of control held by the ESOP may suggest a higher multiple." Dec. 2016 FMV, at 29; June 2017 FMV, at 29. Control over a majority of the equity of PDC, but without the right to elect directors, does not confer control rights that would justify a high multiple.

**5.    Stout's FMV Determinations Include Fundamental Flaws In the Discounted Cash Flow Method**

267.    The DCF Method as applied in Stout's FMV Determinations contain fundamental flaws, rending them of diminished value. A non-exclusive list of these flaws is discussed below.

### a.    The Company-Specific Risk Premium

268.    Each of the Stout's FMV Determinations apply a Company-Specific Risk Premium when determining the Weighted Average Cost of Capital for each of the Carbonless and Thermal Businesses. Figure 18 below reflects the Company-Specific Risk Premium Stout used to calculate the Weighted Average Cost of Capital for each of the Carbonless and Thermal Businesses.

### Figure 18: Company-Specific Risk Premium Used By Stout

|  | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| Carbonless | 0.0% | 2.0% | 0.0% | 0.0% | 1.0% | 2.0% | 0.0% | 0.0% |
| Thermal | 1.0% | 1.0% | 2.0% | 2.0% | 2.0% | 4.0% | 4.0% | 4.0% |

*See* Dec. 2013 FMV, at 39-40; June 2014 FMV, at 40-41; Dec. 2014 FMV, at 45-46; June 2015 FMV, at 44-45; Dec. 2015 FMV, at 44-45; June 2016 FMV, at 40-41; Dec. 2016 FMV, at 46, 51; and June 2017 FMV, at 46, 51.

269.    None of the December 2014 FMV, June 2015 FMV, December 2015 FMV, nor June 2016 FMV discuss how Stout (with possible input from Management) came to its conclusion regarding whether to apply a Company-Specific Risk Premium or how the percentages above were selected. None of the December 2014 FMV, June 2015 FMV, December 2015 FMV, nor June 2016 FMV even mention potential company-specific circumstances such as customer concentration, key person risk, unique operating limitations, etc. None of the December 2014 FMV, June 2015 FMV, December 2015 FMV, nor June 2016 FMV provide any qualitative or quantitative analysis and provide any reasoned formula for addition of a nonsystematic risk premium to offset Stout's assessment of the reasonableness of Appvion's financial projections. Thus, for the December 2014 FMV, June 2015 FMV, December 2015 FMV, and June 2016 FMV, Stout's selection of Company-Specific Risk Premiums did not flow from any valuation technique used by valuation professionals.

270.    For example, the Company-Specific Risk Premium used by Stout for the June 2015 FMV, December 2015 FMV and June 2016 FMV contains adjustments unmoored to reality. In those FMV reports, Stout applied a 0%, 1%, and 2% Company-Specific Risk Premium for the Carbonless Business, respectively. *See* June 2015 FMV, at 44-45; Dec. 2015 FMV, at 44-45; June 2016 FMV, at 44-45. Yet, Management's EBITDA projections for the Carbonless Business during that period remained virtually unchanged from FMV Determination Date to FMV Determination Date. *See* Figure 19 below.

**Figure 19: DCF EBITDA Carbonless Projections (in $ thousands)**

| Valuation Date↓ | 12/31/15 | 12/31/16 | 12/31/17 | 12/31/18 | 12/31/19 | 12/31/20 | 12/31/21 |
|---|---|---|---|---|---|---|---|
| 6/30/2015 | $ 44,677 | $ 45,173 | $ 45,823 | $ 45,404 | $ 44,698 | $ 44,781 | -- |
| 12/31/2015 | -- | $ 44,107 | $ 47,371 | $ 47,265 | $ 45,838 | $ 45,619 | -- |
| 6/30/2016 | -- | $ 40,607 | $ 47,371 | $ 47,265 | $ 45,838 | $ 45,619 | -- |
| 12/31/2016 | -- | -- | $ 32,565 | $ 40,447 | $ 38,143 | $ 35,804 | $ 33,602 |
| 6/30/2017 | -- | -- | $ 30,423 | $ 35,903 | $ 32,280 | $ 31,447 | $ 31,602 |

*See* June 2015 FMV, at 46; Dec. 2015 FMV, at 46; June 2016 FMV, at 42; Dec. 2016 FMV, at 23; and June 2017 FMV, at 23.

271.    Thus, Stout inexplicably raised the Company-Specific Risk Premium for the Carbonless Business from 0% for the June 2015 FMV report to 1% for the December 2015 FMV Report to 2% for the June 2016 FMV Report even though there was no change to Appvion's financial projections for the Carbonless Business.

272.    Notes from a July 11, 2016 meeting of Mr. Martin, Ms. Cosgrove, Mr. Shorthouse and Mr. Hanberger, all of Argent, and Mr. Levine and Mr. Aguilar of Stout, indicate that Mr. Aguilar of Stout stated that, with ***emphasis added***:

> Carbonless continue to decline. There has been somewhat of an offset by the sales of specialty products that are higher margin. They have made some progress on sales of security paper which is use[d] for documents such as birth certificates (very small market). The company expects sales to be relatively flat. ***Over the long term sales are expected to decline. The projections are the same as the projection provided for year end with the exception of 2016.***

273.   In spite of Mr. Aguilar's statement, and even though Appvion's Carbonless Business EBITDA projections remained relatively unchanged from the June 2015 FMV to the June 2016 FMV. Yet, the Carbonless Company-Specific Risk Premium changed from 1% to 2%.

274.   For the Thermal Business, Stout application of a Company-Specific Risk Premium does not correlate with the facts. For example, the June 2015 FMV and December 2015 FMV each applied a 2% Company-Specific Risk Premium to the Thermal Business's DCF Valuation.

275.   At the July 11, 2016 meeting, Mr. Aguilar is also attributed with saying, with *emphasis added*:

> Thermal: Thermal sales increased slightly. This division suffered in 2014 as a result of a competitor having the advantage of the lifting of trade restrictions. The Company has been able to recover from this 2014 dip and the price competition that characterized this year. ***The projection for 2016 was up from the last time we looked at the projections as the Company has experienced a higher run rate. The remainder of the projections remain the same as the valuation as of December 31, 2015.***

276.   In spite of Mr. Aguilar's observation that the Thermal Business year ended December 31, 2016 EBITDA projections would be back up from the projections used at the December 2015 FMV, the Thermal Company-Specific Risk Premium went up from 2% to 4%.

277.   Even G. Grant Lyon, then the sole member of the ESOP Administrative Committee of Appvion, Inc. observed in a September 1, 2017 report, that:

> Appvion Prepares financial projections. Given history of Company not hitting projections, SRR and Argent both review the Company's projections, but typically haven't not adjusted the projections.

> Argent, alongside [Stout], does interview management to discuss the projected financial performance and recent operations. (Also note that the projected financial performance is consistent with the projections provided to and reviewed by the Company's Board) [Stout] will adjust for the assessed riskiness of the projections in the discount rate.

278.    Only in the two most recent FMVs, the December 2016 FMV and the June 2017 FMV, did Stout finally explain its selection of a Company-Specific Risk Premiums. Stout allegedly lowered the Carbonless Company-Specific Risk Premium in the December 2016 FMV Determination to account for the fact that the projections for future years' EBITDA had been lowered from the levels used in the June 2016 FMV Determination. Stout stated:

> Company Specific Risk Premium: The company-specific risk premium accounts for risk factors specific to the subject company (i.e., unsystematic risk factors) not captured in the long-term market equity risk premium, beta, or the small stock risk premium.
>
> We considered the following factors in selecting the Company Specific Risk Premium for Carbonless:
>
> – Carbonless' adjusted EBITDA projections for fiscal 2017 are ▇▇ lower than the projections used as of the June 30, 2016 analysis. The increased conservatism of management's forecast reduces the risk associated with the projections.
>
> We considered the following factors in selecting the Company Specific Risk Premium for Thermal:
>
> – Over the last three years, Thermal's adjusted EBITDA declined at an annualized rate of ▇▇. In comparison, the Company is projecting annualized adjusted EBITDA growth of ▇▇ for Thermal between the LTM period and fiscal 2021. There is increased risk associated with the Company's projections given that projected earnings growth is above historical levels.
>
> – Thermal's adjusted EBITDA projection for fiscal 2017 is ▇▇ lower than the projections used as of the June 30, 2016 analysis. The increased conservatism of management's forecast reduces the risk associated with the projections.

Dec. 2016 FMV, at 18-19.

279.    In its June 2017 FMV, Stout stated:

> Company Specific Risk Premium: The company-specific risk premium accounts for risk factors specific to the subject company (i.e., unsystematic risk factors) not captured in the long-term market equity risk premium, beta, or the small stock risk premium.
>
> We considered the following factors in selecting the Company Specific Risk Premium for Carbonless:
>
> – Carbonless' adjusted EBITDA projections for fiscal 2017 are ▇▇ lower

than the projections used in the December 31, 2016 analysis.

– Carbonless' projected revenue and adjusted EBITDA continue to reflect the long-term decline in demand for carbonless paper.

– We did not change the Company Specific Risk Premium from 0.0% for Carbonless.

We considered the following factors in selecting the Company Specific Risk Premium for Thermal:

– Between fiscal 2013 and the LTM period, Thermal's adjusted EBITDA declined at an annualized rate of 13.9%. In comparison, the Company is projecting annualized adjusted EBITDA growth of ███ for Thermal between the LTM period and fiscal 2021 due to strong demand for thermal tag, label, and entertainment products, increased point-of-sale paper pricing, ongoing improvements to manufacturing operations, and cost savings initiatives.

– Thermal's adjusted EBITDA projection for fiscal 2017 is ███ lower than the projections used in the December 31, 2016 analysis.

– We did not change the Company Specific Risk Premium from 4.0% for Thermal.

June 2017 FMV, at 18-19.

280.    Stout's decision to adjust the Company-Specific Risk Premium for the December 2016 FMV and the June 2017 FMV evidence the fact that Stout knew that Appvion's financial projections available at that time were overly optimistic (and therefore contained more risk), and that it was attempting to compensate for that risk by arbitrarily manipulating its FMV Determinations. When compared to the December 2016 FMV and June 2017 FMV, the prior FMV determinations lacked any qualitative or quantitative analysis of Management's financial projections. *Compare* December 2016 FMV and June 2017 FMV *to* December 2013 FMV, June 2014 FMV, December 2014 FMV, June 2015 FMV, December 2015 FMV, and June 2016 FMV.

### b.    The Cost of Debt

281.    Each of the Stout's FMV Determinations apply a "Cost of Debt" when determining the Weighted Average Cost of Capital for each of the Carbonless and Thermal Businesses. Figure 20 below reflects the Cost of Debt used to calculate the Weighted Average

Cost of Capital for each of the Carbonless and Thermal Businesses.

### Figure 20: Cost of Debt Used by Stout

|  | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| Carbonless | 6.0% | 6.0% | 6.0% | 6.0% | 5.5% | 4.4% | 4.8% | 6.5% |
| Thermal | 6.0% | 6.0% | 6.0% | 6.0% | 5.5% | 4.4% | 4.8% | 6.5% |

*See* Dec. 2013 FMV, at 39-40; June 2014 FMV, at 40-41; Dec. 2014 FMV, at 45-46; June 2015 FMV, 44-45; Dec. 2015 FMV, 44-45; June 2016 FMV, 44-45; Dec. 2016 FMV, 46, 51; and June 2017 FMV, at 46, 51.

282.    In certain cases, the Stout FMV Determinations state that the "Cost of Debt" is "[b]ased on estimated senior lending rates as of the Valuation Date." *See, e.g.,* Dec. 2013 FMV, at 39-40; June 2014 FMV, at 40-41; Dec. 2014 FMV, at 45-46; June 2015 FMV, 44-45; Dec. 2015 FMV, 44-45; June 2016 FMV, 44-45.Yet, there is no disclosure of what constitutes "senior lending rates," or how it was estimated, or  what the source of such information was, or that the source of such information as one or more of the Officer/Employee Defendants. Stout's June 2017 FMV Determination does not disclose the benchmark that was used to determine the Cost of Debt.

283.    In other determinations, the Stout FMV Determinations state that the "Cost of Debt" is "[b]ased on long-term corporate bond yields as of the Valuation Date." *See, e.g.,* Dec. 2016 FMV, 46, 51; and June 2017 FMV, at 46, 51. Stout notes that "[t]o estimate the Company's marginal cost of debt, we rely on the 20-year corporate bond yield for "BBB"-rated securities (or Moody's equivalent), …." Dec. 2016 FMV, 19. The use of a "BBB" rated benchmark for the Debtors' cost of debt as of December 31, 2016 is deeply flawed. As of the December 31, 2016, Standard & Poor's long term local issuer credit rating for Appvion was a "B-". So while a "BBB" rated corporate bond maturing in 20 years had an interest rate of 4.8%, Stout's use of that benchmark is wholly inappropriate where Appvion, as issuer, was rated "B-." As of December

31, 2016, a "B-" rated corporate bond maturing in 20 years had an interest rate of 7.8%. As a result of the use of a "BBB" benchmark for the cost of debt, the FMV Determination as of this date artificially increased the FMV.

### c.    Terminal EBITDA Multiple

284.    Each of the Stout's FMV Determinations apply a "Terminal EBITDA Multiple" when calculating the DCF Method for each of the Carbonless and Thermal Businesses. Figure 21 below reflects the Terminal EBITDA Multiple used to calculate the DCF for each of the Carbonless and Thermal Businesses.

### Figure 21: Terminal EBITDA Multiple Used By Stout

|            | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|------------|----------|---------|----------|---------|----------|---------|----------|---------|
| Carbonless | 6.0X     | 5.0X    | 5.0X     | 5.5X    | 5.5X     | 5.5X    | 6.5X     | 7.0X    |
| Thermal    | 6.0X     | 7.5X    | 7.5X     | 5.5X    | 5.5X     | 5.5X    | 5.5X     | 5.5X    |

*See* Dec. 2013 FMV, at 41-42; June 2014 FMV, at 42-43; Dec. 2014 FMV, at 47-48; June 2015 FMV, 46-47; Dec. 2015 FMV, 46-47; June 2016 FMV, 46-47; Dec. 2016 FMV, 23-24; and June 2017 FMV, at 23-24.

285.    The Terminal EBITDA Multiple used by Stout moved contrary to industry trends in the case of the Carbonless Business, and not at all in the case of the Thermal Business. Stout's use of terminal EBITDA multiples that failed to reflect the Debtors' long term business prospects, when viewed through the decline of the Debtors' businesses and the Debtors' failure to meet projections, artificially caused the FMV to increase.

286.    In the June 2015 FMV, Stout calculated the terminal value as part of the DCF differently than it had with respect to other FMV reports. Stout used EBITDA Projections for using six years before calculating the terminal value for the residual period.

### d.    The Discount Rate for Limited Marketability

287.    Stout's FMV Determinations provide for a five percent (5%) discount to reflect

the fact that PDC was required to exercise the repurchase obligation to redeem shares from terminated or retiree employees. In Stout's view,

> the effect of such put option is that it greatly improves the marketability of the underlying closely held Company's shares, and thus the liquidity of an ESOP participant's investment. Hence, the existence of a put option should significantly reduce or eliminate the otherwise appropriate discount for limited marketability.

Dec. 2016 FMV, at 35; *see also* Dec. 2013 FMV, at 50; June 2014 FMV, at 51; Dec. 2014 FMV, at 56; June 2015 FMV, at 51; Dec. 2015 FMV, at 51; June 2016 FMV, at 47; June 2017 at 35.

288. In each of the FMV Determinations since June 2015, Stout stated that it did not believe that the Debtors' future repurchase obligations would exceed five percent (5%) of PDC's common equity value, or approximately $5 million. In each of the FMV Determinations December 31, 2013 to December 31, 2014, Stout stated that it did not believe that the Debtors' future repurchase obligations would exceed five percent (5%) of PDC's common equity value. These projections were derived from input from the Debtors' management.

289. Despite significant changes to results of the Debtors' business as well as significant movement in the trading prices of the Debtors' Term Loan and Second Lien Notes, reflecting the Debtors' insolvency, Stout's discount for limited marketability never changed. Had Stout increased the discount for limited marketability, it would have led to a materially lower FMV of PDC's common stock for the period December 2013 through June 2017.

**D. THE ESOP STRUCTURE GAVE RETIRING DIRECTORS AND OFFICERS A VESTED FINANCIAL INTEREST IN MAXIMIZING THE FMV, WHICH A NUMBER WOULD LATER CAPITALIZE ON**

290. The ESOP's structure gives retiring participants a vested financial interest in ensuring that the FMV of PDC's common stock is maximized for each period when the participant receives a distribution on account of PDC's common stock.

291. During the time period where valuation methodology decisions were employed by

Stout, certain high level officers retired from the Debtors, and their compensation awards had vested or begun to vest.

292.   In addition to the compensation listed in Figure 2, Mr. Richards received ESOP distributions totaling $107,054 for the years 2016 and 2017. He also received grants of RSUs and SARs totaling $440,000 for 2015, and a "Non-Qualified Distribution of $2,958,421 for 2016. Mr. Richards exercised diversification rights in 2016 and 2017 under the ESOP, thereby receiving consideration worth $29,523 and $55,744 respectively.

293.   In addition to the compensation listed in Figure 4, Mr. Ferree received ESOP distributions of $26,084 for 2017, RSUs and SARs totaling $596,731 for the years 2015 through 2017. Mr. Ferree received certain RSU Payments ("Ferree 2017 RSU Payments") within one year of the Petition Date totaling $237,431. *See* D.I. 266, Question 30, at 11-12.

### Figure 22: Ferree 2017 RSU Payments

| Payment Date | Payment Amount |
|---|---|
| 2/17/17 | $124,200 |
| 8/18/17 | $83,577 |
| 8/18/17 | $29,654 |
| **TOTAL** | **$237,431** |

294.   Mr. Ferree also received certain non-qualified distributions within one year of the Petition Date totaling of $1,030,800 for 2017 (collectively, the "Ferree 2017 Non-Qualified Distributions"). *See* D.I. 266, Question 30, at 11-12.

### Figure 23: Ferree 2017 Non-Qualified Distributions

| Payment Date | Payment Amount |
|---|---|
| 6/30/17 | $736,612 |
| 6/30/17 | $231,505 |
| 9/1/17 | $62,683 |
| TOTAL | $1,030,800 |

295.    Mr. Ferree exercised diversification rights in 2016 and 2017 under the ESOP, thereby receiving consideration worth $66,930. Ferree also received certain SERP distributions within ninety (90) days of the Petition Date totaling $177,874 (the "Ferree 2017 SERP Distributions" and with the Ferree 2017 Non-Qualified Distributions and the Ferree 2017 RSU Payments, the "Ferree 2017 Specified Distributions").

**Figure 24: Ferree 2017 SERP Distributions**

| Payment Date | Payment Amount |
|---|---|
| 6/30/17 | $176,873 |
| 9/1/17 | $1,001 |
| TOTAL | $177,874 |

296.    In addition to the compensation listed in Figure 6, Ms. Arent received ESOP distributions of $105,620 for 2016 and 2017, RSUs of $55,000 for 2015, and Non-Qualified Distributions, including SERP, of $316,511 for 2016 and 2017. Ms. Arent exercised diversification rights in 2016 and 2017 under the ESOP, thereby receiving consideration worth $95,478.

297.    In the three years prior to the Petition Date, there were approximately $23.8 million in withdrawals from the ESOP due to employee terminations. For the twelve month period ending June 2017, the employee termination related withdrawals from the ESOP were calculated using an average FMV of PDC common stock of $11.95 per share. For the same period, employees contributed approximately $4.8 million in deferred compensation to the ESOP at an average FMV of PDC common stock of $8.33 per share. These contributions were subject to the Debtors' "company match" of $5.1 million.

298.    In the three years prior to the Petition Date, contributions to the ESOP totaled approximately $11 million while total withdrawals from the ESOP totaled $38 million. Revenues

from the Debtors' operations were insufficient to account for this approximately $27 million shortfall between the obligations to pay required distributions from the ESOP and the amount of new contributions from participants seeking to purchase PDC common stock. Consequently, the Debtors increased their borrowings under their secured credit facility in order to allow the ESOP to satisfy its obligations to ESOP participants.

E. **COMPENSATION AND BENEFITS**

1. **The Officer/Employee Defendants and Director Defendants' Compensation**

299. As of the Petition Date, in addition to regular compensation, the Debtors maintained a long-term incentive compensation plan composed of (i) the Long-Term Stock Appreciation Rights Plan ("SAR Plan"); and (ii) the Long-Term Restricted Stock Unit Plan ("RSU Plan" and together with the SAR Plan, the "Long-Term Incentive Plans").

300. The Debtors did this through its long-term restricted stock unit for key management employees to grant with future cash payments based on the FMV Determination, the Debtors' non-qualified deferred compensation plan to award non-employee members of their boards of directors with phantom stock units, and the LTIP to award synthetic equity units to employees.

301. In 2006, the Debtors established a nonqualified deferred compensation plan to award non-employee members of its board of directors with phantom stock units. The deferred compensation is paid in five equal annual cash installments following a director's conclusion of service on the board of directors.

302. Under the RSU Plan, the Debtors purported to award key management employees with future cash payments based on the value of Appvion common stock. All RSUs vest three years after the award date and the cash value of the stock is paid to the employee on the besting

date. In the event of a change of control transaction, all outstanding RSUs vest immediately and related payments are accelerated.

303.    The compensation committee(s) of the PDC Board and/or the Appvion Board established the number of units granted each year under the Long-Term Incentive Plans. The Appvion Board and/or the PDC Board determined the awards for the named executive officers. Management decided which employees were in a position to make a significant contribution to growth and profitability, and of the employees who received awards under the Long-Term Incentive Plans, most receive such awards based on a succession planning and leadership management process. Units received prior to January 1, 2017 were generally vested three years after the award date. Units received on and after January 1, 2017 vested one third each year over a three-year period after the award date. Under the RSU Plan, units were paid at vesting. For the SAR Plan, the recipient had a 10-year window following vesting within which to opt to receive payment.

304.    The Debtors maintained a Supplemental Executive Retirement Plan ("SERP") to provide retirement benefits for eligible salaried employees whose benefits are reduced by the tax-qualified plan limitations of the Pension Plan.

305.    The Debtors also maintained the Nonqualified Excess Plan for highly compensated current and former employees and non-employee directors. With respect to employees, the Nonqualified Excess Plan allowed for deferral of compensation on a pre-tax basis and accumulation of tax-deferred earnings in an amount of up to 50% of a participant's base salary and up to 75% of a participant's annual performance-based incentive pay or restricted stock units. Non-employee directors could defer 100% of their fees. As of September 2017, the balance under the Nonqualified Excess Plan was approximately $1.48 million.

306.    The Debtors had also established a benefit within the Nonqualified Excess Plan for management and other highly compensated employees whose benefits are reduced as the result of deferring income into the Nonqualified Excess Plan or by the tax-qualified plan income limitations applied to the KSOP.

### 2.    The Debtors' Pension Plan

307.    The Pension Plan is a single-employer defined benefit pension plan with approximately 3,200 participants.

308.    Until 2012, certain of the Debtors' hourly employees participated in the Pace Industry Union-Management Pension Plan (the "PIUMPF"), a multi-employer defined benefit plan. In 2012, employees at the West Carrollton Plant and the Kansas City distribution center elected to end their participation in the PIUMPF. As a result, the Debtors recorded $25 million of expense in 2012, representing the estimated withdrawal liability under the terms of the PIUMPF's trust agreement with a twenty-year payment period beginning January 2014, to which the Debtors made payments totaling $2.9 million in 2016 and 2017. The Stout FMV Determinations did not disclose the financial obligations related to PIUMPF.

### 3.    Ownership of PDC Common Stock

309.    Figure 25 below reflects the PDC equity ownership as of December 31, 2013.

**Figure 25: Paperweight Equity Ownership Schedule as of December 31, 2013**

| | | | | Total | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Canadian SAR Units | Fully Diluted Ownership | Percentage |
| ESOP | 7,979,233 | 0 | 0 | 0 | 0 | 7,979,233 | 77.3% |
| Management | 0 | 216,125 | 81,160 | 2,039,600 | 500 | 2,337,385 | 22.7% |
| Total | 7,979,233 | 216,125 | 81,160 | 2,039,600 | 500 | 10,316,618 | 100.0% |

*(Table title within image: Paperweight Equity Ownership Schedule)*

June December 2013 FMV, at 6.

310.    Figure 26 below reflects the PDC equity ownership as of June 30, 2014.

**Figure 26: Paperweight Equity Ownership Schedule as of June 30, 2014**

| Paperweight Equity Ownership Schedule | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total | | |
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Canadian SAR Units | Fully Diluted Ownership | Percentage |
| ESOP | 7,803,579 | 0 | 0 | 0 | 0 | 7,803,579 | 75.9% |
| Management | 0 | 323,850 | 89,415 | 2,063,450 | 500 | 2,477,215 | 24.1% |
| Total | 7,803,579 | 323,850 | 89,415 | 2,063,450 | 500 | 10,280,794 | 100.0% |

June 2014 FMV, at 6.

311.    Figure 27 below reflects the PDC equity ownership as of December 31, 2014.

**Figure 27: Paperweight Equity Ownership Schedule as of December 31, 2014**

| Paperweight Equity Ownership Schedule | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total | | |
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Canadian SAR Units | Fully Diluted Ownership | Percentage |
| ESOP | 7,340,838 | 0 | 0 | 0 | 0 | 7,340,838 | 74.7% |
| Management | 0 | 332,625 | 97,817 | 2,050,950 | 500 | 2,481,892 | 25.3% |
| Total | 7,340,838 | 332,625 | 97,817 | 2,050,950 | 500 | 9,822,730 | 100.0% |

Dec. 2014 FMV, at 6.

312.    Figure 28 below reflects the PDC equity ownership as of June 30, 2015.

**Figure 28: Paperweight Equity Ownership Schedule as of June 30, 2015**

| Paperweight Equity Ownership Schedule | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | Total | | |
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Canadian SAR Units | Fully Diluted Ownership | Percentage |
| ESOP | 6,934,029 | 0 | 0 | 0 | 0 | 6,934,029 | 71.8% |
| Management | 0 | 370,000 | 110,918 | 2,248,780 | 300 | 2,729,998 | 28.2% |
| Total | 6,934,029 | 370,000 | 110,918 | 2,248,780 | 300 | 9,664,027 | 100.0% |

June 2015 FMV, at 7.

313.    Figure 29 below reflects the PDC equity ownership as of December 31, 2015.

**Figure 29: Paperweight Equity Ownership Schedule as of December 31, 2015**

| | **Paperweight Equity Ownership Schedule** | | | | | |
|---|---|---|---|---|---|---|
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units | Fully Diluted Ownership | Percentage |
| ESOP | 6,751,614 | 0 | 0 | 0 | 6,751,614 | 72.6% |
| Management | 0 | 359,975 | 121,987 | 2,063,134 | 2,545,096 | 27.4% |
| **Total** | **6,751,614** | **359,975** | **121,987** | **2,063,134** | **9,296,710** | **100.0%** |

Dec. 2015 FMV, at 7.

314.    Figure 30 below reflects the PDC equity ownership as of June 30, 2016.

**Figure 30: Paperweight Equity Ownership Schedule as of June 30, 2016**

| | **Paperweight Equity Ownership Schedule** | | | | | |
|---|---|---|---|---|---|---|
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units [a] | Fully Diluted Ownership | Percentage |
| ESOP | 6,398,362 | 0 | 0 | 0 | 6,398,362 | 72.1% |
| Management | 0 | 280,567 | 126,857 | 2,069,099 | 2,476,523 | 27.9% |
| **Total** | **6,398,362** | **280,567** | **126,857** | **2,069,099** | **8,874,885** | **100.0%** |
| [a] Of the 2,069,099 LTIP units outstanding, 963,978 units are in-the-money. | | | | | | |

June 2016 FMV, at 6.

315.    Figure 31 below reflects the PDC equity ownership as of December 31, 2016.

**Figure 31: Paperweight Equity Ownership Schedule as of December 31, 2016**

| Paperweight Equity Ownership Schedule | | | | | | |
|---|---|---|---|---|---|---|
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units [a] | Fully Diluted Ownership | Percentage |
| ESOP | 6,262,701 | 0 | 0 | 0 | 6,262,701 | 82.8% |
| Management | 0 | 248,650 | 139,570 | 911,034 | 1,299,254 | 17.2% |
| Total | 6,262,701 | 248,650 | 139,570 | 911,034 | 7,561,955 | 100.0% |

[a] Of the 911,034 LTIP units outstanding, none of the units are in-the-money.

Dec. 2016 FMV, at 10.

316.    Figure 32 below reflects the PDC equity ownership as of June 30, 2017.

**Figure 32: Paperweight Equity Ownership Schedule as of June 30, 2017**

| Paperweight Equity Ownership Schedule | | | | | | |
|---|---|---|---|---|---|---|
| Shareholder | Common Stock | Restricted Stock Units | Phantom Stock Units | LTIP Units [a] | Fully Diluted Ownership | Percentage |
| ESOP | 5,932,120 | 0 | 0 | 0 | 5,932,120 | 77.7% |
| Management | 0 | 334,797 | 145,505 | 1,223,759 | 1,704,061 | 22.3% |
| Total | 5,932,120 | 334,797 | 145,505 | 1,223,759 | 7,636,181 | 100.0% |

[a] Of the 1,223,759 LTIP units outstanding, none of the units are in-the-money.

June 2017 FMV, at 10.

F.    **APPVION'S CREDIT RATING HISTORY**

317.    Figure 33 below reflects Appvion's Standard & Poor's long term local issuer credit rating.

**Figure 33: Appvion's Standard & Poor's Long Term Local Issuer Credit Rating**

| | 10/2/09 – 8/23/16 | 8/24/16 – 8/18/17 | 8/19/17 – 10/1/17 | 10/2/17 – the Petition Date |
|---|---|---|---|---|
| Appvion's Standard & Poor's Long Term Local Issuer Credit Rating | B | B- | CCC | D |

G.      **SUMMARY OF ESOP TRANSACTIONS**

318.    At inception in 2001, there were 10,684,372 shares of PDC in the ESOP Trust. Since inception of the ESOP, contributions to the ESOP Trust totaled 8,390,810 shares of PDC at a blended price per share of $18.97. Thus, total contributions to the ESOP Trust since inception was approximately $159.2 million.

319.    Since inception of the ESOP, withdrawals from the ESOP Trust totaled 13,252,071 shares of PDC at a blended price per share of $19.73. Thus, total withdrawals from the ESOP Trust since inception was approximately $261.5 million.

320.    Since inception of the ESOP, withdrawals from the ESOP Trust exceeded contributions to the ESOP Trust by approximately $102.3 million.

321.    The total number of PDC common shares have decreased from 2012 to 2017 as withdrawals (mostly due to employee terminations) have outpaced contributions (mostly from employee contributions).

322.    The FMV Determination price per share of PDC common stock has dropped by 58.4% since June 2012. Figure 34 below reflects the historical ESOP share counts and valuation for the period 2012 to 2017.

**Figure 34: Historical ESOP Share Counts and Valuation for the Period 2012 to 2017**



*See* June 2015 FMV, at 57; Dec. 2015 FMV, at 57; June 2016 FMV, at 53; Dec. 2016 FMV, at 39-40; June 2017 FMV, at 39-40.

323.    Figure 35 below reflects Selected Financial Data for each FMV Determination Date since December 2013 (with the June 2015 FMV adjusted to exclude the Encapsys Sale), as calculated and rounded by Stout.

**Figure 35: LTM EBITDA, Enterprise Value, Share Price and Implied Enterprise Value ($ in thousands, except share price)**

|  | 12/31/13 | 6/30/14 | 12/31/14 | 6/30/15 | 12/31/15 | 6/30/16 | 12/31/16 | 6/30/17 |
|---|---|---|---|---|---|---|---|---|
| LTM EBITDA – Carbonless | 51,653 | 45,709 | 43,211 | 45,303 | 43,826 | ███ | ███ | ███ |
| LTM EBITDA – Thermal | 44,952 | 39,252 | 33,805 | 15,688 | 6,296 | ███ | ███ | ███ |
| LTM EBITDA – Carbonless & Thermal | 96,605 | 84,961 | 77,016 | 60,991 | 50,122 | ███ | ███ | ███ |
| Total Enterprise Value Carbonless & Thermal | 588,000 | 570,000 | 534,000 | 509,000 | 513,000 | ███ | ███ | ███ |
| Total Enterprise Value Encapsys | 150,000 | 161,000 | 166,000 |  |  |  |  |  |
| Share Price | $ 16.25 | $ 16.30 | $ 11.00 | $ 12.90 | $ 12.30 | $ 13.70 | $ 10.35 | $ 6.85 |
| Implied Equity Value | 129,600 | 127,100 | 80,700 | 89,000 | 83,000 | ███ | ███ | ███ |

*See* Dec. 2013 FMV, at 34, 36, 51; June 2014 FMV, at 35, 37, 52; Dec. 2014 FMV, at 40, 42, 57; June 2015 FMV, at 39, 41, 49, 52, 57; Dec. 2015 FMV, at 39, 41, 49, 52, 57; June 2016 FMV, at 35, 37, 45, 48, 53; Dec. 2016 FMV, at 30, 32-33, 36, 39-40; June 2017 FMV, at 30, 32-33, 36,

39-40.

324.    Between June 2013 and June 2017, there were significant withdrawals from the ESOP due to employee terminations and other factors (including diversification and hardship payments, loans and loan fees, forfeitures, and losses on plan transactions).  Total withdrawals far exceeded contributions made to the ESOP during the same period (including employee deferrals and company matches of such deferrals, employee loan payments, purchases from interest, and gains on plan transactions).

325.    From June 2013 to June 2017, contributions to the ESOP totaled on $16,061,995, while withdrawals from the ESOP totaled $51,579,906. This resulted in a deficit on $35,517,911, which was funded by PDC and Appvion.

326.    For the six months leading up to December 2013, contributions to the ESOP totaled $2,450,825, while withdrawals from the ESOP totaled $5,739,281. This produced a deficit of $3,288,456, which was funded by PDC and Appvion.

327.    For the six months leading up to June 2014, contributions to the ESOP totaled $2,549,610, while withdrawals from the ESOP totaled $7,801,677. This produced a deficit of $5,252,067, which was funded by PDC and Appvion.

328.    For the six months leading up to December 2014, contributions to the ESOP totaled $2,161,213, while withdrawals from the ESOP totaled $12,144,253. This produced a deficit of $9,983,040, which was funded by PDC and Appvion.

329.    For the six months leading up to June 2015, contributions to the ESOP totaled $2,382,291, while withdrawals from the ESOP totaled $5,081,997. This produced a deficit of $2,699,706, which was funded by PDC and Appvion.

330.    For the six months leading up to December 2015, contributions to the ESOP

totaled $1,699,170, while withdrawals from the ESOP totaled $4,341,893. This produced a deficit of $2,642,723, which was funded by PDC and Appvion.

331.    For the six months leading up to June 2016, contributions to the ESOP totaled $1,919,379, while withdrawals from the ESOP totaled $6,094,436. This produced a deficit of $4,175,057, which was funded by PDC and Appvion.

332.    For the six months leading up to December 2016, contributions to the ESOP totaled $1,531,120, while withdrawals from the ESOP totaled $4,155,508. This produced a deficit of $2,624,388, which was funded by PDC and Appvion.

333.    For the six months leading up to June 2017, contributions to the ESOP totaled $1,368,387, while withdrawals from the ESOP totaled $6,220,861. This produced a deficit of $4,852,474, which was funded by PDC and Appvion.

H.    **APPVION'S HISTORICAL DEBT TRADING PRICES DID NOT TRACK STOUT'S FMV DETERMINATIONS**

334.    Figures 36 and 37 below are graphs charting Stout's FMV Determinations against the Second Lien Notes' debt trading prices for the period December 2013 through June 2017.

**Figure 36: Historical Trading Prices**



**Figure 37: Historical Trading Prices (% Changes)**



I.     THE BOND AND LOAN MARKETS TOOK NOTE OF THE DEBTORS' DECLINING
       FINANCIAL POSITION AND INSOLVENCY

335.    The markets took note of the Debtors' declining financial condition. In November

2013 the Second Lien Notes were priced by Bloomberg Valuation (a/k/a "BVAL") at a discount

to par. *See* Figure 38 below.

### Figure 38: BVAL of the Second Lien Notes in November 2013
### ($ in thousands)

|  | Principal Amount | x | Market Price | = | Market Value | | (Deficit) | |
|---|---|---|---|---|---|---|---|---|
| 11/29/2013 | $250,000 | | 98.125% | | $ | 245,313 | $ | (4,688) |
| 11/27/2013 | $250,000 | | 98.0% | | $ | 245,000 | $ | (5,000) |
| 11/26/2013 | $250,000 | | 98.0% | | $ | 245,000 | $ | (5,000) |
| 11/25/2013 | $250,000 | | 97.75% | | $ | 244,375 | $ | (5,625) |
| 11/22/2013 | $250,000 | | 97.75% | | $ | 244,375 | $ | (5,625) |
| 11/21/2013 | $250,000 | | 97.75% | | $ | 244,375 | $ | (5,625) |
| 11/20/2013 | $250,000 | | 97.875% | | $ | 244,688 | $ | (5,313) |
| 11/19/2013 | $250,000 | | 97.75% | | $ | 244,375 | $ | (5,625) |
| 11/18/2013 | $250,000 | | 97.688% | | $ | 244,220 | $ | (5,780) |
| 11/15/2013 | $250,000 | | 97.938% | | $ | 244,845 | $ | (5,155) |
| 11/14/2013 | $250,000 | | 98.125% | | $ | 245,313 | $ | (4,688) |

*Source*: Bloomberg.

336.    Then, again, in the second half of 2014, the Second Lien Notes were valued by

BVAL from par (100% of the principal amount) to approximately 68% of par by December 31,

2014. Standing alone, the debt trading prices of the Second Lien Notes in the second half 2014

reflected the market's belief that the value of the debt was materially impaired and that Appvion

was insolvent by at least $78 million. The debt trading markets (reflected by BVAL) echoed the

conclusion that Appvion was insolvent through the Petition Date.

337.    The markets fundamentally disagreed with Stout concerning Stout's the value of

PDC common stock.

338.    As of the June 2015 FMV, the Second Lien Notes' BVAL was 35% below par (or

at a price of roughly $0.65 per every $1.00 of principal amount). This reflected the market's conclusion that Appvion was insolvent by at least $86.5 million.

339.    As shown in Figure 39 below, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of the December 2014 FMV Determination. Even if Stout's methodology of considering only "Interest-Bearing Debt" is accepted, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of December 31, 2014.

**Figure 39: BVAL of Certain Obligations as of December 31, 2014 ($ in thousands)**

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 328,225 |  | 98.6880% |  | $323,919 | ($4,306) |
| Revolving Credit Facility | $ 9,600 |  | 100% |  | $ 9,600 | $   - |
| Ohio Loan | $ 3,010 |  | (n/a) |  | $ 3,010 | $   - |
| Second Lien Notes | $ 250,000 |  | 68.8756% |  | $172,188 | ($77,813) |
| Industrial Revenue Bonds | $ 6,000 |  | (n/a) |  | $ 6,000 | $   - |
| Columbia County, Wisconsin Forgivable Note | $    - |  | (n/a) |  | $   - | $   - |
| TOTAL | $ 596,835 |  |  |  | $514,716 | ($82,119) |

*Source*: PDC Form 10-K for the year ended December 31, 2014, at 15 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts); Bloomberg.

340.    As shown in Figure 40 below, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of the June 2015 FMV Determination. Even if Stout's methodology of considering only "Interest-Bearing Debt" is accepted, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of June 30, 2015.

**Figure 40: BVAL of Certain Obligations as of June 30, 2015 ($ in thousands)**

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 329,138 |  | 93.688% |  | $308,363 | ($20,775) |
| Revolving Credit Facility | $ 9,600 |  | 100% |  | $ 9,600 | $  - |
| Ohio Loan | $ 3,010 |  | (n/a) |  | $ 3,010 | $  - |
| Second Lien Notes | $ 250,000 |  | 64.938% |  | $162,345 | ($87,655) |
| Industrial Revenue Bonds | $ 6,000 |  | (n/a) |  | $ 6,000 | $  - |
| Columbia County, Wisconsin Forgivable Note | $  - |  | (n/a) |  | $  - | $  - |
| TOTAL | $ 597,748 |  |  |  | $489,318 | ($108,430) |

*Source*: PDC Form 10-Q for the period ended July 5, 2015, at 15 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts; also assumes that the principal amount of Term Loan and Second Lien Notes were the same as of July 5, 2015); Bloomberg.

341.    As shown in Figure 41 below, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of the December 2015 FMV Determination. Even if Stout's methodology of considering only "Interest-Bearing Debt" is accepted, the markets disagreed with Stout's view of the solvency of PDC/Appvion as of December 31, 2015.

**Figure 41: BVAL of Certain Obligations as of December 31, 2015 ($ in thousands)**

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 157,308 |  | 93.50% |  | $147,083 | ($10,225) |
| Revolving Credit Facility | $ 9,600 |  | 100% |  | $ 9,600 | $  - |
| Ohio Loan | $ 3,010 |  | (n/a) |  | $ 3,010 | $  - |
| Second Lien Notes | $ 250,000 |  | 40.125% |  | $100,313 | ($149,688) |
| Industrial Revenue Bonds | $ 6,000 |  | (n/a) |  | $ 6,000 | $  - |
| Columbia County, Wisconsin Forgivable Note | $  - |  | (n/a) |  | $  - | $  - |
| TOTAL | $ 425,918 |  |  |  | $266,005 | ($159,913) |

*Source*: PDC Form 10-K for the year ended January 2, 2016, at 58 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts; also assumes that the principal amount of Term Loan and

Second Lien Notes were the same as of January 2, 2016); Bloomberg.

342.    As shown in Figure 42 below, the market's disagreement with Stout's view of the

solvency of PDC/Appvion continued when measured as of June 30, 2016.

**Figure 42: BVAL of Certain Obligations as of June 30, 2016 ($ in thousands)**

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 158,300 | | 95.5% | | $151,177 | ($7,124) |
| Revolving Credit Facility | $ 27,000 | | 100% | | $ 27,000 | $  - |
| Ohio Loan | $ 2,238 | | (n/a) | | $ 2,238 | $  - |
| Second Lien Notes | $ 250,000 | | 57.56% | | $143,908 | ($106,093) |
| Industrial Revenue Bonds | $ 6,000 | | (n/a) | | $ 6,000 | $  - |
| Columbia County, Wisconsin Forgivable Note | $   300 | | (n/a) | | $ 300 | $  - |
| TOTAL | $ 443,838 | | | | $330,622 | ($113,216) |

*Source*: PDC Form 10-Q for the quarter ended July 3, 2016, at 19 (principal amount of Term

Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for

purported unamortized discounts; also assumes that the principal amount of Term Loan and

Second Lien Notes were the same as of June 30m 2016 as July 3, 2016); Bloomberg.

343.    As shown in Figure 43 below, the market's disagreement with Stout's view of the

solvency of PDC/Appvion continued when measured as of December 31, 2016.

**Figure 43: BVAL of Certain Obligations as of December 31, 2016 ($ in thousands)**

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 157,572 | | 97.69% | | $153,929 | ($3,643) |
| Revolving Credit Facility | $ 31,920 | | 100% | | $ 31,920 | $  - |
| Ohio Loan | $ 1,443 | | (n/a) | | $ 1,443 | $  - |
| Second Lien Notes | $ 250,000 | | 57.00% | | $142,500 | ($107,500) |
| Industrial Revenue Bonds | $ 6,000 | | (n/a) | | $ 6,000 | $  - |
| Columbia County, Wisconsin Forgivable Note | $   100 | | (n/a) | | $ 100 | $  - |
| TOTAL | $ 447,035 | | | | $335,892 | ($111,143) |

*Source:* PDC Form 10-K for the year ended December 31, 2016, at 52 (principal amount of Term

Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for

purported unamortized discounts); Bloomberg.

344.    As shown in Figure 44 below, the market's disagreement with Stout's view of the solvency of PDC/Appvion continued when measured as of June 30, 2017.

**Figure 44: BVAL of Certain Obligations as of June 30, 2017 ($ in thousands)**

|  | Principal Amount | x | Market Price | = | Market Value | (Deficit) |
|---|---|---|---|---|---|---|
| Term Loan | $ 178,300 |  | 97.38% |  | $173,620 | ($4,680) |
| Revolving Credit Facility | $ 19,500 |  | 100% |  | $ 19,500 | $   - |
| Ohio Loan | $  626 |  | (n/a) |  | $ 626 | $   - |
| Second Lien Notes | $ 250,000 |  | 52.69% |  | $131,720 | ($118,280) |
| Industrial Revenue Bonds | $ 6,000 |  | (n/a) |  | $ 6,000 | $   - |
| Columbia County, Wisconsin Forgivable Note | $   - |  | (n/a) |  | $   - | $   - |
| TOTAL | $ 454,426 |  |  |  | $331,466 | ($122,960) |

*Source*: PDC Form 10-Q for the quarter ended July 2, 2017, at 17 (principal amount of Term Loan and Second Lien Notes adjusted to reflect amount then outstanding without adjustment for purported unamortized discounts; also assumes that the principal amount of Term Loan and Second Lien Notes were the same as of July 2, 2017); Bloomberg.

345.    The trading prices of Appvion's debt furnish strong evidence that Appvion was insolvent. The market, per the trading prices of the debt, did not believe that the value of the company exceeded its debt. That a company's bonds are trading at a discount to part (100 cents) is a "useful, though not exclusive, indicator of insolvency." *E.g., In re Williams Commc'ns Group, Inc.*, 281 B.R. 216, 221 (Bankr. S.D.N.Y. 2002).

**J.    STARTING AT LEAST IN 2013, THE DEBTORS WERE HOPELESSLY INSOLVENT UNDER THE BALANCE-SHEET TEST**

346.    The book value of the Debtors' liabilities exceeded the book value of their assets since at least December 31, 2011 and perhaps before that date. Figure 45 below shows the Book Value of the Debtors at various points in time.

**Figure 45: Book Value of the Debtors' Assets and Liabilities (in $ thousands)**

| | 12/31/11 | 12/29/12 | 12/28/13 | 1/3/15 | 7/5/15 | 1/2/16 | 7/3/16 | 12/31/16 | 7/2/17 |
|---|---|---|---|---|---|---|---|---|---|
| Book Value of Assets | 641,918 | 561,090 | 547,528 | 449,268 | 437,062 | 406,549 | 399,963 | 387,169 | 378,373 |
| Book Value of Liabilities (adjusted to exclude "Accumulated Deficit" and "Accumulated other comprehensive loss") | 929,470 | 1,001,013 | 962,701 | 1,028,404 | 1,034,770 | 826,474 | 829,604 | 819,056 | 818,190 |
| Book Value | (287,552) | (439,923) | (415,173) | (579,136) | (597,708) | (419,925) | (429,641) | (431,887) | (439,817) |

*See* PDC Form 10-K for the year ended December 31, 2011, at 50; PDC Form 10-K for the year ended December 29, 2012, at 45; PDC Form 10-K for the year ended January 3, 2015, at 42; PDC Form 10-Q for the quarter ended July 5, 2015, at 3; PDC Form 10-K for the year ended January 2, 2016, at 38; PDC Form 10-Q for the quarter ended July 3, 2016, at 2; PDC Form 10-K for the year ended December 31, 2016, at 38; PDC Form 10-Q for the quarter ended July 2, 2017, at 2.

### K.    THE DEBTORS WERE HOPELESSLY INSOLVENT UNDER THE CASH-FLOW TEST

347.    The Debtors were insolvent on a cash-flow basis at various points in time since 2013. The Debtors generated net cash flow from operations of negative $92.7 million for the year ended January 3, 2015 and negative $19 million for the year ended December 31, 2016. In the year ended January 2, 2016, the Debtors generated net cash flow from operations of negative $30.2 million when adjusted to exclude the gain from the sale of the Debtors' Encapsys business. *See* PDC Form 10-K for the year ended January 3, 2015, at 44; PDC Form 10-K for the year ended January 2, 2016, at 40; PDC Form 10-K for the year ended December 31, 2016, at 35.

## VII. THE ESOP COMMITTEE'S RATIFICATION OF THE STOUT FMV DETERMINATIONS

348.    On January 17, 2014, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Richards, Mr. Hillend and Ms. Van Straten in attendance, as well as Mr. Levine, Mr. El Tahch, Mr. Martin and Mr. Kaplan. (App015157). At that meeting, Mr. Levine reviewed the December 2013 FMV with the ESOP Committee and the ESOP Committee members asked questions regarding the December 2013 FMV. *Id*. The ESOP Committee approved the stock valuation, as contained in the December 2013 FMV. *Id.*

349.    The agenda for the July 15, 2014 meeting of the ESOP Committee allocated 20 minutes for the "Review Stock Price Calculation" with Argent and Stout. (App014296) On July 15, 2014, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Richards, Mr. Hillend and Ms. Van Straten in attendance, as well as Mr. Levine, Mr. Martin and Mr. Hansberger. (App015160). At that meeting, the ESOP Committee reviewed the June 2014 FMV and Mr. Levine described the process used to arrive at the valuation. *Id*. The ESOP Committee members asked questions regarding the June 2014 FMV. *Id*. The ESOP Committee approved the stock valuation, as contained in the June 2014 FMV. *Id.*

350.    The agenda for the January 14, 2015 meeting of the ESOP Committee allocated 20 minutes for the review of the December 2014 FMV with Argent and Stout. MLB_00481_1 / App014434. On January 14, 2015, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Richards, Ms. Arent and Ms. Van Straten in attendance, as well as Mr. Gilligan, Mr. Levine, Mr. Martin and Mr. Hansberger. (App015163). At that meeting, Mr. Levine reviewed the December 2014 FMV with the ESOP Committee. *Id*. The ESOP Committee members asked questions regarding the December 2014 FMV. *Id*. At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the

December 2014 FMV, as no such motion was made. *Id.*

351.    On August 4, 2015, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Richards, and Ms. Arent in attendance, as well as Ms. Van Straten, Mr. Levine, Mr. Martin and Mr. Hansberger, among others. (App015168). At that meeting, the ESOP Committee reviewed the June 2015 FMV and Mr. Levine described the process used to arrive at the valuation. *Id.* The ESOP Committee members asked questions regarding the June 2015 FMV. *Id.* At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the June 2015 FMV, as no such motion was made. *Id.*

352.    On November 24, 2015, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Daniel Macke, Andrea Peeters, and Amy Vissers in attendance, as well as Ms. Van Straten, and Maria Van Groll. (App015170). At that meeting, Mr. Ferree let a discussion regarding the five year financial projections that were prepared for Stout to use in their December 2015 FMV and the potential effects to the share price. *Id.* The ESOP Committee members asked questions regarding the projections which were answered by Mr. Ferree. *Id.*

353.    On January 15, 2016, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Macke, Ms. Peeters, and Ms. Vissers in attendance, as well as Ms. Van Straten, Ms. Van Groll, Mr. Levine, Mr. Aguilar, and Mr. Martin (App015171). At that meeting, Mr. Levine reviewed the December 2015 FMV with the ESOP Committee and the ESOP Committee members asked questions regarding the December 2015 FMV. *Id.* At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the December 2015 FMV, as no such motion was made. *Id.* The agenda for the January 15, 2016 meeting of the ESOP Committee allocated 20 minutes for the review of the

December 2015 FMV with Argent and Stout. MLB_00481_1 / App014434.

354.   On May 26, 2016, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Macke, Ms. Peeters, and Ms. Vissers in attendance, as well as Mr. Kelly, John Bohl, and Ms. Van Groll. (App015174). At that meeting, Mr. Ferree led a discussion regarding the five year financial projections that were prepared for Stout to use for their June 2016 FMV. An updated copy of the five year financial projections was handed out at the meeting. *Id.*

355.   On July 11, 2016, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Macke, Ms. Peeters, and Ms. Vissers in attendance, as well as Mr. Kelly, Patricia Nieuwenhius, Mr. Levine, Mr. Aguilar, Mr. Hansberger, and Mr. Martin (App015175). At that meeting, Mr. Levine reviewed the June 2016 FMV with the ESOP Committee and the ESOP Committee members asked questions regarding the June 2016 FMV. *Id*. At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the June 2016 FMV, as no such motion was made. *Id.* The agenda for the July 11, 2016 meeting of the ESOP Committee allocated 30 minutes for the "Review Stock Price Calculation" with Argent and Stout. *Id*.

356.   On November 28, 2016, the ESOP Committee met, with ESOP Committee members Mr. Gilligan, Mr. Macke, Ms. Peeters, Mr. Kelly, Mr. Macke, in attendance, as well as Mr. Ferree, Ms. Van Straten, Ms. Van Groll and Matthew Lyons. (App015177). At that meeting, Mr. Kelly led a discussion regarding the five year financial projections that were prepared for Stout to use for their December 2016 FMV and the potential effects to the share price. *Id*. Meeting participants asked questions regarding the projections which were answered by Mr. Ferree and Mr. Kelly. The ESOP Committee voted to provide the financial projections to Stout.

*Id.*

357.    On January 18, 2017, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Kelly, Mr. Macke, Ms. Meltzer, and Ms. Peeters in attendance, as well as Ms. Van Groll, Ms. Van Straten, Mr. Levine, and Mr. Martin (App015178). At that meeting, Mr. Levine reviewed the December 2016 FMV with the ESOP Committee and the ESOP Committee members asked questions regarding the December 2016 FMV. *Id.* At that meeting, the ESOP Committee did not entertain a motion to approve the stock valuation, as contained in the June 2016 FMV, as no such motion was made. *Id.* The agenda for the July 11, 2016 meeting of the ESOP Committee allocated 30 minutes for the "Review Stock Price Calculation" with Argent and Stout. *Id.*

358.    On May 25, 2017, the ESOP Committee met, with ESOP Committee members Mr. Ferree, Mr. Gilligan, Mr. Macke, Mr. Kelly, and Ms. Melzer in attendance, as well as David Govier, and Ms. Van Groll. (App015181). At that meeting, Mr. Kelly led a discussion regarding the five year financial projections that were prepared for Stout to use for their June 2017 FMV. *Id.*

## VIII.   THE BANKRUPTCY FILING; THE PLAN OF LIQUIDATION; AND THE LIQUIDATING TRUST'S RIGHT TO PURSUE CLAIMS PREVIOUSLY HELD OR CONTROLLED BY THE DEBTORS' ESTATES.

359.    On the Petition Date, the Debtors filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code with the Bankruptcy Court for the District of Delaware. The cases are being jointly administered under case number 17-12082.

360.    The Appvion Liquidating Trust was created in accordance with the 2L/Committee Settlement (as defined in the Plan of Liquidation).

361.    The Motion seeking approval of the 2L/Committee Settlement was filed on May 9, 2018. *See* D.I. 734. The 2L/Committee Settlement was approved by the Bankruptcy Court on

May 14, 2018. *See* D 753. The 2L/Committee Settlement agreement set forth the parameters for the creation of the liquidating trust and specifically states that it claims relating to arising out of the ESOP, claims against D&Os, claims under chapter 5 not purchased, claims against insiders of the Debtors.

362.    The Plan of Liquidation's definition of "Litigation Claims" (defined therein and replicated below) was drafted with the purpose of preserving for the benefit of the Debtors' second lien and unsecured creditors, all clams and causes of action, including those arising under state law, connected with the Debtors' ESOP Structure, to the extent that such claims are not Direct ESOP Claims.

363.    On August 14, 2018, the Bankruptcy Court entered an order confirming the Plan of Liquidation.

364.    Under the terms of the Plan of Liquidation and corresponding documents, the Appvion Liquidating Trust was given the right, authority, and discretion to pursue Litigation Claims, specifically reserving all rights to investigate and prosecute causes of action against, among others, certain former directors and officers of the Debtors, and any persons related to claims and Causes of Action related to or arising out of ESOP that are not Direct ESOP Claims (as defined in the Plan). Plan Art. VIII.G.1, *see also* Plan Art. IX.C.

365.    Under the Plan, the Liquidating Trust Assets were "assigned, transferred, and vest in the Liquidating Trust upon the Effective Date..." Plan Art. VIII.D. The Liquidating Trust Assets include the "Litigation Claims." Plan of Liquidation, Art. I.A.111.

366.    The Plan of Liquidating defines the "Litigation Claims" as

any and all Causes of Action of any Debtor and/or any of the Estates against any Person (excluding the Released D&O Claims), including but not limited to, (a) all claims and Causes of Action related to or arising out of the ESOP that are not Direct ESOP Claims, (b) the Preserved D&O Claims, (c) all claims and Causes of

Action arising under Chapter 5 of the Bankruptcy Code (other than Causes of Action that constitute Acquired Assets), and (d) all claims and Causes of Action against insiders of the Debtors.

Plan of Liquidation, Art. I.A.114.

367.    The Plan of Liquidation defines "Preserved D&O Claims" as:

any and all claims and Causes of Action (together with any proceeds thereof, including any proceeds of the D&O Insurance) held by the Debtors and their Estates against the Debtors' Directors and Officers, solely in their capacities as such, including those claims and Causes of Action that are not currently asserted, but could be asserted against them, including but not limited to, Claims held by the Debtors and their Estates relating to the ESOP; provided, however, that the Preserved D&O Claims shall not include the Released D&O Claims.

Plan of Liquidation, Art. I.A.136.

368.    The Plan of Liquidation defines "Released D&O" to mean:

any of the Debtors' Directors and Officers who (i) served in such capacity at any time in the four months prior to the 363 Sale Effective Date, (ii) are retained or employed by the Purchaser as of the 363 Sale Effective Date, and (iii) remain retained or employed by the Purchaser for a period of not less than 180 days following the 363 Sale Effective Date.

Plan of Liquidation, Art. I.A.149.

369.    The Plan of Liquidation defines "Released D&O Claims" to mean "any claims and Causes of Action held by the Debtors and their Estates against any of the Released D&O."

Plan of Liquidation, Art. I.A.149.

370.    The Plan of Liquidation defines "Direct ESOP Claims" to mean:

Solely and exclusively a direct cause of action held by the ESOP Committee, the ESOP Trustee, or any other party with respect to the ESOP which, for the avoidance of doubt, excludes any Causes of Action related to the ESOP held by the Debtors and their Estates.

Plan of Liquidation, Art. I.A.58.

371.    The Plan of Liquidation Provides that following the Effective Date, the Bankruptcy Court shall retain jurisdiction to matters related to the Chapter 11 Cases, as is legally

permissible. *See* Plan of Liquidation, Art. XV. The Plan of Liquidation specifically reserves for the Bankruptcy Court "[t]o hear, decide and resolve any motions, adversary proceedings, contested or litigated matters involving or related to Directors and Officers, Causes of Action (including Released D&O Claims) and D&O Insurance." Plan of Liquidation, Art. XV.21.

372.    Upon information and belief, on June 27, 2018, employees of Prime Clerk LLC caused Mr. Richards, Mr. Ferree, Ms. Van Straten, Ms. Arent, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, Mr. Suwyn, Mr. Laurino, Mr. Roberts, and Mr. Gilligan to receive a copy of certain solicitation materials related to the Plan of Liquidation. (D.I. 868, Ex. D, at 20, 50, 51, 80, 107, 122, 187, 210, 252, 274, 331).

373.    Upon information and belief, on June 27, 2018, employees of Prime Clerk LLC caused Stout Risius Ross Inc. and Argent to receive a copy of certain solicitation materials related to the Plan of Liquidation. (D.I. 868, Ex. B, at 2 and Ex. D, at 295).

374.    The Plan of Liquidation's effective date (the "Effective Date") was August 24, 2018.

375.    Upon information and belief, on August 25, 2018, employees of Prime Clerk LLC caused Mr. Richards, Mr. Ferree, Ms. Van Straten, Mr. Fletcher, Ms. Arent, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, Mr. Suwyn, Mr. Laurino, Mr. Roberts, and Mr. Gilligan to receive a copy of the Notice of Effective Date of the Plan of Liquidation (D.I. 1011, Ex. D, at 26, 70, 71, 150, 154, 170, 265, 297, 355, 361, 366, 387, 467).

376.    Upon information and belief, on August 25, 2018, employees of Prime Clerk LLC caused Stout Risius Ross Inc. and Argent to receive a copy of the Notice of Effective Date of the Plan of Liquidation (D.I. 1011, Ex. D, at 26, 417).

IX.    **THE** DIRECTOR DEFENDANTS **AND THE** OFFICER/EMPLOYEE DEFENDANTS **ARE NOT RELEASED D&OS UNDER THE PLAN OF LIQUIDATION.**

377.    Mr. Richards does not qualify as a "Released D&O" under the Plan of Liquidation.

378.    Mr. Ferree does not qualify as a "Released D&O" under the Plan of Liquidation.

379.    Ms. Van Straten does not qualify as a "Released D&O" under the Plan of Liquidation.

380.    Mr. Fletcher does not qualify as a "Released D&O" under the Plan of Liquidation.

381.    Ms. Arent does not qualify as a "Released D&O" under the Plan of Liquidation.

382.    Mr. Carter does not qualify as a "Released D&O" under the Plan of Liquidation.

383.    Mr. Murphy does not qualify as a "Released D&O" under the Plan of Liquidation.

384.    Mr. Reardon does not qualify as a "Released D&O" under the Plan of Liquidation.

385.    Ms. Seifert does not qualify as a "Released D&O" under the Plan of Liquidation.

386.    Mr. Suwyn does not qualify as a "Released D&O" under the Plan of Liquidation.

387.    Mr. Laurino does not qualify as a "Released D&O" under the Plan of Liquidation.

388.    Mr. Roberts does not qualify as a "Released D&O" under the Plan of Liquidation.

389.    Mr. Gilligan served as a consultant to Appvion Holding Corp. after the Effective Date. Mr. Gilligan did not serve as an officer or director of Appvion Holding Corp. after the Effective Date.

X.    **NOTICE OF THE CLAIMS ASSERTED IN THIS ACTION WAS GIVEN TO CURRENT AND FORMER DIRECTORS AND OFFICERS OF THE DEBTORS**

390.    On information and belief, on June 20, 2018, counsel to the Official Committee of Unsecured Creditors (the "<u>Creditors' Committee</u>") appointed in the Debtors chapter 11 cases furnished the current and former directors and officers of Appvion through the Debtors'

bankruptcy counsel, DLA Piper LLP (US), with a  letter detailing the existence of the claims and

causes of action that the Co-Trustees assert herein. This letter specifically articulated that claims

existed against the current and former directors and officers of Appvion under theories of

breaches of fiduciary duties, among other things. The lawyers for the Creditors' Committee

wrote that the Creditors' Committee "intends to hold the current and former directors and

officers of the Debtors accountable for their actions."

## XI.    CAUSES OF ACTION

### <u>COUNT I</u>
**(Breach of Fiduciary Duties of Care and Loyalty Against The** Officer/Employee Defendants
**and the** Director Defendants**)**

391.    The Plaintiff repeats the allegations of each of the prior and following paragraphs

as if fully set forth herein.

392.    The Director Defendants and the Officer/Employee Defendants, in their

respective capacities as directors, executive officers, and/or employees of the Debtors, each

individually owed the Debtors fiduciary duties of care and loyalty under applicable state

corporate law.

393.    By participating in and contributing to the overvaluation of PDC's common stock

in order to further their own individual self-interest, the Director Defendants and the

Officer/Employee Defendants breached the duty of loyalty they each owed to the Debtors.

394.    By failing to detect and failing to take any action to stop the overvaluation of

PDC's common stock, the Director Defendants and the Officer/Employee Defendants breached

the duty of care they each owed to the Debtors.

395.    The Director Defendants and the Officer/Employee Defendants, in conjunction

with Argent and Stout, caused the overvaluation of PDC's common stock in order to serve their

individual financial interests. Because each Director Defendant and Officer/Employee Defendant

stood to receive substantial incentive compensation whose value was directly dependent on Stout's FMV Determination, the Director Defendants and the Officer/Employee Defendants had a material financial incentive to maximize Stout's FMV Determinations. Each Director Defendant and Officer/Employee Defendant also stood to receive distributions from the ESOP for the PDC common stock held attributable to each individual's ESOP account. Because the value of such distributions and attributions were directly dependent on Stout's FMV Determination, the Director Defendants and Officer/Employee Defendants had an additional material financial incentive to maximize Stout's FMV Determinations.

396.    In order to determine the FMV of PDC's common stock, Stout relied heavily on financial forecasts prepared and/or approved by the Director Defendants and the Officer/Employee Defendants. Stout relied on these projections despite the fact that the Debtors historically almost never achieved their financial projections, and typically accepted them at face value without questioning their reliability or suggested that management's projections be revised downward. Stout also routinely met with certain of the Director Defendants and Officer/Employee Defendants in the course of preparing its biannual FMV Determination reports, and consulted certain of the Director Defendants and Officer/Employee Defendants with regard to specific aspects of the valuation techniques it employed, including but not limited to the selection of companies for use in Stout's Guideline Companies Method analysis. In these and in other ways, the Director Defendants and Officer/Employee Defendants contributed to the overvaluation of PDC's common stock for their own personal gain, in violation of the duty of loyalty they owed to the Debtors.

397.    The Director Defendants and Officer/Employee Defendants also breached the duty of care they owed to the Debtors' by failing to detect and remedy the systemic and repeated

inability to produce reliable and achievable EBITDA projections that were used to cause the overvaluation of PDC's common stock. It was manifestly evident for several years prior to the Petition Date that the Debtors' business (and the industry in which the Debtors operated) was in terminal decline. It was also clear that the financial forecasts prepared by certain of the Director Defendants and Officer/Employee Defendants were demonstrably and consistently unreliable, because the Debtors' historically almost never came close to achieving their projections. Despite the fact that the financial forecasts prepared by certain of the Director Defendants and Officer/Employee Defendants portrayed a wholly-unrealistic version of the Debtors that was divorced from reality, the Director Defendants and Officer/Employee Defendants nonetheless permitted Argent and Stout to continue to rely on such projections to determine the FMV of PDC's common stock. By failing to detect and take any meaningful action against the obvious overvaluation of PDC's common stock, the Director Defendants and Officer/Employee Defendants breached the duty of care they each individually owed to the Debtors.

## COUNT II
**(Breach of Fiduciary Duties of Loyalty and Care Against Richards, Ferree, Van Straten, Arent, Fletcher and John/Jane Does 1-20)**

398.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

399.    In their individual capacities as directors, officers, and/or employees of Appvion, Richards, Gilligan, Ferree, Van Straten, Arent, Fletcher, and John/Jane Does 1-20 each owed fiduciary duties of loyalty and care to Appvion under applicable state corporate law.

400.    In November 2013, Appvion forgave the Intercompany Note and all related interest due from PDC. Appvion received no consideration from PDC in exchange for the forgiveness of the Intercompany Note.

401.    By permitting the forgiveness of the Intercompany Note in November 2013,

Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher each breached the fiduciary duties of loyalty and care they owed to Appvion.

## COUNT III
### (Breach of Fiduciary Duty of Care Against Richards, Ferree, Van Straten, Arent, and Fletcher)

402.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

403.    In their individual capacities as directors, officers, and/or employees of Appvion, Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher each owed a fiduciary duty of care to Appvion under applicable state corporate law.

404.    By participating in the decision to extend credit from Appvion to PDC in the form of the Intercompany Loans with the knowledge that PDC would never be able to repay the Intercompany Loans, each of Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher breached the fiduciary duties of care and loyalty they owed to Appvion.

405.    PDC's common stock constituted all of the stock beneficially owned by the ESOP. As such, PDC was responsible for receiving any contributions to, and making any distributions from the ESOP to the ESOP participants. However, because PDC served only as the holding company for Appvion, and because PDC had no independent revenue-generating business operations of its own, PDC was only able to fund distributions through the contributions made by ESOP participants. Further, distributions had significantly outstripped contributions in the years leading up to the Petition, PDC was forced to borrow the funds necessary to continue to fulfill its distribution obligations from Appvion.

406.    Because PDC had no ability to generate revenue, and given the fact that distributions from the ESOP had significantly exceeded contributions to the ESOP in the preceding years, it was obvious that PDC would never have the ability to repay the Intercompany

Loans. Despite the fact that Appvion would, in all likelihood, never be able to seek repayment of the Intercompany Loans from PDC, Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher each contributed to or approved of the decision to extend credit to PDC in the form of the Intercompany Loans. By doing so, Richards, Gilligan, Ferree, Van Straten, Arent, and Fletcher each breached the duties of care and loyalty they owed to Appvion.

**COUNT IV**
**(Aiding and Abetting Breaches of the Fiduciary Duties of Care and Loyalty Against Ferree, Richards, Van Straten, Arent, And Certain John/Jane Does 1-20)**

407.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

408.    Ferree, Richards, Gilligan, Van Straten, Arent, And Certain John/Jane Does, in their capacities as members of the ESOP Committee, were responsible for supervising and overseeing the activities of Argent, as the ESOP Trustee.

409.    As alleged above and below, the Director Defendants and the Officer/Employee Defendants each breached the fiduciary duties of care and loyalty that they each owed to the Debtors. In their roles as members of the ESOP Committee, Ferree, Richards, Gilligan, Van Straten, Arent, and certain John/Jane Does knew that the Director Defendants and the Officer/Employee Defendants were breaching their fiduciary duties of care and loyalty by purposefully overvaluing PDC's common stock, and gave substantial assistance or encouragement to the Director Defendants and the Officer/Employee Defendants in these malfeasant acts.

410.    Through this conduct, Ferree, Richards, Gilligan, Van Straten, Arent, and certain John/Jane Does aided and abetted the Director Defendants' and the Officer/Employee Defendants' breaches of the fiduciary duties of care and loyalty, causing damage to the Debtors and their businesses and prospects, in an amount to be determined at trial.

## COUNT V
### (Aiding and Abetting Breaches of the Fiduciary Duties of Care and Loyalty Against Argent)

411.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

412.    Argent served as the ESOP Trustee, and was responsible for, *inter alia*, engaging an independent outside appraiser to assist with determining the fair market value of PDC's common stock on a biannual basis. Argent engaged Stout to assist it with determining the fair market value of PDC's common stock.

413.    In its role as the ESOP Trustee, Argent was ultimately responsible for determining the fair market value of PDC's common stock. Argent and Stout consulted with management, reviewed the Debtors' financial projections, and were aware of the history of the Debtors' failure to meet projections. Rather than urge the D&O Defendants against the inflation of financial projections, Argent and Stout resolved to merely adjust for assessed riskiness in the discount rate (in the DCF model). As such, Argent knew that the Director Defendants and the Officer/Employee Defendants were either breaching their fiduciary duties of care and loyalty by purposefully overvaluing PDC's common stock or had failed to exercise their duties of care and/or loyalty. In either case, Argent gave substantial assistance or encouragement to the Director Defendants and the Officer/Employee Defendants in these malfeasant acts.

414.    Through this conduct, after October 1, 2014, Argent aided and abetted the Director Defendants' and the Officer/Employee Defendants' breaches of the fiduciary duties of care and loyalty, causing damage to the Debtors and their businesses and prospects, in an amount to be determined at trial.

## COUNT VI
### (Aiding and Abetting Breaches of the Fiduciary Duties of Care and Loyalty Against Stout)

415.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

416.    Stout was engaged by Argent to assist Argent, in its role as the ESOP Trustee, with determining the fair market value of PDC's common stock. In order to do so, Stout relied heavily on financial projections provided by Debtors' senior management. Stout also had full access to the Debtors' historical financial results and historical financial projections, and was therefore fully aware that the Debtors' business was deteriorating, and that the Debtors almost never achieved their financial projections. Stout nonetheless continued to rely blindly on the financial projections provided by senior management to conduct its valuations. Stout also purposefully manipulated a number of critical elements of its valuation methodologies in order to artificially inflate the fair market value determination that such methodologies would produce.

417.    Argent and Stout reviewed the Debtors' financial projections and were aware of the history of the Debtors' failure to meet projections. Rather than urge certain D&O Defendants against the inflation of financial projections, Argent and Stout resolved to merely adjust for assessed riskiness in the discount rate (in the DCF model). Stout knew that the Director Defendants and the Officer/Employee Defendants were either breaching their fiduciary duties of care and loyalty by purposefully overvaluing PDC's common stock, or had failed to exercise their duties of care and/or loyalty. In either case, Stout gave substantial assistance or encouragement to the Director Defendants and the Officer/Employee Defendants in these malfeasant acts.

418.    Through this conduct, after October 1, 2014, Stout and abetted the Director Defendants' and the Officer/Employee Defendants' breaches of the fiduciary duties of care and loyalty, causing damage to the Debtors and their businesses and prospects, in an amount to be

determined at trial.

## COUNT VII

### (Illegal Dividends in Violation of 8 Del. C. §§ 170, 173, and 174 Against Richards, Carter, Murphy, Reardon, Seifert, and Suwyn)

419. The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

420. Each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn were directors of Appvion at the time when the Intercompany Note was forgiven in November 2013.

421. Each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn were directors of PDC at the time when the Intercompany Note was forgiven in November 2013.

422. During November 2013, Appvion was insolvent and lacked adequate surplus, as required by law, to pay a corporate dividend in connection with the forgiveness of the Intercompany Note.

423. The forgiveness of the Intercompany Note was, in substance, an unlawful corporate dividend that Appvion paid to PDC while Appvion was insolvent.

424. The forgiveness of the Intercompany Note when Appvion was insolvent and lacked adequate statutory surplus violated applicable law, including 8 *Del. C.* § 170 and § 173.

425. Pursuant to 8 *Del. C.* § 174, each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn are jointly and severally liable to Appvion for payment of an illegal dividend.

426. Appvion and its creditors have been damaged as a proximate result of the illegal dividend.

## COUNT VIII

**(Illegal Dividends in Violation of 8 Del. C. §§ 170, 173, and 174 Against Richards, Carter, Murphy, Reardon, Seifert, and Suwyn)**

427.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

428.    Each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn were directors of Appvion at a time when one or more the Intercompany Loans were made.

429.    Each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn were directors of PDC at a time when one or more Intercompany Loans were made.

430.    From 2014 through the Petition Date, Appvion was insolvent and lacked adequate surplus to pay a dividend to PDC.

431.    From 2014 through the Petition Date, the Appvion Board knew that PDC did not, and would likely never have, the financial means to repay the Intercompany Loans.

432.    The extension of credit by Appvion to PDC, when the Appvion Board knew that PDC did not, and would likely never have, the financial means to repay the Intercompany Loans, was, in substance, an unlawful dividend made while Appvion was insolvent.

433.    The extension of credit by Appvion to PDC, when the Appvion Board knew that PDC did not, and would likely never have, the financial means to repay the Intercompany Loans, and when Appvion was insolvent and lacked adequate statutory surplus, violated applicable law, including 8 *Del. C.* § 170 and § 173.

434.    Pursuant to 8 *Del. C.* § 174, each of Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn are jointly and severally liable to Appvion for payment of an illegal dividend.

435.    Appvion and its creditors have been damaged as a proximate result of the illegal

dividend.

## COUNT IX

**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Ferree)**

436.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

437.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Ferree 2017 Specified Distributions occurred.

438.    The Ferree 2017 Specified Distributions constituted transfers of property, or an interest in property, of the Debtors.

439.    At all relevant times, Ferree was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

440.    At all relevant times, Mr. Ferree was an "insider" of the Debtors, as defined by 11 U.S.C.§ 101, due to his status as Senior Vice President and Chief Financial Officer of the PDC and Appvion.

441.    In the one year prior to the Petition Date, PDC and/or Appvion transferred property or an interest in property totaling $1,446,105 in cash to Mr. Ferree.

442.    The Ferree 2017 Specified Distributions were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Ferree 2017 Specified Distributions were made.

443.    The Ferree 2017 Specified Distributions were made while the Debtors were insolvent.

444.    As a result of the Ferree 2017 Specified Distributions, Mr. Ferree received more

than he would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Ferree 2017 Specified Distributions had not been made and (iii) Mr. Ferree received payments of such debts.

445.   Mr. Ferree had reasonable cause to believe that the Debtors were insolvent.

446.   In accordance with the foregoing, the Ferree 2017 Specified Distributions are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Ferree should be required to return the value he received pursuant to the Ferree 2017 Specified Distributions to the Appvion Liquidating Trust.

## COUNT X
### (Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Stout)

447.   The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

448.   Stout received payment from Appvion of $25,937.60 on July 7, 2017 in connection with fees and expenses associated with the June 2017 FMV (the "July 2017 Stout Payment").

449.   Stout received payment from Appvion of $25,536.00 on August 10, 2017 in connection with fees and expenses associated with the June 2017 FMV (with the July 2017 Stout Payment, the "Stout Preference Payments").

450.   Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Stout Preference Payments occurred.

451.   The Stout Preference Payments constituted transfers of property, or an interest in property, of the Debtors.

452. At all relevant times, Stout was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

453. In the ninety (90) days prior to the Petition Date, PDC and/or Appvion transferred property or an interest in property totaling $51,473.60 in cash to Stout.

454. The Stout Preference Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Stout Preference Payments were made.

455. The Stout Preference Payments were made while the Debtors were insolvent.

456. As a result of the Stout Preference Payments, Stout received more than they would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Stout Preference Payments had not been made and (iii) Stout received payments of such debts.

457. Stout had reasonable cause to believe that the Debtors were insolvent.

458. In accordance with the foregoing, the Stout Preference Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Stout should be required to return the value he received pursuant to the Stout Preference Payments to the Appvion Liquidating Trust.

## COUNT XI
**(Avoidable Transfer in Violation of 11 U.S.C. §§ 544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11 Against Stout)**

459. The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

460. Stout received payment in Figure 2 above totaling $522,229.71 (the "Stout Transfers") within four years of the Petition Date in connection with Stout's fees and expenses associated with the December 2013 FMV, the June 2014 FMV, the December 2014 FMV, the

121

June 2015 FMV, the December 2015 FMV, the June 2016 FMV, the December 2016 FMV, and the June 2017 FMV.

461.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The Claims of a number of existing unsecured creditors arise before the Stout Transfers occurred.

462.    Appvion did not receive reasonably equivalent value in exchange for the Stout Transfers.

463.    At the time of the Stout Transfers, (i) Appvion was engaged in business or a transaction, or were about to engagement in business or a transaction, for which any property remaining with Appvion was an unreasonably small capital; and/or (ii) Appvion intended to incur, or believed or reasonably should have believed that it would incur, debts that would be beyond its ability to pay as such debts matured.

464.    At the time of the Stout Transfers, Appvion was insolvent or became insolvent as a result of the obligations incurred or the payments made.

465.    At the time of the Stout Transfers, Stout had reasonable cause to believe that Appvion was insolvent.

466.    Consequently, the Stout Transfers were fraudulent as to then present and future creditors.

467.    The Stout Transfers made to Stout should be set aside pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11. Stout should be required to return the value they received pursuant to the Stout Transfers to the Appvion Liquidating Trust.

## COUNT XII
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Argent)**

468.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

469.    Argent received payments totaling $35,996 in the ninety (90) days prior to the Petition Date, from Appvion, Inc. as follows: (i) $17,979 on August 10, 2017, and (ii) $18,017 on September 5, 2017 (the "Argent Preference Payments"). While the exact amount of payments to Argent is not presently known to the Plaintiff, upon information and belief, Argent received annual payments from Appvion, Inc. in the amount of $200,000 from mid-2015 through the Petition Date (with the Argent Preference Payments, the "Argent Transfers"). Argent received the Argent Transfers in return for services rendered as trustee of the ESOP.

470.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Argent Preference Payments occurred.

471.    The Argent Preference Payments constituted transfers of property, or an interest in property, of the Debtors.

472.    At all relevant times, Argent was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

473.    In the ninety (90) days prior to the Petition Date, Appvion, Inc. transferred property or an interest in property totaling $35,996 in cash to Argent.

474.    The Argent Preference Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Argent Preference Payments were made.

475.    The Argent Preference Payments were made while the Debtors were insolvent.

476.    As a result of the Argent Preference Payments, Argent received more than they would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Argent Preference Payments had not been made and (iii) Argent received payments of such debts.

477.    Argent had reasonable cause to believe that the Debtors were insolvent.

478.    In accordance with the foregoing, the Argent Preference Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Stout should be required to return the value he received pursuant to the Argent Preference Payments to the Appvion Liquidating Trust.

## <u>COUNT XIII</u>
**(Avoidable Transfer in Violation of 11 U.S.C. §§ 544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11 Against Stout)**

479.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

480.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The Claims of a number of existing unsecured creditors arise before the Argent Transfers occurred.

481.    Appvion did not receive reasonably equivalent value in exchange for the Argent Transfers.

482.    At the time of the Argent Transfers, (i) Appvion was engaged in business or a transaction, or were about to engagement in business or a transaction, for which any property remaining with Appvion was an unreasonably small capital; and/or (ii) Appvion intended to incur, or believed or reasonably should have believed that it would incur, debts that would be

beyond its ability to pay as such debts matured.

483.    At the time of the Argent Transfers, Appvion was insolvent or became insolvent as a result of the obligations incurred or the payments made.

484.    At the time of the Argent Transfers, Argent had reasonable cause to believe that Appvion was insolvent.

485.    Consequently, the Argent Transfers were fraudulent as to then present and future creditors.

486.    The Argent Transfers made to Argent should be set aside pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), and 550, as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11. Argent should be required to return the value they received pursuant to the Argent Transfers to the Appvion Liquidating Trust.

## COUNT XIV
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Ms. Siefert)**

487.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

488.    In addition to the compensation otherwise addressed herein, Ms. Siefert received board fees ESOP distributions of $78,125 (the "Siefert Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.4.

**Figure 46: Siefert Board Fee Payments**

| Payment | Payment Amount |
|---------|----------------|

| Date | | |
|------|---|---|
| 12/16/2016 | $ | 15,625 |
| 3/17/2017 | $ | 15,625 |
| 7/3/2017 | $ | 15,625 |
| 9/26/2017 | $ | 15,625 |
| 9/28/2017 | $ | 15,625 |
| **TOTAL** | **$** | **78,125** |

489.    Ms. Siefert received board fee payments as set forth in Figure 46.

490.    The Siefert Board Fee Payments include $55,000 for non-employee director remuneration and $7,500 for serving as the chairman of the Appvion governance committee.

491.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Siefert Board Fee Payments occurred.

492.    The Siefert Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

493.    At all relevant times, Ms. Siefert was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

494.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $78,125 in cash to Ms. Siefert.

495.    The Siefert Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Siefert Board Fee Payments were made.

496.    The Siefert Board Fee Payments were made while the Debtors were insolvent.

497.    As a result of the Siefert Board Fee Payments, Ms. Siefert received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy

Code; (ii) the Siefert Board Fee Payments had not been made and (iii) Siefert received payments of such debts.

498.    Ms. Siefert had reasonable cause to believe that the Debtors were insolvent.

499.    In accordance with the foregoing, the Siefert Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Ms. Siefert should be required to return the value he received pursuant to the Siefert Board Fee Payments to the Appvion Liquidating Trust.

**COUNT XV**
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Mr. Suwyn)**

500.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

501.    In addition to the compensation otherwise addressed herein, Mr. Suwyn received board fees ESOP distributions of $83,750 (the "Suwyn Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.7.

**Figure 47: Suwyn Board Fee Payments**

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $         13,750 |
| 3/17/2017 | $         17,500 |
| 7/3/2017 | $         17,500 |
| 9/26/2017 | $         17,500 |
| 9/28/2017 | $         17,500 |
| TOTAL | $         83,750 |

502.    Mr. Suwyn received board fee payments as set forth in Figure 47.

503.    The Suwyn Board Fee Payments include $55,000 for non-employee director remuneration and $7,500 for serving as the chairman of the PDC audit committee.

504.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured

creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Suwyn Board Fee Payments occurred.

505.    The Suwyn Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

506.    At all relevant times, Mr. Suwyn was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

507.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $83,750 in cash to Mr. Suwyn.

508.    The Suwyn Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Suwyn Board Fee Payments were made.

509.    The Suwyn Board Fee Payments were made while the Debtors were insolvent.

510.    As a result of the Suwyn Board Fee Payments, Mr. Suwyn received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Suwyn Board Fee Payments had not been made and (iii) Mr. Suwyn received payments of such debts.

511.    Mr. Suwyn had reasonable cause to believe that the Debtors were insolvent.

512.    In accordance with the foregoing, the Suwyn Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Suwyn should be required to return the value he received pursuant to the Suwyn Board Fee Payments to the Appvion Liquidating Trust.

## COUNT XVI
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under
6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Mr. Murphy)**

513.     The Plaintiff repeats the allegations of each of the prior and following paragraphs

as if fully set forth herein.

514.     In addition to the compensation otherwise addressed herein, Mr. Murphy received

board fees ESOP distributions of $125,000 (the "Murphy Board Fee Payments") within one year

of the Petition Date. *See* D.I. 266, Question 30.11.

**Figure 48: Murphy Board Fee Payments**

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $        25,000 |
| 3/17/2017 | $        25,000 |
| 7/3/2017 | $        25,000 |
| 9/26/2017 | $        25,000 |
| 9/28/2017 | $        25,000 |
| **TOTAL** | **$      125,000** |

515.     Mr. Murphy received board fee payments as set forth in Figure 48.

516.     The Murphy Board Fee Payments include $55,000 for non-employee director

remuneration and $45,000 for serving as the chairman of the Appvion Board and PDC Board.

517.     Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured

creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor

could assert under applicable law. The claims of a number of existing unsecured creditors arose

before the Murphy Board Fee Payments occurred.

518.     The Murphy Board Fee Payments constituted transfers of property, or an interest

in property, of the Debtors.

519.     At all relevant times, Mr. Murphy was a creditor of the Debtors, as defined by 11

U.S.C. § 101.

520.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $ 125,000 in cash to Mr. Murphy.

521.    The Murphy Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Murphy Board Fee Payments were made.

522.    The Murphy Board Fee Payments were made while the Debtors were insolvent.

523.    As a result of the Murphy Board Fee Payments, Mr. Murphy received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Murphy Board Fee Payments had not been made and (iii) Mr. Murphy received payments of such debts.

524.    Mr. Murphy had reasonable cause to believe that the Debtors were insolvent.

525.    In accordance with the foregoing, the Murphy Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Murphy should be required to return the value he received pursuant to the Murphy Board Fee Payments to the Appvion Liquidating Trust.

## COUNT XVII
**(Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Mr. Laurino)**

526.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

527.    In addition to the compensation otherwise addressed herein, Mr. Laurino received board fees ESOP distributions of $68,750 (the "Laurino Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.1.

**Figure 49: Laurino Board Fee Payments**

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $ 13,750 |
| 3/17/2017 | $ 13,750 |
| 7/3/2017 | $ 13,750 |
| 9/26/2017 | $ 13,750 |
| 9/28/2017 | $ 13,750 |
| TOTAL | $ 68,750 |

528.   Mr. Laurino received board fee payments as set forth in Figure 49.

529.   The Laurino Board Fee Payments include $55,000 for non-employee director remuneration.

530.   Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Laurino Board Fee Payments occurred.

531.   The Laurino Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

532.   At all relevant times, Mr. Laurino was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

533.   In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $68,750 in cash to Mr. Laurino.

534.   The Laurino Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Laurino Board Fee Payments were made.

535.   The Laurino Board Fee Payments were made while the Debtors were insolvent.

536.   As a result of the Laurino Board Fee Payments, Mr. Laurino received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy

Code; (ii) the Laurino Board Fee Payments had not been made and (iii) Mr. Laurino received payments of such debts.

537.    Mr. Laurino had reasonable cause to believe that the Debtors were insolvent.

538.    In accordance with the foregoing, the Laurino Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Laurino should be required to return the value he received pursuant to the Laurino Board Fee Payments to the Appvion Liquidating Trust.

## COUNT XVIII
### (Avoidable Preference in Violation of 11 U.S.C. §§ 544, 547, and 550, as well as under 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Against Mr. Roberts)

539.    The Plaintiff repeats the allegations of each of the prior and following paragraphs as if fully set forth herein.

540.    In addition to the compensation otherwise addressed herein, Mr. Roberts received board fees ESOP distributions of $68,750 (the "Roberts Board Fee Payments") within one year of the Petition Date. *See* D.I. 266, Question 30.2.

**Figure 50: Roberts Board Fee Payments**

| Payment Date | Payment Amount |
|---|---|
| 12/16/2016 | $    13,750 |
| 3/17/2017 | $    13,750 |
| 7/3/2017 | $    13,750 |
| 9/26/2017 | $    13,750 |
| 9/28/2017 | $    13,750 |
| **TOTAL** | **$    68,750** |

541.    Mr. Roberts received board fee payments as set forth in Figure 50.

542.    The Roberts Board Fee Payments include $55,000 for non-employee director remuneration.

543.    Pursuant to 11 U.S.C. § 544(b), Plaintiff has the rights of an existing unsecured

creditor of the Debtors and is permitted to assert claims and causes of action that such a creditor could assert under applicable law. The claims of a number of existing unsecured creditors arose before the Roberts Board Fee Payments occurred.

544.    The Roberts Board Fee Payments constituted transfers of property, or an interest in property, of the Debtors.

545.    At all relevant times, Mr. Roberts was a creditor of the Debtors, as defined by 11 U.S.C. § 101.

546.    In the one (1) year prior to the Petition Date, Appvion transferred property or an interest in property $68,750 in cash to Mr. Roberts.

547.    The Roberts Board Fee Payments were made for, or on account of, an antecedent debt or debts owed by one or more of the Debtors before the Roberts Board Fee Payments were made.

548.    The Roberts Board Fee Payments were made while the Debtors were insolvent.

549.    As a result of the Roberts Board Fee Payments, Mr. Roberts received more than he/she would have received if: (i) the Debtors' cases were under Chapter 7 of the Bankruptcy Code; (ii) the Roberts Board Fee Payments had not been made and (iii) Mr. Roberts received payments of such debts.

550.    Mr. Roberts had reasonable cause to believe that the Debtors were insolvent.

551.    In accordance with the foregoing, the Roberts Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq. Mr. Roberts should be required to return the value he received pursuant to the Roberts Board Fee Payments to the Appvion Liquidating Trust.

**WHEREFORE**, by reason of the foregoing, Plaintiff respectfully requests that this Court

enter judgment against defendants as follows:

(a) On the First Cause of Action, entry of a judgment against the Officer/Employee Defendants and the Director Defendants by this Court in an amount to be determined at trial, including punitive damages;

(b) On the Second Cause of Action, entry of a judgment against Mr. Richards, Mr. Ferree, Ms. Van Straten, Ms. Arent, Mr. Fletcher and John/Jane Does 1-20 by this Court in an amount to be determined at trial, including punitive damages;

(c) On the Third Cause of Action, entry of a judgment against Mr. Richards, Mr. Ferree, Ms. Van Straten, Ms. Arent, and Mr. Fletcher by this Court in an amount to be determined at trial, including punitive damages;

(d) On the Fourth Cause of Action, entry of a judgment against Mr. Ferree, Mr. Richards, Ms. Van Straten, Ms. Arent, And Certain John/Jane Does 1-20 by this Court in an amount to be determined at trial, including punitive damages;

(e) On the Fifth Cause of Action, entry of a judgment against Argent by this Court in an amount to be determined at trial, including punitive damages;

(f) On the Sixth Cause of Action, entry of a judgment against Stout by this Court in an amount to be determined at trial, including punitive damages;

(g) On the Seventh Cause of Action, entry of a judgment against Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn by this Court in an amount to be determined at trial, including punitive damages;

(h) On the Eighth Cause of Action, entry of a judgment against Mr. Richards, Mr. Carter, Mr. Murphy, Mr. Reardon, Ms. Seifert, and Mr. Suwyn by this Court in an amount to be determined at trial, including punitive damages;

(i) On the Ninth Cause of Action, entry of a judgment against Mr. Ferree by this Court that the Ferree 2017 Specified Distributions are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Ferree 2017 Non-Qualified Distributions, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(j) On the Tenth Cause of Action, entry of a judgment against Stout by this Court that the Stout Preference Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Stout Preference Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(k) On the Eleventh Cause of Action, entry of a judgment against Stout by this Court, (I) finding that the Stout Transfers constituted fraudulent transfers pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11, (II) avoiding the Stout Transfers pursuant to 11 U.S.C.

§§ 544(b), 548(a)(1)(B), as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11, and (III) entering judgment against Stout pursuant to 11 U.S.C. § 550.

(l) On the Twelfth Cause of Action, entry of a judgment against Argent by this Court that the Argent Preference Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Argent Preference Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(m) On the Thirteenth Cause of Action, entry of a judgment against Argent by this Court, (I) finding that the Argent Transfers constituted fraudulent transfers pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11, (II) avoiding the Argent Transfers pursuant to 11 U.S.C. §§ 544(b), 548(a)(1)(B), as well as under 6 Del. C. §§ 1301-1311, Wisconsin Statutes, Ch. 242.01-242.11, and (III) entering judgment against Argent pursuant to 11 U.S.C. § 550.

(n) On the Fourteenth Cause of Action, entry of a judgment against Ms. Siefert by this Court that the Siefert Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Siefert Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(o) On the Fifteenth Cause of Action, entry of a judgment against Mr. Suwyn by this Court that the Suwyn Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Suwyn Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(p) On the Sixteenth Cause of Action, entry of a judgment against Mr. Murphy by this Court that the Murphy Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Murphy Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(q) On the Seventh Cause of Action, entry of a judgment against Mr. Laurino by this Court that the Laurino Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Laurino Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(r) On the Eighteenth Cause of Action, entry of a judgment against Mr. Roberts by this Court that the Roberts Board Fee Payments are avoidable pursuant to 11 U.S.C. §§ 547, 544(b) and 550, 6 Del. C. § 1301 et seq., Wisconsin Statutes, Ch. 242, et seq., and that the Roberts Board Fee Payments, to the extent that it is avoided, be recovered by the Plaintiff pursuant to 11 U.S.C. § 550;

(s)  awarding Plaintiff its attorneys' fees, costs, and other expenses incurred in this action;

(t)  awarding Plaintiff pre- and post-judgment interest at the maximum rate permitted by law; and

(u)  awarding Plaintiff such other and further relief as the Court deems just and proper.

Dated: June 26, 2019

**GRANT & EISENHOFER P.A.**

By: */s/ Vivek Upadhya*
Gordon Z. Novod (admitted *pro hac* vice)
485 Lexington Avenue, 29th Floor
New York, New York 10017
Tel: 646-722-8500
Fax: 646-722-8501
gnovod@gelaw.com

Christine Mackintosh (DE Bar No. 5085)
Vivek Upadhya (DE Bar No. 6241)
R. Alexander Gartman (*pro hac vice* to be filed)
123 Justison Street
Wilmington, DE 19801
Tel: 302-622-7000
Fax: 302-622-7100
cmackintosh@gelaw.com
vupadhya@gelaw.com
agartman@gelaw.com

*Special Counsel for Alan D. Halperin and Eugene I. Davis, as Co-Trustees of the Appvion Liquidating Trust*